1  KIRK M. HALLAM        (SBN 108975)
   khallam@gormanmiller.com
2  JUN Y. KWON           (SBN 315166)
   jkwon@gormanmiller.com
3  Gorman & Miller, a Law Corporation
   201 Santa Monica Boulevard, Suite 300
4  Santa Monica, California  90401
   Tel:    (310) 656-8000
5  Fax:    (310) 564-7623

6  Attorneys for Plaintiffs
   *Gannaway Entertainment, Inc.,*
7  *Albert C. Gannaway III and Samantha Gannaway*

8             UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12 | GANNAWAY ENTERTAINMENT, | Case No. |
13 | INC., a Delaware corp., ALBERT C. | |
   | GANNAWAY III, SAMANTHA | **COMPLAINT FOR VIOLATION OF** |
14 | GANNAWAY, | |
   | | 1. **Section 10(b) of the 1934 Securities** |
15 | Plaintiffs, | **Exchange Act, 15 U.S.C. § 78j(b)** |
   | | |
16 | vs. | 2. **Section 20(a) of the 1934 Securities** |
   | | **Exchange Act, 15 U.S.C. § 78t(a)** |
17 | FRANKLY INC., STEVE CHUNG, | |
   | SKP AMERICA, LLC, JJR PRIVATE | 3. **Cal. Corp. Code § 25401** |
18 | CAPITAL LIMITED PARTNERSHIP, | |
   | RON SCHMEICHEL, | 4. **Fraud** |
19 | LOUIS SCHWARTZ, | |
   | | 5. **Constructive Fraud** |
20 | Defendants. | |
   | | 6. **Breach of Fiduciary Duty** |
21 | | |
22 | | **DEMAND FOR JURY TRIAL** |
23

24

25

26

27

28

Plaintiffs Gannaway Entertainment Inc., Albert C. Gannaway III (hereafter "Gary Gannaway") and Samantha Gannaway (collectively "Plaintiffs"), by and through their attorneys, allege the following upon personal knowledge except as to those matters alleged on information and belief. As to such matters alleged on information and belief, Plaintiffs' belief is based upon, among other things, investigation by Plaintiffs and their counsel and investigators, including but not limited to: (a) review and analysis of all regulatory filings made by Frankly Inc. ("Frankly" or the "Company"), with the United States Securities and Exchange Commission ("SEC"), the Toronto Stock Exchange Venture ("TSXV") and the Ontario Securities Exchange Commission; (b) review and analysis of press releases and media reports authored and authorized by Defendants and issued by and disseminated by Frankly; and (c) review of other publicly available information concerning Frankly and the Individual Defendants, (d) interviews or conversations with numerous confidential witnesses most of whom are either present or former employees of Frankly, and Plaintiffs' personal knowledge.

## JURISDICTION AND VENUE

1.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), as well as California Corporations Code §25401 and California Common Law.

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

### Intradistrict Assignment

3.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Frankly's principal executive offices are located within this Judicial District, its CEO, Defendant Steven Chung, is a resident of this Judicial District, and a significant portion of Defendants' actions took place in this Judicial District.

4.     In connection with the acts and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

5.     Plaintiff Gannaway Entertainment Inc., ("GEI") is a Delaware corporation owned by Plaintiffs Gary Gannaway and Samantha Gannaway.

6.     Plaintiff Gary Gannaway is a resident of the State of New York, the principal owner of GEI, , and through ownership of GEI, formerly the principal owner and CEO of Gannaway Web Holdings, LLC, dba WorldNow, a Delaware Limited Liability Company ("WorldNow").  World Now was acquired by Frankly, Inc. (defined below) on August 25, 2015, and is now a wholly-owned subsidiary of Frankly Inc.

7.     Plaintiff Samantha Gannaway is the daughter of Gary Gannaway, and a resident of the State of New York.  Ms. Gannaway is an owner of GEI, and through GEI, formerly an owner of WorldNow.  She is a former executive and Member of the Board of Directors of WorldNow, and was a post-acquisition employee of Frankly Inc. until January 1, 2017.

8.     Defendant Frankly Inc., is Canadian corporation headquartered in San Francisco, California, currently trading on the TSXV ("Frankly" or the "Company"). Frankly was formed in December of 2014 by reverse triangular merger with TicToc Planet, Inc., a Canadian corporation formed by Steve Chung and Defendant SKP America, LLC ("TicToc"), and WB III Acquisition Corp., a Canadian shell corporation formed by Defendants Ron Schmeichel and his company JJR Private Capital Limited Partnership.

9.     Frankly acquired WorldNow on August 25, 2015, and changed the name of WorldNow to "Frankly Media LLC," now Frankly's wholly-owned subsidiary.

10.     Defendant Steve Chung is a resident of San Francisco, California, and at all times relevant hereto, Chairman of the Board of Directors and the Chief Executive Officer of Frankly. Chung was the co-founder (along with SKP) of TicToc, Frankly's predecessor.

2.

11.     Defendant SKP America, LLC is a Delaware Limited Liability Company (hereafter "SKP America" or "SKP"), headquartered in Redwood City, California, the former parent and founder of TicToc, and a wholly-owned subsidiary of SK Planet Co., Ltd., a South Korean Company, itself a wholly- owned subsidiary of SK Telecom Co., Ltd., a South Korean telecommunications company.

12.     Prior to cofounding Frankly, Chung was the Executive Vice President of KIT digital, Inc. ("Kit Digital") (along with Defendant Louis Schwartz), a publicly traded (NASDAQ) internet "roll up" company, bankrupted in 2013 after an SEC investigation revealed widespread accounting and securities fraud. Criminal indictments of the CEO and CFO were handed down in 2015, and are now pending trial in the District Court for the Southern District of New York).

13.     Defendant Louis Schwartz is a resident of the State of Georgia, the current CFO and COO of Defendant Frankly, formerly Plaintiffs' financial representative and fiduciary in connection with the sale of WorldNow, formerly the Chief Strategy Officer of WorldNow, and a former Executive Vice President and General Counsel of Kit Digital from 2010 through March of 2012.

14.     Defendant Ron Schmeichel is a dual resident of Toronto, Ontario, Canada, and Miami Beach, Florida, and is the primary or exclusive owner of JJR Private Capital Limited Partnership, a Canadian Limited Liability Partnership ("JJR" or "JJR Private Capital") Schmeichel also is the founder and former CEO of WB III Acquisition Corp. ("WBIII"), a Canadian corporation which is a predecessor in interest to Frankly, and was formed by Schmeichel in June of 2013.

15.     WBIII began trading and completed its initial public offering through the TSXV in October of 2013. Schmeichel then merged WBIII in December of 2014 with Frankly Co. and TicToc, a wholly-owned subsidiary of WBIII, by "reverse triangular merger," the resulting legal entity renamed "Frankly Inc."

16.     Frankly on August 25, 2015, based on a total purchase price of $45 million for 100% of WorldNow, acquired from Plaintiffs 62% of the membership interest in

3.

WorldNow, for $8.5 million in cash, an unsecured promissory note of $11 million, and 3,021,072 shares of Frankly stock, valued at $6,182,990, based on the then-average market price of Frankly's stock ($2.0466212).

17.     Defendants Chung, Schmeichel and SKP are sometimes collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, had the authority to and did control the contents of the Company's disclosures to Plaintiffs and the investing public. Each Individual Defendant received the Company's reports and press releases alleged to be misleading prior to their issuance, and were aware of and contributed to the Company's and other Defendants' communications with reputed third party analysts, communications designed to cause such analysts to report such information as matters of fact to the investing public, including Plaintiffs.

18.     The persons controlling Frankly in every material respect were the Individual Defendants whose decisions, both those made directly and through their control of the Board of Directors, were binding on the Company. The major or significant business decisions affecting Frankly, including all management and policy decisions by Frankly, including the negotiations, terms and conditions of Frankly's acquisition of WorldNow, were made by the Individual Defendants.

## NATURE OF THE ACTION

19.     Plaintiffs allege violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; section 20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a) ("control person" liability); violation of California Securities Laws, Cal. Corp. Code § 25401).  Plaintiffs also allege common law fraud, constructive fraud and breach of fiduciary duty.

20.     As substantiated by the scores of documents and confidential witnesses alleged herein, Defendants between January 5 of 2015, when Frankly began to trade on the TSXV, and August 25, 2015, when Frankly induced Plaintiffs to sell Frankly their

controlling interest in WorldNow for cash and almost 10% of Frankly's stock, Defendants both together and individually made a series of material omissions and consequential misrepresentations regarding Frankly, its technology, its available capital and its plans for convergence of the two companies' assets, technologies and business plans.

21.     These material omissions and misrepresentations in 2015 had the effect of:

     (a)     artificially inflating the market price for Frankly's stock, and

     (b)     inducing Plaintiffs to sell WorldNow to Frankly for cash and almost 10% of Frankly stock, thereby acquiring stock in Frankly valued at market prices artificially inflated by Defendants' material omissions, stock now almost worthless as a result of Defendants' fraud and its subsequent disclosure.

22.     In April of 2015, having received an extremely negative opinion from its auditor, KPMG, expressing "significant doubt" whether Frankly was a "going concern," Defendants' secretly implemented a plan to shed Frankly of its defective, undeveloped and unsuccessful assets and business, pivoting instead to the acquired business and assets of a successful internet company, *i.e.* WorldNow, with 17 years of operations, and consistent and positive cash flows (more than $26 million in net revenue and $6.5 million in EBITDA in 2014).

23.     To induce Plaintiffs to accept Frankly's offer of part cash and part Frankly stock for the assets and revenue of WorldNow (and to forego other more valuable offers for WorldNow) Defendants made a series of representations to Plaintiffs and to the investing public regarding the status of Frankly's business, assets and technology, representations rendered substantially misleading by Defendants' material omissions as alleged herein.

24.     Among the many material omissions and misrepresentations which were made by Defendants in the months leading up to the acquisition of WorldNow were:

     (a)     the nonexistence of a "guaranteed" $10 million Credit Facility for Frankly's post-acquisition development and marketing of the combined assets, platforms and technologies of the two companies,

    (b)    the nonexistence of 35 million new users for Frankly's chat (its "user base"),

    (c)    the nonexistence of Frankly's contractual right and technological ability to sell the advertising inventory of its purported "brand partners," including and especially Victoria's Secret,

    (d)    KPMG's negative opinion, and the specific bases for its opinion, that Frankly might not survive as a "going concern,"

    (e)    the nonexistence and nonfunctionality of Frankly's core technology, its Software Development Kit ("SDK") and data analytics capabilities, technology which was essential to achieve the promised synergies between the assets and platforms of the two companies, and

    (f)    Frankly's undisclosed inability and unwillingness to converge the technology and digital platforms of Frankly and WorldNow, to create the post-acquisition synergies and exponential growth in Frankly's revenue and stock price (projected as more than 10 times its pre-acquisition value), that were the gist of Defendants' successful sales pitch to Plaintiffs.

25.    The juxtaposition of Frankly's contemporaneous press releases and public statements in the weeks and months prior to and after the acquisition of WorldNow provide a clear outline of Defendants' scheme.

26.    In a Frankly press release of July 29, 2015, quoting both CEO Steve Chung and soon-to-be Frankly COO Louis Schwartz (then WorldNow's Chief Strategic Officer and Plaintiffs' fiduciary), Defendants announced the execution of the purchase agreement ("Purchase Agreement") for Frankly's acquisition of WorldNow, describing it as follows:

**"Frankly's acquisition of Worldnow enables us to combine two of the most powerful and proven engagement categories in mobile today," said Steve Chung, Founder and CEO of Frankly. "We will become a leading provider** *of mobile messaging and news content on one integrated platform, creating unique long-term growth and cross-selling opportunities.*

6.
COMPLAINT

**"We are excited to begin the integration of our combined technologies," said Lou Schwartz, Chief Strategy Officer at Worldnow. "The Frankly and Worldnow joint offering will enable us to better serve our combined customers in media, sports, entertainment, retail, local news and mobile app development.**

***With a combined chat and content platform, our customers have an industry leading engagement and monetization solution that enables them to interact directly with their consumers in real-time,* allowing the content and brand owners to become more relevant and increase mindshare on their own digital properties."**

27.    In a press release on August 25, 2015, announcing the formal closing of Frankly's acquisition of WorldNow, Chung described the business of these now combined corporate entities as follows:

**With the integration of WorldNow's platform for *local news content and Frankly's chat platform*, we have effectively combined two of the most powerful social engagement categories in mobile today, and now reach over 100 million monthly active users across 450 properties.**

28.    Contrary to these representations by Defendants, representations made directly to Plaintiffs and to the investing public in the days and weeks leading up to Frankly's acquisition of WorldNow, upon the closing (August 25, 2015), Frankly jettisoned its entire chat and SDK businesses, those mobile and chat platforms, technologies and capabilities which Defendants successfully hyped for purposes of:  (a) artificially inflating Frankly's stock price, and (b) inducing Plaintiffs to accept Frankly's offer to acquire some 10% of Frankly's stock.  With the complete abandonment of Frankly's pre-acquisition assets and products, Defendants dropped any pretense of the promised asset convergence and synergies.

29.    By the end of June 2016, Frankly formally had changed the description of Frankly's business to include only the business and media platform of WorldNow, as set forth in Frankly's 6/30/2016 Financial Statement. And as Defendants admitted in their S-1 Registration Statement filed with the SEC in 2016, with the acquisition of WorldNow in August of 2015, Frankly immediately abandoned its entire Chat and SDK businesses, segueing exclusively and precipitously to WorldNow's business, technology and platform:

7.

**We have had two distinct phases of product evolution in our history. In our first phase from February 2013 *until August 2015, we were developers of mobile applications and a next generation server platform*.**

**During this phase, we launched, developed and marketed a consumer focused *Frankly Chat* mobile application, as well as launched a whitelabeled, business to business mobile communication platform via a software development kit ("SDK") that was used by retailers such as Victoria's Secret, professional sport teams such as the Sacramento Kings, nonprofits such as the United Nations Foundation and publishers such as the Bleacher Report.**

***The mobile app and SDK business are no longer a material part of our business…***

30.     Employing their own unique brand of "pump and dump" meets "bait and switch," Defendants had induced Plaintiffs to sell Frankly the assets and revenue of their profitable, well-established internet company, a company in which Plaintiffs invested more than $32 million, a company with 17 years of operating experience, substantial revenues and consistent profits, in return for $8.5 million in cash, an unsecured promissory note for $11 million, and just under 10% of Frankly's artificially inflated stock, stock now rendered almost worthless by the public's subsequent realization of Defendants' fraud.

31.     The net economic result of Defendants' fraudulent scheme is that Defendants induced Plaintiffs to forego other offers to purchase WorldNow, instead accepting a deal in which Plaintiffs provided most of the debt for the acquisition of their own company, and acquired substantial quantities of Frankly's now almost worthless stock, stock manipulation induced by Chung, Schmeichel and Schwartz (then Plaintiff's fiduciary, now Frankly's CFO and COO), each for his own financial gain.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     General Subjects of Defendants' Material Omissions

32.     Defendants' intentional refusals and failures to disclose material facts known to them at and before the sale of Frankly securities to Plaintiffs on August 25, 2015, made

8.
COMPLAINT

many of Defendants' related statements to the public and to Plaintiffs materially misleading.  These statements, as alleged herein, were made directly to Plaintiffs as well as to the investing public in the form of press releases, audited and unaudited financial statements and other Canadian government filings, earnings calls, S-1 Registration applications filed with the Securities and Exchange Commission, interviews and online statements, and oral statements made to Plaintiffs and to Plaintiffs' Confidential Witnesses.

33.    Such omissions from Defendants' public and private statements included Defendants' failure to disclose:

(a)    their inability to obtain a $10 million credit facility (guaranteed by JJR and Schmeichel) required for successful convergence and marketing of the two companies' digital platforms, an express condition precedent to the Purchase Agreement for Frankly's purchase of WorldNow and Plaintiffs' acquisition of their stock in Frankly (the "Purchase Agreement"),

(b)    their unwillingness and failure to invest $5 million of existing Frankly capital into WorldNow's post acquisition business, as expressly required by the Purchase Agreement,

(c)    their failure to develop a functional, scalable Software Development Kit ("SDK"),

(d)    the paid endorsement nature of Frankly's "partnership" with Victoria's Secret, and the expiration of and nonmonetizability of that relationship.

(e)    the Company's legal and technological inability to gather, analyze and monetize consumer data ("data analytics"),

(f)    Frankly's inability to monetize either its SDK or Frankly Chat,

(g)    Frankly's failure and inability to increase its user base, including the nonexistence of 35 million new or potential users of Frankly Chat, 35

COMPLAINT

million users purportedly acquired by Frankly as part of the assets of photo-blogging platform "Muzy."

34.     Defendants intentionally withheld from Plaintiffs and the investing public material information that Defendants knew would make the related statements they made materially misleading, specifically, *inter alia*, the following.

35.     Frankly's SDK technology was nonfunctional, *i.e.* it was not scalable and did not enable Frankly Chat to be integrated into the web and mobile platform of any other company, including WorldNow's media platform as expressly promised.

36.     Frankly Chat, and a valuable part of that chat technology, had been substantially impaired as a result of class action litigation in the Northern District of California, litigation challenging Frankly's user expansion technology as a violation of federal law, *i.e.* Frankly's use of unsolicited short text messages to invite the contacts of Frankly Chat members to join the Frankly chat network, "spams" Frankly allegedly had been illegally sending to contacts of its existing members virally to expand its user base.

37.     Frankly's SDK and chat technology lacked the professed ability to access, analyze and exploit consumer data ("data analytics") acquired from the users of Frankly's chat applications, and the Company did not have the ability to monetize that user data through sale of that data or by increase in the price Frankly could charge for its brands' internet advertising inventory ("Cost Per Million" or "CPM").

38.     Frankly did not have either the contractual or the technological ability to sell the internet advertising inventory of Victoria's Secret's web and mobile platforms, or the advertising inventory of any of Frankly's other brand "partners."

39.     Frankly had ***not*** significantly expanded and was ***not*** expanding ***its actual user base***, much less at the exponential rates they claimed in Defendants' public statements. Frankly failed to disclose that its Frankly Chat, SDK and brand partnerships were not contributing to the expansion of its user base as claimed, and it failed to disclose that Frankly's acquisition of the assets of Muzy did not give Frankly access to 35 million new users, or to monetize those purported 35 million new users. Muzy did not have 35

10.

million users or anywhere near that amount, and Frankly would not be able to add any of those 35 million new users to its user base.

### B.      Defendants' Specific Omissions and Misrepresentations

#### *Frankly's SDK Was Nonexistent "Vaporware"*

40.      In October of 2014, Defendants issued a press release, announcing Frankly's "partnership" with Victoria's Secret to integrate Frankly's chat function into Victoria's Secret's "PINK NATION" mobile app, via Frankly's purported "software development kit" or "SDK, " stating in part:

> Frankly, Inc. is a next generation chat technology platform that brings dynamic conversation and direct consumer engagement to mobile app experiences. Frankly aims to unlock the power of messaging for every platform by *seamlessly enabling access* to conversations that matter most to individuals and communities. ***Through the simple integration of our Chat SDK,*** Frankly's technology can be inserted into a website or mobile application to provide a customizable version of Frankly's messaging technology. Currently, Frankly is working with many partners, across several industries. Frankly, Inc. also offers Frankly Chat, a free, mobile messaging application for iOS and Android devices. Frankly Chat has over 2 million downloads, and is focused on user privacy by offering ephemeral messages and unsend capabilities.

41.      On January 5, 2015, after the "reverse triangular merger," Frankly and the Individual Defendants collectively issued another press release, including quotes from both Schmeichel as a Board Member, and Chung as a Board Member and CEO, announcing the public offering of Frankly's shares on the Toronto Stock Exchange Venture. With this press release, Defendants began their scheme intentionally to mislead investors and artificially inflate Frankly's stock price, ultimately to induce Plaintiffs to purchase almost 10% of that stock at those artificially inflated prices, through a series of material omissions and misrepresentations in their public statements, regulatory filings, press releases, published interviews, as well oral and written statements, many of them made directly to Plaintiffs.

42.     This January 5, 2015, press release reads in pertinent part:

**Frankly Inc. to Commence Trading on the TSX Venture Exchange** SAN FRANCISCO, CA--(Marketwired - Jan 5, 2015) - Frankly Inc. (TSX VENTURE: TLK) is pleased to announce that its common shares have commenced trading on the TSX Venture Exchange (the "TSX-V") today, January 5, 2015, under the trading ticker symbol "TLK". As part of the listing, Frankly has raised $23 million (U.S.) in subscription receipts to Canadian and U.S. investors, and is one of the first Silicon Valley-based companies to go public on the TSX-V. The Toronto Stock Exchange / Toronto Venture Stock Exchange is the third largest stock exchange group in the world by equity capital raised in 2012 - 2013 according to the World Federation of Exchange. ***Frankly's core business is to offer a technology solution that enables any developer to integrate mobile chat capabilities inside of their app. and mobile app developers can utilize Frankly's software development kit (SDK) to insert a chat function seamlessly into their existing apps to increase user engagement and monetization in a truly mobile-first method.***

43.     Frankly's January 5, 2015 press release goes on to state:

In November 2014, Frankly announced a partnership with Victoria's Secret to power chat within its PINK Nation mobile app. In addition to the SDK business, Frankly owns and operates its own messaging application Frankly Chat, which was launched on September 24, 2013. Frankly Chat is a free, ephemeral mobile messaging app for iOS and Android devices that caters to the increasing demand of the world's smartphone users for ways to better communicate without digital consequences.

///

Frankly's global investor base includes SK Planet, a subsidiary of SK Telecom, South Korea's #1 biggest telecom company. SK Planet was a founding shareholder and is a significant investor. The Stanford-StartX Fund, which is affiliated with Stanford University, is also an investor along with JJR Private Capital, one of - 2 - Canada's top private equity investors. With total funding of nearly $45 million to date, Frankly was also recently recognized with the 2014 Early Stage Investment Award from Frost & Sullivan. Frankly plans to invest its newly raised funds to expand its team, continue its product development and expand its business development efforts as the company continues to build out its chat SDK business and build partnerships in 2015.

**Frankly, Inc.**
Frankly, Inc. is a next generation chat technology platform that brings dynamic conversation and direct consumer engagement to mobile app experiences. Frankly aims to unlock the power of messaging for every platform by seamlessly enabling access to conversations that matter most to individuals and communities. Through the simple integration of our Chat SDK, Frankly's technology can be inserted into a website or mobile application to provide a customizable version of Frankly's messaging technology. Currently, Frankly is working with many partners, across several industries. Frankly, Inc. also offers Frankly Chat, a free, mobile messaging application for iOS and Android

12.

COMPLAINT

devices. Frankly Chat has over 2 million downloads, and is focused on user privacy by offering ephemeral messages and unsend capabilities.

44.     This January 5, 2015, press release by Frankly and the Individual Defendants contains statements which by virtue of Defendants' intentional omission of material facts were rendered materially misleading.  As alleged with reference to evidentiary facts set forth hereinbelow, the SDK technology that Defendants described in this press release as its "core business," allowing brand users "seamlessly" to access customer chat, and to "easily" integrate Frankly's chat function into their own website or mobile app, simply did not exist when this statement was made, and in fact *never* existed.  Frankly's SDK was mere "vaporware," as substantiated by Plaintiffs' Confidential Witnesses.

45.     This press release was both false and misleading due to Defendants' purposeful omission of the critical fact that Frankly's "software development kit" (SDK) simply did not exist.  Frankly had not developed the purported technology or ability to insert its chat function into existing platforms.

46.      The program to integrate Frankly's chat function into another company's web or mobile platform had to be developed separately for each new brand, requiring enormous expenditures of time and resources, a process far from "seamless," "instantaneous," "quick" or "simple," as Defendants falsely asserted. The Frankly chat platform simply was not scalable, as Defendants repeatedly and falsely asserted through their public statements.

47.     When the aforementioned statements were made, Defendants knew full well that Frankly could not offer to potential brand partners and their mobile app developers the proclaimed ability seamlessly, quickly or easily to integrate mobile chat capabilities into their app.

48.     According to Plaintiff's Confidential Witnesses, mostly former or current Frankly employees, Frankly's SDK technology never existed (it was "vaporware"), and Defendants' representations to Plaintiffs as to their ability and intent to integrate Frankly Chat into WorldNow's media platform simply were false.

49.     Further proof of Defendants' knowingly false statements is established by the fact that immediately upon Frankly's acquisition of WorldNow, Defendants jettisoned both Frankly's Chat and its SDK business and technology, immediately discontinuing the development of that technology and any marketing of these products.

### *Defendants Deceived the Public and Plaintiffs with Fake Research Reports*

50.     On February 17, 2015, Frankly's paid "Manager of Investor Relations," Etienne Moshevich, posing as third-party market research analyst for Canadian Company Transcend Capital, wrote the first of six online articles or blogs regarding Frankly and its stock, touting the new stock as a "must buy" and its promoter, Ron Schmeichel, as a big winner with a touch of gold.

51.     What Moshevich intentionally neglected to mention, and at the behest of the Defendants deliberately failed to disclose in his many "research reports" on Frankly, was that he was really Frankly's Manager of Investor Relations, a Frankly insider being compensated for promoting the Company and its stock.

52.     Frankly never disclosed in any of its filings or press releases, or in Moshevich's published "research reports," that Moshevich was paid by Frankly to promote its stock to existing and new investors.  The only vague and oblique reference to this relationship, with no mention of Moshevich, came in Frankly's Annual Information Form for 2014, filed by Frankly in Canada on June 18, 2015:

> On February 24, 2015, the Corporation entered into a consulting agreement with Transcend Capital ("Transcend") to provide investor relation services for an initial term of one year. The Agreement was terminated effective June 15, 2015. Transcend received a monthly fee of C$10,000 throughout the term of the agreement. In addition, Transcend was granted 10,000 option of the Corporation, each with an exercise price of C$2.69.

53.     Moshevich's February 17, 2015 article read in pertinent part:

His Last Deal Went To $60/share. What Will Frankly Chat Go To?
Dear Readers,

This next deal truly could be one of the *most exciting junior stories* to hit the Venture Exchange in a very long time. The company is backed by some ***very influential and deep pocketed investors like SK Telecom, the Stanford Endowment Fund and JJR Private Capital***. Before we go any further, let me give you a little background on the financiers and their last deal. If you had followed Ron Schmeichel and his team at JJR Private Capital over the last two years, despite the wins we've had here, we would have all been a hell of a lot richer. ***The last deal these guys invested in, supported and put their name all over was two years ago with a company called*** *Concordia Healthcare Corp. (TSX:**CXR**). **I think it is less important for me to go through the details of the company because I'm pretty sure its stock chart will speak for itself***:



***Ron Schmeichel not only invested in CXR but was instrumental in taking the company from a $66 million market cap to over $1.5 billion where it sits today**. Now that the stock is trading over $53/share, Mr. Schmeichel and his team have finally come to the market with their new deal. What's even more exciting is it's in one of the only sectors that continues to create billionaires overnight…the chat space.*

////

With the likes of Whatsapp, Facebook, Snapchat and Instagram commanding massive valuations, it's no surprise that everyone is looking for the next big social media app. Silicon Valley and their VC firms have made a name for themselves based on some of these wins and I am hoping this next deal I am about to show you can do just that for the regular investor**.** The mobile messaging technology and app company I want to introduce you to is striving to be the ***world's largest chat network*** on any topic, anywhere. It has been featured by Google Play and Apple App Store as one of the best messaging apps. **Frankly Inc. (TSX.V:TLK)** takes the non-permanent photo messaging services of Snapchat and combines it with the app messaging system of Whatsapp and creates a more complex and fun app ***that can be embedded in any existing app***.

15.

Frankly is unique because it is the only major mobile messaging company that allows its technology to be white-labeled by other apps and be inserted into any existing app. ***The most important thing about any app is growing its users and there are two ways of doing that***: One, you can either advertise your app as being the best and hope people download it or, two, you can embed your chat app into other existing apps who already have millions of users already built in. Frankly is choosing to do both. Not only are they advertising and building their own unique user base***, but the company is growing through brand partnerships***. Why does it appeal to the brands so much? Because instead of spending time, energy and money with a dozen engineers to develop their own chat app, Frankly is able to white-label its proprietary code to ***instantly allow users of any app*** to communicate with each other. The biggest collaboration so far has been with Victoria Secret's PINK Nation app. The PINK Nation app has developed an extensive, loyal community of over 4 million users. Through Frankly, these 4 million users can now interact with each other.

54.     Moshevich's February 17, 2015 "market report" goes on to assert:

Frankly's own standalone (Frankly Chat) leverages the same messaging technology for its own consumer facing messaging app….

***The combination of the messaging app plus its white-labeled solution will propel the company to boast over 100 million users by the end of 2016.*** This year Frankly is focusing on building its user base. Starting in 2016, Frankly will be well positioned to monetize its platform in three different categories: premium advertising and sponsorship, digital and virtual goods, and platform distribution business. Japan's LINE app made $500 million last year, and Korea's KakaoTalk brought in $300 million. One of their biggest drivers has been in the virtual goods category by allowing users to buy emotions during their chats. One of the next verticals that Frankly is looking at is the sports industry. With so many involved fans, it makes sense to offer a service for them to communicate with each other, especially during big events like the Superbowl, for example. Using the three categories Frankly can bring in revenue for itself but also offer its partner an ability to increase their revenue substantially. For example, offering content-related adds during a sports game (premium ads), selling little emoji football players to enhance the conversations (virtual goods), and after the game is over links to the new Madden video game (content distribution). Basically***, Frankly takes all of the ways that mobile messengers make money today and packages them together and brings it to its partners.***

***So how much can this be worth?*** Whatsapp and other chat apps are being valued around $44/user. Frankly now has 2.1 users and ***once you add Victoria's Secret's Pink Nation partnership and a slew of others coming down the pipe, they should hit the 50 million user mark by the end of this year.***

***How much money can Frankly make?*** Again, based on comparables, each user generates around $1.50 in revenue. ***Even if Frankly has to give up 2/3 of their revenue to their partners, that still leaves them around $0.50/user. Multiply that by 50 million users by the end of 2015 or 160 million users by the end of 2016, and you can see how TLK.V can have a very similar journey to its predecessor: Concordia Healthcare (TSX:<u>CXR</u>).***

With a valuable and experienced team led by industry veteran CEO Steve Chung, Frankly is the only North American public company focused on the mobile messaging space. Having just raised over $26 million at $3.05/share, **TLK.V** is perfectly positioned to generate its shareholders substantial returns over the next 12-18 months. For investors that want a foothold in the technology sector, this is the opportunity to do so. The company is just getting started and has big plans for the future. You need to keep **Frankly Inc. (TSXV:TLK)** on watch now! This stock cannot go unnoticed.

Best, Etienne

55.     On February 23, 2015, Moshevich wrote this report on Frankly, again without disclosing that he was a paid Frankly insider:

### Update on Frankly Chat (TSXV:TLK)

President at Transcend Capital Inc. and Editor at Alphastox.com
***Etienne Moshevich** is the Editor of Alphastox.com:* www.alphastox.com
**Frankly Chat (TSX.V: TLK)** has been on a roll. Not only did they just start trading on the TSX Venture Exchange at the beginning of this year, they already have three major partnerships under their belt including Victoria Secret's PINK Nation, Trace, and the Sacramento Kings. The popularity of this messaging app is soaring and they are not slowing down.
//////
***The SDK technology allows the app to be integrated into existing apps and provides users with the ability to chat with other users***.
/////
Here is a short note Frankly's CEO Steve Chung sent to his shareholders yesterday after the news:

*"Overall, I continue to be extremely excited about the fundamentals of our business and for the future ahead. We feel we're in a great position to take advantage of the many opportunities we see in the chat space and this is user base through brand partnerships and ultimately creating shareholder value."*

For Frankly, they are continuing to grow their vertical partners; Victoria Secret is fashion, Trace is technology, the Kings is sports, and Full Picture is the marketing and branding industry. As the company continues to venture into different sectors, the opportunities for partnerships will grow exponentially. ///

Best,
Etienne

56.     On February 26, 2015, Moshevich published his third report on Frankly, again without disclosing his status as Frankly's Manager of Investor Relations, noting that the stock price of Frankly had dropped since his last report, but assuring his readers that the price would be back up very soon (most likely as a result of his own misleading reports):

17.

Big Opportunity Here with Frankly Chat (TSXV:TLK) …Don't miss out.

**FollowEtienne Moshevich**
President at Transcend Capital Inc. and Editor at Alphastox.com
Dear Alphastox Subscribers,

Frankly Chat (TSXV:TLK) is not only one of the most exciting companies to ever go public on the TSX Venture Exchange but its technology seems to be so disruptive, ***that it has been able to grow its user base at a staggering pace***. I understand Frankly (TSXV:TLK) hasn't been trading all that well over the last week or so, sitting around $2.60/share, ***but I think its only a matter of time until we see this stock pop back up to issue price of $3.05/share***. The company is backed by some of the most sophisticated investors in the world, with SK Telecom and (the Rogers of Korea), holding around 40% of the company) the Stanford Endowment Fund owning around 45% of the company collectively, and I can tell you for sure, these guys aren't in this thing for a quick flip-they are long term holders who see the true value of Frankly. Not only do we have these two giants controlling close to half the float, but you have a Chairman leading the way that knows how to create shareholder value. ***Ron Schmeichel and JJR Private Capital are one of savviest investors in the country and there is a reason they wrote a check for over $5 million dollars into Frankly.*** Mr. Schmeichel is coming off a massive win with Concordia Health (TSX:CXR) and there is no doubt in my mind that Frankly can possibly one day become another success story like its predecessor. For sake of argument, take a look at CXR's chart below and tell me you don't have confidence in someone that can do this:



Steve Chung is an unbelievable CEO that can make this deal work. With over $30 million in the treasury and a team that's second to none in the industry, there is no doubt in my mind that Frankly can become another huge success story. ***Like I've said before, this deal is going to move based on its user growth and its partnerships and I can tell you first hand, the company has several quality leads in the pipeline*** they are looking to close in short order. $2.60/share is an opportunity to get in at a substantial discount to where all the institutions got in at just over a month ago. Make sure you keep **TLK.V** on watch right now.
I think we have a huge opportunity here with both Frankly (TSXV:TLK) and Convalo (TSXV:CXV) so make sure you don't miss out. ///

As always, if you have any questions, please do not hesitate to get in touch with me anytime. I look forward to hearing from you.

Best,
Etienne
Disclosure: Transcend Capital Inc. is a shareholder of …Frankly

18.

57.     As a Frankly insider, Moshevich (and Defendants) had full knowledge of the accurate and complete facts regarding Frankly and its technology, its financial status and its user base, facts which were and are in direct conflict with the statements, opinions and projections he previously made (at Defendants' behest) in his article of February of 2015, as well as in additional "research reports" he published on Frankly, as alleged hereinbelow.

58.     With respect to Moshevich's statements and projections as contained in his February 27, 2015 blog quoted above, Moshevich and Defendants knew full well that his statements were untrue and misleading, including but not limited to those statements that:

        (a)    Frankly was growing its user base through its brand partnerships,

        (b)    Frankly had the SDK technology to allow other brand partners and their developers "instantly" to integrate Frankly's chat app into their own apps, and

        (c)    Frankly was rapidly growing its user base through its SDK partnerships, and would reach the projected user base of 100 million users by the end of 2016.

59.     At the behest of Chung, Schmeichel, SKP and Frankly, Moshevich purposely and deliberately excluded from his February 27, 2015 market report each of these material facts which were necessary to make Moshevich's other statements and projections not misleading, and did so with the full knowledge and support of Defendants, for the purpose of misleading the market, *i.e.* Frankly's investors and potential investors.

60.     Only in Frankly's "Investor Presentations" (decks which were distributed only to a select, private group of existing investors), did Moshevich ever disclose his real identity, as Frankly's Manager of Investor Relations, a Frankly insider whose job was to promote Frankly and its stock, identifying himself as:

> ***Etienne Moshevich***
> ***Manager, Investor Relations, Frankly Chat***
> ***et@franklyinc.com***
> ***www.franklyinc.com***

61.     On March 11, 2015, Etienne Moshevich, again posing as a third-party research analyst, published another report on Frankly, and again failed to disclose he was Frankly's own "Manager of Investor Relations," as accurately depicted below.

**Big Success in 2015**

•

Frankly Chat (TSXV:TLK) Positioned for Big Success in 2015

Etienne Moshevich
FollowEtienne Moshevich
President at Transcend Capital Inc. and Editor at Alphastox.com

Dear Alphastox Subscribers,
        I want to reiterate my conviction on **Frankly Chat (TSXV:TLK)**. Not only is the company in one of the hottest sectors in the market today- the chat space, but in my mind, it has only scratched the surface of what's to come. The company is sponsored by some of the biggest names in the industry that have invested over USD $22M collectively**. *Backed by three major partners***; a multibillion conglomerate in Korea, SK Telecom, Stanford University's StarX Fund and ***Ron Schmeichel's JJR Private Capital***, Frankly is well on its way to create tremendous value for their shareholders. *You might have heard of Mr. Schmeichel and his team at JJR through their most recent sponsorships like Atlas Financial (which is trading under the symbol "AFH" on the Nasdaq), Element Financial (TSX:EFN) and Concordia Healthcare (TSX:CXR) which hit a new high yesterday of $82.26/share.* These last three deals have generated investors massive returns over the last three years and I definitely don't see them slowing down with Frankly. JJR started Atlas at $2/share which is now trading at $17.25 giving shareholders over a **760%** return, Element Financial at $4/share which is now trading at $16.14/share giving shareholders a **300%** return *and Concordia at $6/share which closed yesterday at $80.34/share giving shareholders a 1200% return. This is a dream team for any company to have supporting them in the background and we're getting it in a $58 million market cap company…the best part is, this is just the start of why you should get excited.*

As I've mentioned before, Frankly is unique because it is the only major mobile messaging company that allows its technology to be white-labeled by other apps and be inserted into any existing app. Not only are they advertising and building their own unique user base, but the company is growing through brand partnerships. Why does it appeal to the brands so much? *Because instead of spending time, energy and money with a dozen engineers to develop their own chat app, Frankly is able to white-label its proprietary code to instantly allow users of any app to communicate with each other*. /////

*The combination of the messaging app plus its white-labeled solution will propel the company to boast over 100 million users by the end of 2016*. This year Frankly is focusing *on building its user base*. Starting in 2016, Frankly will be well positioned to monetize its platform in three different categories: premium advertising and sponsorship, digital and virtual goods, and platform distribution business. I believe the company can easily surpass the 50 million user mark by the end of the year which should give the company a much higher valuation than where they currently sit today. *With $27 million sitting in the*

20.

COMPLAINT

*treasury and a current market cap of $56 million, the company has around $1.93/share in cash, with over USD $22M and CDN $26M invested into the company to date, so really at the end of the day, Frankly's enterprise value is being given a value of just $29M which is absolutely absurd*…especially in a market where Instagram, Snapchat and Whatsapp users are being valued at around $44/user. With that being said, if we use comparable metrics to value Frankly's stock, using only Frankly's 2.1M unique user base (without any partnerships), it should put the company at a much higher valuation than where we're at today. Now do you understand why I am so bullish on this stock? *I am not sure if everyone has had a chance to see this yet or not, but two very prominent boutique investment dealers in Canada, Beacon Securities and Cormark Securities have initiated coverage on the stock with price targets well north of where we're trading at today. Beacon has a $5.50/share price target while Cormark has a $6/share target on the stock.* Based on its team of financiers and engineers, Frankly could easily become the next darling child of the TSX Venture. Having just raised $26 million (at a 20% premium to today's share price-$3.05/share) led by a CEO that's second to none in the industry and 150 M potential subscribers evaluating the Frankly messaging app, *do I think the stock is undervalued at $2.55/share? Absolutely. If you haven't considered Frankly (TSXV:TLK) as a potential fit in your portfolio, take another look at it right now…in my mind, it is definitely worth your time.*

As always, if you have any questions please do not hesitate to get in contact with me anytime. I look forward to hearing from you.

Best,
Etienne
*Disclosure: Transcend Capital Inc. is a shareholder of Frankly*

62.     Although an insignificant portion of what Moshevich said about Frankly in his March 11, 2015 "research report" was couched as "opinion" or "forward looking statements," several intentional and material omissions of fact nonetheless made those opinions and forward-looking statements entirely misleading and fraudulent.

63.     Those material omissions include his and Defendants' failure to disclose:

(a)     that Moshevich was a Frankly insider, paid to market and promote the Company and its stock to potential investors such as Plaintiffs, not an objective "research analyst,"

(b)     Cormark Securities and Beacon Securities both were underwriters for Frankly, not objective research analysts as Moshevich made them out to be,

(c)   Frankly's SDK technology did not exist, *i.e.* allowing other brands "instantly" or otherwise to integrate Frankly's chat app into their platforms; it had to be built from scratch for each new brand, necessitating substantial "expenditure of time, energy and money," and

(d)   Frankly's auditors (KMPG) in March of 2015 had warned management it had serious doubts whether Frankly even was a "going concern," *i.e.* whether it would survive beyond the short term or be able to raise additional capital to stave of imminent financial insolvency.

64.   On March 12, 2015, Defendants issued another press release repeating the same false and misleading statements with respect to Frankly's SDK technology, the professed "core" of its business:

> Frankly is a next-generation chat-as-a-service platform that lets consumer brands build fan communities, engage their users directly, and join the conversation—right in their mobile app experiences. With Frankly's Chat SDK, brands ***can quickly plug in*** powerful, customizable technology to unlock the power of mobile messaging on their own platforms and access conversations that matter to their business and their users.

65.   On April 1, 2015, Moshevich published yet another Frankly report, again posing as research analyst for Transcend Media, announcing and describing a new business alliance between Frankly and Inmoji.  And again, while Moshevich did disclose that Transcend Media was a shareholder of Frankly, neither he nor any of the Defendants ever disclosed to the public that Moshevich was the Manager of Investment Relations for Frankly, being paid to promote its stock.

66.   His April 1, 2015 blog stated in pertinent part:

> Today, Inmoji Inc. ("Inmoji"), a mobile marketing company that connects top brands to consumers through peertopeer, inmessage, powered emoticons, and Frankly Inc. (TSX VENTURE: TLK) ("Frankly"), a leading provider of mobile messaging technology, announced a partnership to bring clickable, custombranded icons known as Inmoji to any web or mobile app that uses

22.

Frankly's messaging functionality. The partnership creates scalable expansion opportunities for Inmoji, increasing the company's reach beyond a small number of traditional messaging providers to a wide audience of any brand and app that integrates the Frankly Chat SDK. Brands that introduce Franklypowered chat functionality into their apps will now have the option of allowing their users to send inline Inmoji, which can be customized to look like the company's logo or a branded object.

67.   Moshevich's April 1, 2015 article also attached a Frankly press release, announcing Frankly's new "partnership" with Inmoji, which read:

"Partnering with Inmoji is a great step toward Frankly's goal to monetize our platform and make chat relevant and useful to brands and their consumers," says Steve Chung, Frankly's CEO.  "At Frankly, we're passionate about increasing user engagement on a company's branded mobile and web properties, and advertising should augment this engagement, not compromise it.

68.   Significantly, Frankly's April 1 press release, published along with Moshevich's "market research," also describes Frankly's SDK as follows:

With Frankly's Chat SDK, brands can **quickly plug in** powerful, customizable technology to unlock the power of mobile messaging on their own platforms and access conversations that matter to their business and their users.

69.   Nowhere in this "blog" from Moshevich or the press release from Frankly, both dated April 1, 2015, did Defendants disclose that Frankly did not have (and never developed) the requisite technology to "quickly" or "seamlessly" or "easily" plug its chat function into the platform of a new brand partner, *i.e.* there simply was no SDK and Frankly's technology was not scalable.

70.   As Defendants knew full well when they made these statements in April of 2015, and as is affirmed by Plaintiff's Confidential Witnesses alleged hereinbelow, Frankly's claimed "core business" of integrating its chat platform into the platforms of other brand partners, using its SDK technology, was based entirely on "vaporware," *i.e.* its SDK did not work to "simply or "quickly" or "seamlessly" or otherwise, plug Frankly's chat function into, or integrate it into, any other platform.

71.     Also in April of 2015, as a part of Defendants' campaign to induce Plaintiffs to sell Frankly the assets of WorldNow in return for $8.5 million cash, an unsecured promissory note from Frankly for $11 million, and overpriced stock in Frankly, Defendants prepared and provided to Plaintiffs an "Investor Presentation" (a "deck" with digital images, slides and charts).

72.     As pictured below, this Frankly deck unequivocally indicates that Frankly in April of 2015 had a fully functional SDK, ready easily and quickly to be integrated into the platform, depicting an open box, representing the Frankly SDK, with the phrase "Just add the Frankly Chat SDK":



73.     This Frankly presentation for Plaintiffs and WorldNow also states:

> FRANKLY AND WORLDNOW
> A POWERFUL COMBINATION
> 2016
> 100 Million Users
> 100M Messages per Day
> 100 Mobile App Integrations
> $0.50 per user / year

74.     Nowhere in this Presentation, or in any of Frankly's numerous press releases or regulatory filings, did Defendants ever disclose that Frankly had **not** developed, and in fact did not own or have access to, the SDK technology necessary to "easily," "quickly," "instantly" or "seamlessly" plug the Frankly Chat into the platform of any other brand, most importantly WorldNow's brand, an omission rendering Frankly's numerous statements regarding its SDK highly misleading and deceptive, as fully alleged hereinbelow.

75.     As confirmed by Plaintiffs' Confidential Witnesses, the Company never developed a functioning SDK, one that would seamlessly, easily, quickly (or otherwise) integrate into any brand's platform to create the "plug and play" chat functionality Defendants repeatedly boasted of having---the asserted "core" of Frankly's business.

76.     Frankly's April 2015 presentation to Plaintiffs also included the following:

**BACKED BY WORLD-CLASS INVESTORS**
SK, STANFORD, JJR PRIVATE CAPITAL W/ $25M IN CASH
////////
***WE'RE CHAT AS A SERVICE.***
*Give your users what they want,* ***Just add the Frankly Chat SDK***

77.     This presentation to Plaintiffs also explicitly promised convergence and synergies between Plaintiffs' media platform and Frankly's chat and SDK, summarizing this promise with this phrase, again with bold, oversized type:

**"HOW WE CAN BE BETTER TOGETHER"**

78.     The charts which followed this statement, explaining how Frankly would make WorldNow better, included graphic depictions of the fact that WorldNow had over 115 million unique users, while Frankly purportedly would have 100 million of its own users by 2016, generating $.50 per user per year, for a combined 215 million users x $.5 or $107,500,000 in annual revenue.

79.     These projections reaffirmed the misleading projections and representations made by Moshevich on Frankly's behalf just a few weeks earlier, ***projections explicitly based on Defendants' false or misleading statements of fact as to the growth of Frankly's user base and its ownership of SDK and data analytics technologies***.

80.     This April 2015 presentation prepared for Plaintiffs also featured a page with images of Victoria's Secret Pink webpage and in large, bold type the words "**Trust Us It Works**" immediately above the phrase "Chat Powered by Frankly."

81.     This phrase was materially misleading due to Defendants' failure to disclose to Plaintiffs and the public, in this document or elsewhere, the fact that:

      (a)     the Frankly SDK technology to perform these functions simply did not exist, and

      (b)     the Victoria's Secret relationship was a paid endorsement deal, not a brand "partnership," costing Frankly $500,000, was never monetizable, never gave Frankly any contractual right to sell Victoria's Secret's digital advertising inventory, and expired by its terms in April of 2015.

82.     Steven Chung was interviewed in an online advertising magazine called "Biz World" on April 24, 2015, during the initial stages of his efforts to induce Plaintiffs to sell WorldNow to Frankly in return for cash and stock in Frankly, and made the following statement in response to the interviewer's question:

**Kristina**: What about revenue? Is there that potential as well?

**Steve:** Chatasaservice can unlock new revenue streams for brands through native mobile advertising, the sale of digital goods, and partner revenue shares. It can also boost existing sales for instance*, if a sports team integrates Frankly's chat functionality into their app, they'll have the ability to sell merchandise and ad space, all inline. Inapp chat provides instant sentiment and user behavior data* as well [and] brands don't have to be messaging or advertising experts to take advantage of this. Chatasaservice providers dedicate their existence to mastering the art and science of mobile messaging. *This saves the brand's crucial engineering, design, and marketing resources from designing chat functionality inhouse*,

83.     On May 22, 2015, Frankly issued yet another press release in which Chung again failed to disclose that Frankly's purported SDK did not exist, *i.e.* Frankly had no technology which would perform the functions of an SDK:

**Through the simple integration of our Chat SDK, the Company's technology can be inserted into a website or mobile application to provide a customizable version of [our] messaging technology.**

84.     On May 27, 2015, as a further part of Defendants' efforts to induce Plaintiffs to accept their offer to buy WorldNow for part cash and part Frankly stock, Chung sent Plaintiffs the following email:

> RE: Help to rationalize Frankly + Worldnow for my pal Steve...and Gary
> **Date:** Wednesday, May 27, 2015 at 3:54:40 PM Eastern Daylight Time
> **From:** Steve W. Chung
> **To:** Lou Schwartz
> **CC:** Gary Gannaway, Samantha Gannaway, Harrison Shih
> This is great Lou (+Harrison). Here's more rationale that we can present to Raycom and others...
>
> **News + Mobile Messaging is becoming a mega trend that enables news to become more social / mobile thar we can capitalize on together with Frankly + WorldNow. In fact, in addition to mobile messaging, news is the only other app category in "Quadrant I" of the highest retention and frequency of visitors across all of mobile today.**
>
> **We will both need to do some heavy lifting together to unlock this value at WorldNow, but that's why Lou's leadership with rest of exec team (and Frankly team) will be key here.**
>
> **A few concrete real world examples: · Facebook – now asking news organizations to post their articles directly inside of FB app (rather than going to nbc.com or bbc.com, etc.)·**
>
> **Snapchat – with their Discover page, they are integrating messaging + news to help people discover and share news: hap://www.wired.com/2015/05/snapchat-news-business-discovershare/**
>
> **Frankly – we're in discussions with CNN, NBCU and other news/media outlets to bring exactly this as well….**
>
> **Thus, the market is ripe for our combination. The headlines that media will write for our deal will be:**
>
> > ***"Frankly acquires WorldNow to bring social and mobile to local news to over 100M users". We can make history together by bringing a massive disruption to how local news is produced, consumed and shared on mobile…. Gary, are you sure you don't want 100% stock?***
>
> **Steve Chung**

85.     On June 10, 2015, Defendants and Frankly issued another press release, announcing Frankly's deal with another brand for inclusion of its chat function into that brand's web and mobile platforms. And once again, Chung repeated his false assertion that Frankly's SDK technology allowed any brand to "quickly plug in" the Frankly chat app to the platform of any new so-called brand partner:

27.

1

2

3

4

5

      **About Frankly:** Frankly is a next-generation chat-as-a-service platform that lets consumer brands build fan communities, engage their users directly, and join the conversation—right in their mobile app experiences. With Frankly's Chat SDK, brands can ***quickly plug in*** powerful, customizable technology to unlock the power of mobile messaging on their own platform and access conversations that matter to their business and their users.

6

7

8

9

     86.    According to each of Plaintiffs' Confidential Witnesses, including the former Chief Product Officer of Frankly and Frankly's current Head of Product, this statement that Frankly's SDK allows or has ever allowed brands to "quickly plug in" Frankly's chat function to their own platform, was and is an absolute falsehood.

10

11

12

13

     87.    Frankly had not developed by June of 2015 (and in fact never developed) any Software Development Kit capable of "quickly" or "seamlessly" or "easily" or "simply" or otherwise, plugging Frankly's chat function into another brand's web or mobile platform. Frankly's SDK product was "vaporware" and each of the Individual Defendants knew it.

14

15

     88.    On June 1, 2015, Steve Chung wrote an online article, touting Frankly's future in mobile messaging:

16

17

18

19

20

21

STEVE CHUNG, CEO FRANKLY:

As you know, our mission here at Frankly is to bring the power of mobile messaging to every app and website, helping to ignite engagement and interaction for our customers end-users. We are believers that mobile messaging is the single most important experience on your mobile phone today, and through our technology, we help brands and content owners harness this power to increase the frequency and retention of their end-users, enabling immersive and contextualized real-time conversations inside of peoples' favorite apps.

22

23

24

25

26

     89.    On July 7, 2015, Frankly issued yet another Press Release, not coincidentally in the middle of Defendants' negotiations with Plaintiffs, announcing Frankly's new agreement to integrate Frankly Chat into another brand's platform, *i.e.* "Get Social," a gaming app, using the Frankly SDK, stating in pertinent part:

27

28

Today, ***leading chat-as-a-service company Frankly Inc***. (TSX VENTURE: TLK) ("Frankly") and GetSocial ("GetSocial"), a powerful social engagement platform for gaming apps, ***announced a partnership to bring Frankly's***

*advanced chat SDK platform and mobile messaging expertise to GetSocial's suite of tools.* ///

*The partnership will bring Frankly's robust, scalable chat technology to GetSocial's platform to support community-building and messaging-based engagement within mobile games.* ////

[S]aid Frankly CEO, Steve Chung. "We're excited to strengthen our ties with the gaming world through our partnership with GetSocial, who have shown amazing traction with integrations in key games and an exciting pipeline of customers in the coming year." "Mobile messaging is a killer feature on mobile, and *integrating Frankly's robust chat technology will allow us to stretch and test the boundaries of messaging as a driver of community and retention for gaming apps -- not to mention the potential acquisition and revenue benefits for our customers*," ////

About Frankly: Frankly is a next-generation chat-as-a-service platform that lets consumer brands build fan communities, engage their users directly, and join the conversation—right in their mobile app experiences. *With Frankly's Chat SDK, brands can quickly plug in powerful, customizable technology to unlock the power of mobile messaging* on their own platform and access conversations that matter to their business and their users.

90.     Immediately after the Purchase Agreement was executed and 27 days prior to the closing of the transaction on August 25, 2015, Defendants issued a press release which was quoted in this online article in Television News:

Worldnow Being Sold In $45 Million Deal
By Harry A. Jessell
TVNewsCheck, July 29, 2015 11:37 AM EDT
Worldnow, a leading purveyor of contenmanagement systems and digital media technology for TV stations and other local media, has been purchased by *social media provider Frankly* Inc for $45 million in cash and stock, it was announced this morning.

The publicly traded Frankly (TSXV: TLK) *offers a white label chat technology that can be incorporated into native mobile apps of all kinds. It currently powers the chat features of apps for Victoria's Secret*, the NBA's Sacramento Kings and Rep. Charlie Rangel (N. Y.), among others. Based in San Francisco since its inception two years ago, *Frankly also owns the direct to consumer messaging app Frankly Chat for iOS and Android devices.* It was launched in September 2013.

Worldnow is owned by chairman, CEO and founder Gary Gannaway (63%) and Raycom Media (37%). Under terms of the deal, Frankly will pay them $10 million in cash and   $20 million in Frankly stock at closing and an additional $15 million in cash on the first anniversary of the closing. After the deal closes, Raycom will have a 20% interest in the combined company. Joe Fiveash, VP of digital media, strategy and business development at Raycom, will join the Frankly board.

29.

*Steve Chung, CEO of Frankly, said he was attracted to Worldnow by the opportunity to marry messaging and the news producers — the broadcasters — that use the Worldnow platform. "If you take a leading news platform like Worldnow, and you take a leading mobile messaging platform like Frankly, you essentially have a synergistic relationship that is really innovative and market leading that nobody else in this space is able to do," he said.*

*Frankly will offer Worldnow clients and other broadcasters "engagement" with viewers,* he said. "What news organizations truly want today is to be relevant, to have a dialogue with their audience and to have that in real time." At the same time, he said, they want their news stories and video to circulate as far and wide as they possibly can.

"In 2015, any piece of content from anywhere in the world can spread like wildfire in an instant, and the preferred medium for that is native mobile because that is where people are spending their time," he said. "We *could really be a partner* to local broadcasters in helping them transform from just a onetomany broadcast system to *a truly interactive and bidirectional* conversation in real time."

Frankly went public in January and trades on the TSX Venture Exchange in Toronto under the TLK symbol. Its stock closed yesterday at $2.59. Its shareholders include SK Telecom, a major South Korean wireless carrier. Backers also include Stanford University and *JJR Private Capital, which is providing a $10 million line of credit.*

According to Chung, Worldnow will remain more or less intact and operate as a unit of Frankly in New York under the direction of Lou Schwartz, who joined Worldnow several months ago as chief strategy officer. Schwartz was instrumental in bringing Frankly and Worldnow together. He is a longtime friend of Gannaway and he once worked with Chung at Kit Digital. "The Frankly and Worldnow joint offering will enable us to better serve our combined customers," said Schwartz in a prepared statement. "*With a combined chat and content platform, our customers have an industry leading engagement and monetization solution that enables them to interact directly with their consumers in real time.*

91.    This Frankly press release was false and misleading in several respects:

     (a)    Frankly did not own and did not intend to deploy with WorldNow's platform the SDK technology described,

     (b)    Frankly did not have, and Schmeichel and JJR Capital had no ability or intention to provide, the $10 million line of credit described,

     (c)    Defendants had neither the ability nor the intention to combine Frankly's chat platform or functionality with WorldNow's media content management and advertising platform.

*Defendants Failed to Disclose Its User Base Was Completely Static*

92.     Frankly and Chung, both directly and through Moshevich's blogs and Frankly's underwriters, Cormark Securities and Beacon Securities, repeatedly made public statements between January and August of 2015, to the effect that the growth of the Frankly Chat user base was the key to Frankly's plans for monetization and revenue growth, and their projected exponential increase in its stock valuation.

93.     In February of 2015, just after Frankly went public with the TSXV, Frankly, through Chung and Schmeichel, told its underwriters, Cormark Securities:

> Frankly is a unique instant messaging platform with 2 MM unique users. ***Developed with SK Telecom***, Korea's largest telecommunications operator. The Company is moving from the development to commercialization stage. One of the early adopters of the Frankly platform ***is Victoria's Secret PINK brand where Frankly's platform is embedded into the PINK mobile application which has 4.5 MM subscribers. In total, Frankly claims to have over 30 brands representing over 150 MM potential subscribers evaluating the Frankly messaging platform. Fundamentally, we believe Frankly offers a unique value proposition where enterprise brands can increase engagement in their apps through messaging with the added benefit of capturing information/analytics on their subscribers.***

94.     Based upon the information expressly provided to Cormark by Chung and Schmeichel, Frankly's underwriter, Cormark, published an analysis of Frankly and its stock value on February 20, 2015, stating that, consistent with Defendants' representations, the Frankly user base would grow to 37 million in 2015, and to 89 million users in 2016, with its stock value growing accordingly for a valuation in 12 months of $6 CAD per share (roughly 300% increase in stock valuation directly resulting from the increase in the user base that Frankly, Chung and Schmeichel predicted):

> ***We see its user base next year scaling from 37 MM this year to 89 MM users. Given that growth and user base, we believe the name has the potential to garner a valuation comparable to other high growth messaging platforms where a valuation of only 1/6th the comps would have TLK valued at C$6.00.***

95.     Cormark's statements of fact and projections based thereon came entirely from "factual" information provided to Cormark by Frankly, Chung and Schmeichel, *i.e.*

31.

their statements that the Frankly user base had been increased by the same amount as the entire user bases of Frankly's new SDK "partners," starting with the 4.5 million users of the Victoria's Secret Pink app.

96.     These statements by Frankly, Chung and Schmeichel were false and misleading, however, and both Chung and Schmeichel knew their statements were false and misleading; Chung and Schmeichel intentionally misled Cormark into asserting that:

> (a)     Frankly's user base would increase exponentially and in tandem with the addition of each new SDK brand partner and its existing user base.
>
> (b)     Frankly in fact had "over 30 new potential brand partners with over 150 million potential new subscribers for the Frankly Chat app.

97.     These statements by Frankly, Chung and Schmeichel were materially misleading because of what they intentionally failed to mention, *i.e.* that:

> (a)     Frankly had nowhere near 30 new potential brand partners with a combined user base of over 150 million users actively considering integrating Frankly's chat function into their platforms,
>
> (b)     Frankly had in fact not yet developed the backend technology for its SDK to be scalable, *i.e.*, its SDK was virtually nonexistent and did ***not*** permit any other brands to use the same chat technology being used for Victoria's Secret's Pink, or to integrate the Frankly chat product into the platform of any other brand partner, much less ***30 new brand partners.***

98.     In its March 12, 2015 press release quoted hereinabove, Defendants also announced the acquisition of the assets of photo-blogging service "Muzy," in particular its "35 million registered users" who, Defendants stated, would become part of Frankly's rapidly expanding user base, putting Frankly over its stated goal of 40 million users by the end of 2015:

**FRANKLY COMPLETES ASSET PURCHASE OF MUZY**
*35 Million Users on Photo Blogging App Muzy to Receive Chat Functionality*

**SAN FRANCISCO, CA, MARCH 12, 2015** – Frankly Inc., a leading provider of messaging technology, has announced that it has completed the acquisition of the assets of Muzy Inc., a San Francisco-based microblogging platform focused on mobile content creation **with over 35 million users worldwide.**

////

**About Muzy:**
Muzy (pronounced "Muse-zee") is a blog for your creative side. **Over 35 million users** post, enhance, create and share photos, thoughts, drawings, animations, collages and all kinds of fun content. Muzy offers more than 50 publishing tools on Android, iOS, and web, and a global network for sharing content. **Muzy is a Top 10 app in the Photo & Video Category in over 100 countries.**

Frankly Inc.
Steve Chung
Chief Executive Officer

99.     Frankly's press release of March 12, 2015 regarding the acquisition of Muzy states that Muzy in March of 2015 had a user base of over 35 million unique users, and further asserts that those 35 million Muzy users automatically would receive Frankly Chat through the use of its SDK.

100.     On the same day, March 12, 2015, Defendants reinforced this press release announcing Frankly's acquisition of Muzy and its "35 million registered users," with another deceptive "blog" by Etienne Moshevich, again posing as a research analyst and deliberately failing to disclose he was Frankly's Manager of Investor Relations, stating:

Frankly (TSXV:TLK) Completes Purchase of Muzy- Photo Sharing App with 35 Million Users

What does this mean for Frankly?
- *Integrate their chat SDK into Muzy's 35M registered user base (getting closer to our goal of 50M users by end of year)*
- *Showcase best of class chat SDK integration into a top mediasharing app to help bring in other SDK partners*
- Also, having now Frankly Chat and Muzy as their own inhouse apps gives them marketing power and leverage to be able to offer crosspromotion and other value added benefits to their future SDK partners

Stay tuned for more to come!
Best,
Etienne

33.
COMPLAINT

101.    Also on March 12, 2015, Frankly's underwriter, Beacon Securities, at the

behest of Defendants and based on information provided by Frankly (Chung and

Schmeichel), published an online "analysis" of the Frankly acquisition of Muzy and its 35

million users, and the effect Frankly's addition of those 35 million users to Frankly's own

user base would have on the Company's revenue and stock valuation:

> This morning, Frankly announced that it has completed the **acquisition of the assets of Muzy Inc., a microblogging platform with 35MM registered users worldwide**. In essence we view today's announcement as being **a significant SDK win – except Frankly will also own the platform it is partnering with.**
> */////*
> - With the addition of Muzy, **Frankly has already exceeded our expectation of total install base from SDK partners by the end of 2015** (40MM), and almost reached management's target of 50MM.
> *////*
> **Significant Leap in Total Install Base**
> - With today's announcement, **Frankly's total install base from announced SDK partnerships reaches 41.5MM users**.

102.    Beacon, Frankly's underwriter also posing as research analyst, received from

Defendants in March of 2015 the "factual" information that Muzy had 35 million active

users, and that Frankly would add all 35 million active Muzy users to its own user base.

Expressly based on those false assertions of fact, Moshevich made entirely fictitious

revenue and stock value projections, as follows:

> **Maintaining Speculative Buy and C$5.50 Target Price**
> - ***Our C$5.50 target price is derived by applying a Price/Forward Sales multiple of 7.0x to our revenue forecast for the four quarters ending December 2016. We note that this translates to an EV/Installed User of $2.00 on our forecast installed user base in a year***.
> **Exhibit 4. Calculation of Target Price & Quantification of Discounts to Relevant Benchmarks**
> **Beacon Estimate    Relevant Benchmark Discount**
> *Total Install Base (FY16E Avg., MM) 80.4 105.0 -23%*
> *Annual Rate of Monetization (FY16E Avg., $/User) $0.17 $0.35 -51%*
> *Four Quarter Revenue Estimate (ending December 2016, MM, USD) $13.7*
> Target Valuation Multiple 7.0x 8.6x -18%
> Market Cap (MM, USD) $95.7
> USD to CAD $1.28
> Market Cap (MM, CAD) $122.1
> Shares Outstanding (ending December 2015, MM) 22.1
> **Target Price (C$, Rounded) $5.50**
> **Implied Return *114%***
> **Rationale for Relevant Benchmarks**

34.

**Total install base** – *Simple average of management's targets (50MM users by the end of the FY15 and 160MM by the end of FY16).*

103.   Defendants knew when they issued their March 12, 2015, press release, and when they fed the investing public through the "research reports" of Moshevich and Beacon Securities the contention that Muzy had 35 million active users who would be added to Frankly's user base, that Muzy did ***not have*** 35 million users, or even a ***fraction*** of that number, having lost most of its users since January of 2014.

104.   Defendants also knew when they published Frankly's March 12, 2015 press release, and the affirming "research reports" of Moshevich and Beacon Securities, that through its acquisition of Muzy, Frankly would not add 35 million new users to its user base, or anywhere ***near*** that number, ***if any***.

105.   Defendants, by their omission of these material facts from their own and their sponsored public pronouncements pertaining to the acquisition of Muzy and its "35 million users," intentionally and deliberately misled first the investing public, who acquired Frankly's stock at inflated prices, then, Plaintiffs, who acquired almost 10% of Frankly's stock at those same artificially inflated prices (rejecting other bids for WorldNow).

106.   As Defendants knew full well in March of 2015 when they made these public pronouncements regarding Muzy and its 35 million users, Muzy had lost most of its user base by then, and in fact by September of 2014, was on the verge of collapse, when Frankly agreed to buy Muzy's assets for a mere $100,000.

107.   Defendants knew by March of 2015 when Frankly directly and through its Manager of Investor Relations, Etienne Moshevich, and its underwriter, Beacon Securities, announced the Muzy acquisition with great fanfare, Muzy had lost most of its users.

108.   Online data aggregator *Priori Data* (a subscription data service) verifies that ***throughout the entirety of 2015, only a paltry 247,000 users worldwide downloaded Muzy, and Muzy's total revenue in 2015 was a grand total of $547.***

109.   As Defendants also knew but failed to disclose to Plaintiffs or the investing public, in early 2014, Muzy released a new version of its photo blogging app, and a rash of

35.

1    negative comments from former Muzy users ensued.  The new Muzy app crashed

2    incessantly while editing photos, as this typical quote from Muzy a blogger in 2014 aptly

3    demonstrates:

4

5        **App crashes constantly by JojoPea** on 2014/06/01 09:11

6        When I first started using this it was easily a 4* app. Now though i can't get
         past first base. It crashes every single time I try to use it. Deleted and re-
7        downloaded twice in phone before attempting on iPad. Crash, crash, crash.

8        110.    Defendants also knew that the original Founder and CEO of Muzy, Andrew

9    Chen, wanted out of Muzy at any cost, hoping to avoid the damage to his reputation that

10   Muzy's very public failure was about to cause, while Muzy's very sophisticated angel

11   investors (one of the world's largest advertising agencies and the co-founder of Netscape),

12   who had invested more than $12 million in Muzy, were prepared to write off their

13   investments as a total loss.

14       111.    On May 11, 2015, while Defendants were in active negotiations with

15   Plaintiffs to acquire WorldNow and sell Plaintiffs almost 10% of Frankly's stock (at its

16   artificially inflated market price), Defendants made the following public statement in

17   Frankly's Public Notice of Shareholder Meeting:

18

19       Since the completion of our qualifying transaction in December 2014, we
         have overseen a period of change and development at Frankly Inc. During the
20       past five months of 2015, Frankly Inc. has made tremendous progress in
         gaining market traction and expanding both our user reach and partner
21       ecosystem. We have won new customers such as The Sacramento Kings (an
         NBA team known as a top technology leader), expanded our ecosystem with
22       strategic partners such as Full Picture (a leading marketing agency in
         entertainment, media and fashion) and ***closed the asset purchase of Muzy, a***
23       ***photo editing and microblogging platform with over 35 million registered***
         ***users. We are on track and well on our way to hit our stated goal of***
24       ***reaching 50 million registered users by the end of 2015, positioning us to***
         ***be a substantive global player in mobile communications.***
25
26       Very Truly Yours,
         Steve Chung, CEO
27

28

                                      36.

112.   When Defendants made these public statements to the effect that the acquisition of Muzy added over 35 million users to Frankly's user base, putting the Company "on track and well on our way to hit our stated goal of reaching 50 million registered users by the end of 2015," Defendants knew that these statements omitted material facts, omissions which rendered Defendants' related public statements entirely misleading.  Those omissions included the facts that:

(a)   Muzy did not have anywhere near 35 million actual users; Muzy's actual user base had dropped closer to 5 million by March of 2015,

(b)   Frankly did not have a functioning Software Development Kit that would enable Frankly to integrate Frankly Chat into Muzy, and

(c)   as a result of (a) and (b), Frankly's claim to adding "over 35 million new users" to its user base through acquisition of Muzy was pure fiction; Frankly added none or virtually none of Muzy's users to its user base before shuttering Muzy a few months later.

113.   On August 11, 2015 (just 3 weeks after Frankly and Plaintiffs executed the Purchase Agreement and two weeks before the deal closed), Muzy (now owned by Frankly) published its last "update" for the Muzy app, and provided notice to its remaining registered users (but not to Plaintiffs or the investing public) that the Muzy app was to be discontinued by the end of 2015:

It is with heavy hearts that we let you know that this will be our final update and that Muzy will be shutting down at the end of this year. It has been a wonderful ride and we are so sad to have to say goodbye.

114.   In this same August 11, 2015 notice to Muzy users, Frankly as the then owner of Muzy, indicated that the current (soon to be gone) version of the Muzy app had only 5 to 10 million installations.  None of this information, that the Muzy app had only 5 to 10 million installs, and that Muzy was closing down by the end of 2015, ever was disclosed to Plaintiffs, or to the investing public, before the Purchase Agreement was executed and closed.

115.     On December 31, 2015, Frankly shut down the Muzy app, and the Muzy user base (only 6 months earlier claimed by Plaintiffs to be more than 35 million), was gone, as Muzy's few remaining prior users reported on line:

> Holly A. E. O'Neill · 6 February 2016 00:  "Muzy is down and the listed email contact is gone. I think the owners bailed."

116.     Defendants knew when they acquired the Muzy assets that Muzy's user base of 35 million largely had disappeared, and Defendants never intended to maintain the Muzy app or to integrate Muzy's users into Frankly's Chat.

117.     Defendants intentionally omitted from their public statements between March and August of 2015, the accurate information as to the number of active Muzy users still in existence, or as to Defendants' real intention with respect to Muzy, *i.e.* to shutter Muzy almost immediately after the Purchase Agreement was executed and the acquisition of WorldNow, for cash and Frankly stock, was closed.

### *Defendants Failed to Disclose the Damaging Terms of Frankly's Legal Settlement*

118.     On May 19, 2014, a class action complaint was filed against Frankly (then named TicToc Planet, Inc.) in the U.S. District Court for the Northern District of California (*Harnish v. TicToc Planet, Inc.*, cv-02321-EJD), alleging a single cause of action against the Company for violation of the Telephone Consumer Protection Act ("TCPA"). The complaint alleged that the Company violated the TCPA because its chat technology sent short message service ("SMS") text message invitations (spams) to the friends and contacts of actual Frankly chat members, asking them to download the Frankly chat app.

119.     The plaintiff alleged in this suit that the messages violated the TCPA, because the recipients did not give prior consent to receive those invitation messages, and sought to represent a nationwide class of persons receiving those SMS message invitations, asking for statutory damages of $500 per message.

120.     Frankly filed a Motion to Dismiss this lawsuit, and on March 11, 2015, the

Court denied Frankly's Motion, ruling:

> Plaintiff alleges that Defendant sends unauthorized text message calls to the cellular telephones of consumers throughout the country. Compl. at ¶¶ 1, 15. He alleges the short code from which the message was transmitted, and the content of the message. Id. at ¶ 17. Plaintiff further alleges that the use of a short code enabled Defendant's mass transmission of the message to a list of cellular telephone numbers. Id. at ¶ 18. Given these allegations, Plaintiff sufficiently alleges that the text message is impersonal because there is no indication that the message is specific to Plaintiff, and the message contains generic content. Moreover, Plaintiff sufficiently alleges that the message was sent en masse to a host of persons nationwide, and that it was sent from a short code. Therefore, Plaintiff has sufficiently alleged the use of an ATDS. Accordingly, Plaintiff has sufficiently pled a TCPA claim.

121.     This method of "inviting" the friends or contacts of anyone who had

downloaded the Frankly App also to join the Frankly Chat app was Frankly's key method

for expanding its chat user base, and along with this expansion of its user base, the

monetization of that user base and the substantial revenues Defendants were projecting.

122.     Without that "viral" method for expanding the Frankly user base, Defendants

knew Frankly could not compete with the many significantly larger chat apps enjoying

users bases in the hundreds of millions, and could not approach the revenue numbers or

stock values they were projecting.

123.     At no point did Defendants disclose to Plaintiffs this lawsuit or its legal and

practical adverse impact on Frankly or the success of Frankly Chat. And Defendants' only

disclosure to the general public regarding the *Harnish* suit and its legal challenge to

Frankly's plan for rapidly expanding its user base through its "viral" chat invitations, and

the monetization of that user base, was one paragraph reference in Frankly's Management

Discussion and Analysis ("MD&A"), dated as of April 24, 2015:

> On May 19, 2014, an individual filed a punative (sic) class action complaint against Frankly Co. (then named TicToc Planet, Inc.) (the "Company") in the U.S. District Court for the Northern District of California. The plaintiff asserts a single cause of action against the Company for violation of the Telephone Consumer Protection Act ("TCPA"). The complaint alleges that the Company violated the TCPA when it enabled users of its Frankly messaging service to send short message service ("SMS") text message invitations to the users' friends and other contacts via a short code assigned to the Company. The

39.

complaint alleges that the Company was the sender of those messages, and that the messages violated the TCPA, because the recipients had not given prior express consent to receive SMS messages. The plaintiff seeks to represent a punative (sic) nationwide class of persons who allegedly received SMS message invitations from a short code assigned to the Company, and he seeks actual or statutory damages in the amount of $500 per message.

124.    On June 11, 2015, Frankly management reported that Frankly had lost its motion to dismiss this class action, but nonetheless expressed the following unreasonably optimistic opinion regarding the likely outcome of the case:

> The outcome of this case is uncertain given its very early stage, uncertainty concerning any potential FCC ruling on the pending petitions, and other factors inherent in litigation; however, management has evaluated the matter in consultation with legal counsel, and has **determined that it is not more likely than not that a loss has been incurred.**

125.    Defendants intentionally and deliberately failed to disclose to the public in Frankly's April 24, 2015 MD&A, or Frankly's June 11, 2015 MD&A, and intentionally and deliberately failed to disclose to Plaintiffs before the execution of the Purchase Agreement, that the Court's denial of Frankly's Motion to Dismiss would force Frankly to settle the litigation and immediately discontinue use of the Company's only method for rapidly expanding its user base, a user base which Defendants fraudulently projected would grow from 2 million to 50 million by the end of 2015.

126.    Defendants knew full well that without Frankly's ability to use its Short Message Text technology virally to grow its user base, Frankly's projected exponential growth of its user base and increase in its stock value would not occur.

127.    On August 21, 2015, after execution of the Purchase Agreement on July 28, 2015, Defendants privately and confidentially settled the *Harnish* lawsuit, publicly disclosing only that Frankly had agreed to pay $180,000 in settlement of the case, but failing and deliberately refusing to disclose any of the other terms of the settlement, most significantly, Frankly's agreement to discontinue its infringing technology and its method for virally increasing the Frankly Chat user base.

128.    Defendants in their public statements on this subject intentionally failed to disclose the material terms of the settlement, the fact that Frankly was compelled by this lawsuit and the Court's adverse ruling immediately to drop its spam invitation technology.

### Defendants Covered Up KPMG's Negative Auditor's Opinion

129.    At the same time as Defendants and their investment bankers were issuing glowing and materially misleading public reports of Frankly's overnight success in dramatically increasing its user base through the acquisition of Muzy, claiming it would substantially increase Frankly's projected revenue and stock value, unbeknownst to Plaintiffs and the public, Frankly's own auditor was expressing "material uncertainty" and "significant doubt" whether Frankly even was a going concern, *i.e.* KPMG was of the opinion Frankly would not survive beyond the short term.

130.    On April 28, 2015, KPMG issued its Auditor's Opinion in connection with its audit of the Year End 2014 financial statements of Frankly (referred to herein as "YE 2014 Audited Financial Statement and Auditor's Opinion," or simply the "Auditor's Opinion"). This Auditor's Opinion states that "the financial statements present fairly the operations and financial condition of the company prepared as if the company was a going concern moving forward."  But KPMG goes on to state that "without modifying its opinion," and in light of the sizeable accumulated deficits incurred by Frankly in pursuing the Company's business plan, KPMG believed there was "a material uncertainty" as to the Company's ability to continue operating as a going concern:

> **Emphasis of Matter**
> Without modifying our opinion, we draw attention to Note 1 in the consolidated financial statements which indicates that Frankly Inc. has, since its inception, had recurring losses and negative cash flows from operating activities. These conditions, along with other matters set forth in Note 1 in the consolidated financial statements, indicate ***the existence of a material uncertainty that may cast significant doubt about Frankly Inc.'s ability to continue as a going concern.***

131.    In that Note 1 to the Auditor's Opinion, KPMG further states:

These consolidated financial statements have been prepared on the basis that the Company is a going concern, which contemplates the realization of its assets and the settlement of its liabilities in the normal course of operations. Since its incorporation, the Company has had recurring losses and has negative cash flows from operating activities. For the year ended December 31, 2014, the Company incurred losses of $16,615,912 and negative cash flows from operating activities of $9,172,891 and as at December 31, 2014 has an accumulated deficit of $21,722,504. These conditions have resulted in material uncertainty that may cast significant doubt about the Company's ability to continue as a going concern into the foreseeable future. While *management* believes that the use of the going concern assumption is appropriate, the ability of the Company *to continue as a going concern* is dependent upon its ability to achieve sustainable profitable operations.

132.    This very unusual Auditor's Opinion, expressing KMPG's "significant doubt" as to whether Frankly would continue as a going concern, and Management's (Defendants') expression of a contrary opinion, fails to disclose the specific reasons for KPMG's "significant doubt" or Management's bases for discounting its "material uncertainty."

133.    Defendants only partially and inadequately disclosed this serious difference of opinion between Defendants and KPMG as to whether Frankly could continue to operate beyond the short term; it was buried in a footnote to the Opinion, filed only on an obscure Canadian website, and never disclosed directly to Plaintiffs.

134.    In fact, Defendants after receiving this negative auditor's opinion, expressing "significant doubt" Frankly would survive, Defendants undertook a series of actions to coverup this negative opinion and the potentially fatal defects in Frankly's business plan and technology which undoubtedly were at the heart of this opinion.

135.    Upon first receiving notice from KPMG in March or early April of 2015 that its auditors had significant doubt whether Frankly was a going concern, *i.e.* would survive beyond the immediate future, Defendants undertook an intricate coverup, designed to mislead the investing public, especially Plaintiffs, by omitting information directly relevant to the financial solvency of Frankly, and its auditor's negative opinion in this regard.

136.    Defendants' first step in this elaborate coverup was to fire KPMG on May 1, 2015 (three days after their negative auditor's opinion and less than 3 months after *hiring*

them), then rehire the same Canadian accounting firm, Collins, Barrow, which was Frankly's auditor prior to KPMG. The annual audited financial statements for Frankly were publicly filed on April 29, 2015, and only a few days later the company replaced KPMG as its independent auditors with Collins, Barrow.

137.   Defendants' next step in their coverup was to file on June 18, 2015, Frankly's Annual Information Form for the Year Ended 2014, disclosing only that on May 4, 2015, KPMG "had been terminated as the auditor of the Corporation for commercial reasons" and replaced by Frankly's original auditor, Collins, Barrow.

138.   Defendants in this Annual Information Form make no mention of KPMG's "significant doubt" or its "material uncertainty," offer no explanation as to why KPMG had significant doubt whether Frankly would survive beyond the near term, or as to why Defendants disagreed with its auditor's negative opinion.

139.   The next step in Defendants' elaborate scheme to coverup KPMG's negative opinion was to fire Collins, Barrow in the fall of 2016, and replace them with US accounting firm, Baker Tilly.

140.   Almost a year and a half later, in November of 2016, in connection with Frankly's currently pending S-1 Registration application filed with the US Securities and Exchange Commission (seeking to register Frankly stock for sale on NASDAQ), Defendants submitted a significantly different Audited Financial Statement for Year End 2014, an entirely different auditor's opinion from yet another auditor (Baker, Tilly), this one eliminating KMPG's expression of "material uncertainty" Frankly was a going concern, and replacing it with a "clean" auditor's opinion.

141.   Without any notice to Frankly's investors, Plaintiffs or the SEC, Frankly's new auditor, Baker, Tilly, at the behest of Defendants, issued a materially different Auditor's Opinion for YE 2014, a revised Opinion containing no acknowledgment it was a revision of an earlier Auditor's Opinion for YE 2014.  This revised Auditor's Opinion by Baker, Tilly, provides no explanation for its substantive revisions to the original KPMG

Auditor's Opinion, nor does it contain any acknowledgment it is in fact a revised opinion for 2014.

142.    Baker, Tilly's revised Auditor's Opinion for YE 2014 contains **none** of KPMG's expression of "material uncertainty" whether Frankly would continue as a "going concern," nor does it disclose any of the reasons for these revisions or any explanation as to why Baker, Tilly did not share KPMG's "significant doubt" or "material uncertainty."

143.    Defendants' most recent misleading explanation for Frankly's nontransparent series of hires and fires of its auditors, *i.e.* their elaborate scheme to mislead the investing public and Plaintiffs as to Frankly's status as a "going concern," is contained in its recently filed (June 2, 2017) Amendment 7 to its S-1 Registration Statement, as follows:

> Prior to the Qualifying Transaction, Collins Barrow Toronto LLP was engaged as WB III Acquisition Corp.'s ("WB III") independent accountants with the recommendation and approval of WB III's audit committee. ***Upon consummation of the Qualifying Transaction, Collins Barrow Toronto LLP resigned as our independent accountants on February 17, 2015 and we engaged KPMG LLP, the Canadian member firm of KPMG International, ("KPMG Canada") as our independent registered public accounting firm on February 17, 2015 to audit our financial statements as of the year ended December 31, 2014. On May 1, 2015, we dismissed KPMG Canada as our independent accountants with the recommendation and approval of our audit committee and we engaged Collins Barrow Toronto LLP as our independent registered public accounting firm on December 16, 2015 to audit our financial statements as of December 31, 2015 and for the year then ended. On June 21, 2016 we engaged Baker Tilly Virchow Krause LLP to audit our consolidated financial statements as of and for the year ended December 31, 2014,*** which had been previously audited by KPMG Canada.

> On December 1, 2016, with the recommendation and approval of our audit committee, and in connection with this offering, we advised Collins Barrow Toronto LLP that, subject to receipt of necessary approvals, we intended to engage Baker Tilly Virchow Krause LLP as our independent registered public accounting firm to audit our financial statements as of and for the year ended December 31, 2016. …The reports of Collins Barrow Toronto LLP as independent accountants to WB III prior to the Qualifying Transaction on WB III's consolidated financial statements did not contain any adverse opinion or disclaimer of opinion, nor were such reports qualified or modified as to uncertainty, audit scope, or accounting principles. The report of Collins Barrow Toronto LLP on our consolidated financial statements did not contain any adverse opinion or disclaimer of opinion, nor were such reports qualified or modified as to uncertainty, audit scope, or accounting principles. ***The report of KPMG Canada on our consolidated financial statements did not contain any adverse opinion or disclaimer of opinion.***

144.    This complex narrative by Defendants is most illustrative for what it does not disclose or provide to investors, namely any explanation as to why Frankly in February of 2015 fired Collins Barrow and hired KPMG, only then to fire KPMG less than 3 months later (immediately after their "significant doubt" Audit Opinion for YE 2014), and replace them with Collins Barrow, only to fire Collins, Barrow again in 2016 and replace them with Baker, Tilly.  Nor does it explain why Baker, Tilly issued in November of 2016 a modified and "clean" Auditor's Opinion for YE 2014, making no reference to the original Auditor's opinion or its expression of "material uncertainty" or "significant doubt."

145.    In April/May of 2015, Frankly had just completed a successful private placement for $21.8 million in December 2014, making an opinion from KPMG in April of 2015, expressing significant doubt as to the continued viability of the Company a monumental problem for Frankly Management, Chung, Schmeichel, and SKP.  Frankly's public position regarding the enormous financial benefits of the Muzy acquisition, and Moshevich's misleading and overly optimistic revenue and stock price projections, were entirely inconsistent with KPMG's negative Auditor's Opinion.

146.    SKP's and Schmeichel's knowledge of and complicity in this regard is beyond doubt, as SKP controlled 4 of the 6 seats on Frankly's board, and voted for the removal of KPMG and the subsequent decision to hire Baker Tilly, and to refile  the 2014 Statement with a "clean" auditor's opinion.

147.    Defendants did not want Plaintiffs or the investing public to take notice that Frankly's most credible and prestigious accounting firm, KPMG, had expressed "material concerns" as to its continued viability, or the precise reasons for those concerns, just when Frankly was seeking to sell to Plaintiffs almost 10% of Frankly's outstanding shares.

148.    Neither Frankly nor the Individual Defendants ever disclosed to the investing public, the Company's shareholders in general or to Plaintiffs in particular, the specific reasons expressed by KPMG's auditors for their "significant doubt" whether the Company would be able to continue in business beyond the short term, or Management's reasons for dismissing those concerns.

149.    Plaintiff believes and alleges on the basis of such information and belief, that the undisclosed reasons for KPMG's "significant doubt" related to the numerous deficiencies in the Company's technology, products and business plans, material deficiencies not disclosed by Defendants to Plaintiff or to the investing public, as specifically alleged herein.

150.    On June 16, 2015, while in negotiations with Plaintiffs to acquire all of the assets of WorldNow, and seeking to induce Plaintiffs to buy 10% of Frankly's stock (rather than taking other more valuable offers), Chung sent an email to Gary Gannaway attaching a report from Beacon Securities (Frankly's investment banker), referring to Beacon Securities as a "third party" and stating:

> **From:** "Steve W. Chung" <steve@franklyinc.com>
> **Date:** Tuesday, June 16, 2015 at 12:41 AM
> **To:** Gary Gannaway <ggannaway@worldnow.com>
> **Cc:** Lou Schwartz <lschwartz@worldnow.com>
> **Subject:** Re: Frankly vs Synacor
> *Research analyst report on our revenue projections:*
> https://www.dropbox.com/s/uzp1nsvbxhu1b5s/TLK-2015-01-27.pdf?dl=0
> *This is pretty close to our internal model but also has third party validation.*

151.    The attached report from Beacon Securities which Chung characterized as "third party validation" of Frankly's financial projections, says, *inter alia*:

> *Mobile messaging is a very fast growing market and we believe Frankly is well positioned to benefit from the following industry trends:  heightened privacy concerns; a desire by their own platform; increased intentions to monetize apps; and higher mobile advertising budgets.*

152.    On June 19, 2015, Beacon Securities as Frankly's underwriter sent an email letter to Steve Chung, at Chung's request, providing to Frankly and Plaintiffs, Beacon's nonbinding but "highly confident" assurance of its ability to raise an additional $25 million in capital for Frankly following the acquisition of WorldNow by Frankly and WorldNow, as required by Plaintiffs as a condition of the deal. This letter reads in pertinent part:

Re: Financing Highly Confident Letter of Beacon Securities Limited

We are pleased to confirm that Beacon Securities Limited ("Beacon") is confident of our ability to arrange, as lead underwriter through an offering conducted on a bought deal underwritten basis, a financing (the "Financing") for Frankly, Inc. ("Frankly" or the "Company") of approximately US$25 million of equity securities of the Company. We understand that the Company is contemplating an acquisition that, if completed, would provide access to significant additional consumers through various media channels, expanding the Company's market reach and providing new sources of income. Based on our experience as the Company's top equity trader, we believe that the announcement of such acquisition would generate significant market interest for the Financing, as the announcement, in our view, would mark a tangible milestone towards Frankly's scale, monetization and revenue growth.

//////

We look forward to further discussing with you the Company's current options with respect to a financing. Please feel free to contact Alistair Maxwell (amaxwell@beaconse.curities.ca) and/or Stephen Delaney (sdelaney@beaconsecurities.ca) at your convenience.
Yours very truly,

BEACON SECURITIES LIMITED
Per:
(Alistair Maxwell) Chairman & CEO


153.    This letter of June 19, 2015, asserting that Beacons was highly confident of its ability to raise $25 million in connection with the transaction, was materially misleading, and Beacon's failure to disclose material adverse information in this letter, and Defendants' wholesale adoption and exploitation of its statement, were deliberate acts of fraud by each of the Defendants.

154.    Defendants' intentional and material omissions and misrepresentations through this Beacons Statement included, among others:

> (a)    Defendants failure to disclose that Frankly's auditor had a significant doubt as to whether Frankly even was a "going concern" that could survive beyond the immediate future, or to disclose the reasons for that significant doubt,

(b)     Defendants failure to disclose that Frankly did not have the SDK technology they repeatedly said they had,

(c)     Defendants failure to disclose they did not have any way of expanding the user base for Frankly's chat platform or monetizing Frankly Chat,

(d)     Defendants' failure to disclose that Frankly was likely to burn through all its capital and become insolvent before it generated any significant revenue.

155.    On August 4, 2015, just three weeks before the closing, Chung sent to Gary and Samantha Gannaway an email attaching another "analyst's report" on Frankly and the proposed acquisition of WorldNow, a report also prepared by Beacon Securities at the behest of its clients, Frankly and the Individual Defendants, Chung, Schmeichel and SKP:

> Please see attached an analyst report from Beacon Securities just published assessing the Frankly acquisition of WorldNow (Raycom also prominently noted). The report is indicative of the very positive feedback we received from every investor we met last week during investor meetings in Toronto (Lou Schwartz, Harrison Shih and I did face to face meetings for 2.5 days). Please let me know if you have any questions - *we will be pushing toward to the closing of the transaction with deliberate speed*.   Onwards and upwards!
>
> Best regards,
> Steve Chung

156.    This email from Chung is evidence of Defendants' scheme to induce Plaintiffs to close the transaction through the use of material omissions, *i.e.* omissions causing Chung's statements to be materially misleading.

157.    Contrary to Chung's explicit statement, Chung, Shih and Schwartz did ***not*** receive "very positive feedback" or any willingness to make an investment from any of the investors with whom they had met the previous week, and Defendants each knew this.

158.    Beacons Report of August 4, 2015, which Chung sent to Plaintiffs just three weeks before the closing of Frankly's acquisition of WorldNow, specifically focused on the value to be created from the convergence of Frankly's existing chat platform and SDK with WorldNow's existing media content and advertising business. These statements by Beacons

48.

and the information on which they were based were exclusively acquired from Frankly, Chung and Schmeichel (in effect, summarizing the sales pitch they used to induce Plaintiffs to sell WorldNow to Frankly), and provided in pertinent part:

> We see several positive aspects to this transaction, including:
>
> - Synergies and **value which can be unlocked from being able to upsell Worldnow's customers** Frankly's ability to build apps, and embed chat.
> - **Opportunities to command higher CPMs from more data** collection Frankly Inc. offers Frankly Chat, a free mobile messaging application focused on user privacy by offering ephemeral messages and unsend capabilities. Also the company offers an SDK which allows its technology to be inserted into a website or mobile application providing a customizable version of Frankly's messaging technology.
>
> **Frankly plans to upsell Worldnow's 450+ clients apps and make SDK partnerships the default setting for arrangements going forward.** The company could go a step further and set up customized chat rooms for different groups to discuss the same issue (for example, one for Republicans, one for Democrats etc.). Ultimately, we believe Frankly could develop one master app covering all of Worldnow's 450+ customers allowing users to be able to access their local news wherever they happen to be.
>
> Management's goal is to create a full package solution (app, embed chat etc.) for a small number of Worldnow's larger clients which can serve as a showcase for the other 450. As this will likely take some time, we expect that the bulk of the benefits of the acquisition will arise in 2016 and beyond as opposed to 2015.

159. Every statement in this "Beacon Securities Report," published by Frankly's investment bankers but touted by Chung as third-party "independent" analysis, was based on "information" provided to (or withheld from) Beacon by Frankly, Chung and Schmeichel.

160. This Beacon Report and the statements contained therein are both false and misleading due to the material omissions in the information provided by Defendants to Beacon as the basis for the Report, statements which include the assertions that:

(a) Defendants were capable of and intended to upsell to WorldNow's media clients Frankly's chat app integrated through its SDK,

(b) Frankly had the technology and the ability to monetize these upsales,

     (c)     Frankly had the ability and intent to provide "data acquisition" technology to the WorldNow platform, enabling Frankly to provide data to the customers of WorldNow and increase the CPM's ("Cost Per Million") for the shared internet advertising revenue of its licensees and Frankly.

161.    Defendants knew that Frankly had no such technology or capability of acquiring and providing to its customers consumer data analytics, or the ability to use such data to increase the rates paid for the internet advertising inventory of WorldNow's media customers.  Defendants were well aware of the false and misleading nature of these statements, created by Defendants' intentional withholding of material information.

162.    Defendants nonetheless published in August of 2015 another "Frankly Presentation" touting the soon-to-be accomplished synergies that existed between Frankly and WorldNow assets, depicted by these graphic presentations that appear on pages 5, 6 and 15 of the Presentation:



COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



163.   On August 25, 2015, the deal closed and Plaintiffs eagerly awaited the convergence of Frankly Chat and Frankly's data analytics capabilities with the WorldNow Content Management and Video Management Systems, all purportedly made possible by Frankly's SDK technology and its professed ability "easily" or "quickly" or "seamlessly" to integrate Frankly Chat into WorldNow's digital media platform.

164.   But that integration process never began and Defendants never even discussed, contemplated or considered integration or synergies after the closing.  As previously planned, Defendants immediately jettisoned Frankly's Chat and SDK business and technology, and completely pivoted to Plaintiffs' digital media business, products and technology, as evidenced by Frankly's belated but candid admission more than a year later (November of 2016) in its S-1 Registration Statement filed with the SEC:

> We have had two distinct phases of product evolution in our history. **In our first phase from February 2013 until August 2015,** we were developers of mobile applications and a next generation server platform. During this phase, we launched, developed and marketed a consumer focused Frankly Chat mobile application, as well as launched a white-labeled, business-to-business mobile communication platform via a software development kit ("SDK") that was used by retailers. **The mobile app and SDK business are no longer a material part of our business** but the technology became the foundation for our current platform. **Through the acquisition of Frankly Media LLC ("Frankly Media") in August 2015,** we leveraged our existing mobile and platform expertise to become a software-as-a-service ("SaaS") provider of content management for broadcasters and media companies.

165.   By August 25, 2015, Frankly's mobile Chat and SDK business were entirely gone, and Frankly had shifted dramatically and exclusively to WorldNow's business and technology, with none of the promised convergence or synergies.

166.   Defendants never intended to continue with Frankly's Chat and SDK product and business lines, and never intended to integrate Frankly's Chat into the platform and technologies of WorldNow.  Defendants' pre-acquisition statements and representations to Plaintiffs and the public were knowingly false and misleading, as more fully alleged herein.

*Defendants Failed to Disclose that JJR's Credit Guarantee Was Not Real*

167.    As a material part of Frankly's consideration for its acquisition of WorldNow and its assets, Plaintiffs as an express condition precedent to the Purchase Agreement required that Frankly obtain a $10 million credit guarantee prior to the closing of the transaction, credit which Plaintiffs felt was essential to insure Frankly's continued financial viability and to provide essential cash to integrate Frankly's technology (primarily its chat and SDK) into WorldNow's much larger media content platform.

168.    To induce Plaintiffs to accept the Purchase Agreement and sell to Frankly their interest in WorldNow for cash and stock, Frankly offered, and the parties agreed, to an express condition precedent to the Purchase Agreement and to Seller's obligation to close that deal, *i.e.* to provide a binding Credit Guarantee as set forth in Paragraph 2.03(e) of the Purchase Agreement:

**Conditions Precedent to Obligations of Sellers and the Company.**

The obligations of Sellers and the Company to consummate the Transaction are subject to the satisfaction of the following conditions before the Closing Date, unless specifically waived by the Seller prior to the Closing Date:

////

(e)    **Additional Financing**.  Purchaser shall have obtained funding in the amount of at least US $10,000,000, from JJR Private Capital Limited Partnership or similar lending entity or a financial institution, which may be in the form a firm commitment letter, line of credit or any other debt instrument or security as determined by Purchaser in its sole discretion.

169.    In order to induce Plaintiffs to close the transaction and satisfy this explicit condition precedent to the Purchase Agreement and Sellers' obligations thereunder, JJR Private Capital (Ron Schmeichel, member of Frankly's Board of Directors and Chairman of its Audit Committee) executed on July 27, 2015, a letter to Steven Chung, CEO of Frankly, styled a "Credit Guarantee Letter," setting forth JJR and Schmeichel's legal commitment to provide Frankly with a $10 million Credit Facility, stating in pertinent part:

Dear. Steve:

The purpose of this letter is to set forth certain binding agreements between JJR Capital Limited Partnership ("the Lender") and Frankly Inc. ("Frankly") with respect to a loan that Lender is prepared to make to Frankly on and subject to the terms set out below:

1.  **The Loan:**   Upon and subject to the conditions hereof, the Lender agrees to loan to Frankly an aggregate principal amount of up to $10 million (US) ("the Loan").

////

2.  **Interest and Fees:**

    2.1     In consideration of Lender making the Loan available to Frankly on the terms contained herein, Frankly shall, immediately upon execution of this letter by Frankly: i) pay to the Lender a commitment fee in the amount of US $100,000 by certified cheque, bank draft or wire transfer, and ii) subject to the TSX Venture Exchange ("TSXV") approval, issue to the Lender 50,000 common shares in the capital of Frankly.

170.   On July 28, 2015, the Purchase Agreement was signed by all parties, and Schwartz made the announcement to the executive team at WorldNow, thanking everyone for helping him close the deal per "our timeline."

171.   On August 4, 2015, Beacon Securities, on behalf of its investment banking client, Frankly, reported online the terms of the Purchase Agreement, specifically noting:

Frankly has obtained a commitment from JJR Private Capital Limited Partnership for a credit facility of up to $10MM which it can draw upon if required.

172.   On August 7, 2015, Defendants filed with Canadian securities regulators a "Material Change Report" summarizing the terms of Frankly's acquisition of WorldNow and expressly asserting that Frankly had satisfied the express condition precedent by virtue of the JJR commitment letter:

The acquisition was a competitive process. We understand that **Frankly prevailed over two NASDAQ-listed companies** due to a combination of: strategic fit; relationship (Steve Chung, Frankly's CEO and Mr. Lou Schwartz, Worldnow's Chief Strategy Officer, had worked together previously); and financial considerations.

- **The company is on track with its business plan.** Consistent with the expectations set out at the start of the year, we expect essentially all of the company's announced partnerships to go live in Q3/FY15, with experimentation of various monetization approaches occurring in Q4/FY15 and revenue commencing in Q1/FY16. **In conjunction with the transaction and subject to TSX-V approval, Frankly has obtained a commitment letter from JJR Private Capital Limited Partnership ("JJR") for a credit facility of up to US$10 million (the "Credit Facility").**

54.

*////*

## Credit Facility

In conjunction with the transaction and subject to TSX-V approval, ***Frankly has obtained a commitment letter from JJR Private Capital Limited Partnership ("JJR") for a credit facility of up to US$10 million*** (the "Credit Facility"). ***In consideration for and upon JJR entering into the Credit Facility, Frankly has agreed to pay to JJR a commitment fee in the amount of US$100,000 and to issue to JJR 50,000 Common Shares, subject to TSX-V*** approval.

*///*

The purpose and business reasons for entering into the Credit Facility were to provide flexibility to the Company by increasing its liquidity and capital resources. Any funds advanced under the Credit Facility are expected to be used for investment in (i) recruitment efforts for additional developers, (ii) ***marketing the Company's technology to Worldnow's customer base***, and (iii) ***funding advertising solutions to maximize merger synergies***. A demonstration of the ability to access additional cash resources, as evidenced by a commitment letter or otherwise, is ***also a condition of closing the transaction contemplated by the Purchase Agreement.***

173.    Also on August 7, 2015, Frankly received and forwarded to Plaintiffs a letter of "conditional approval" of the Purchase Agreement from Nancy Ho of the TSXV, *i.e.* TSXV's conditional approval of the terms of the proposed acquisition of WorldNow and the sale of Frankly shares to Plaintiffs, conditioning such approval only on the submission of all pertinent documents prior to closing.

174.    On August 14, 2015, Chung forwarded to Gary Gannaway a letter from Nancy Ho of the TSXV to Frankly's Canadian lawyer, acknowledging receipt of all the pertinent documents in satisfaction of the only remaining condition required for approval. Chung congratulated everyone on the final approval.

175.    In Frankly's Unaudited Consolidated Financial Statement for the Six Months Ending 6/30/2015 for Frankly Inc. (consolidating Frankly Inc. and WorldNow's Financial Statements), Defendants further asserted that JJR ***unconditionally*** agreed as part of the acquisition of WorldNow to provide the $10 million credit facility, as follows:

In conjunction with the transaction, the Company obtained a commitment letter from JJR Private Capital LP ("JJR") for a credit facility of up to $10 million. In consideration for and upon JJR entering into the credit facility, the Company has agreed to pay to JJR a commitment fee in the amount of $100,000 and to issue to JJR 50,000 common shares.

55.

176.    Defendants' statement in the Unaudited Consolidated Financial Statement regarding the JJR Commitment Letter made no reference to it being subject to further approval by the TSXV, or any other contingency, present or future.  The JJR $10 million credit facility *was* in place, Defendants explicitly stated, in satisfaction of the express condition precedent to the Purchase Agreement.

177.    In fact, the JJR Credit Facility never was provided by JJR or Schmeichel, and the evidence establishes that Frankly never paid JJR or Schmeichel the $100,000 commitment fee, and neither Chung nor Schmeichel ever intended that JJR or Schmeichel actually would or could provide to Frankly the promised $10 million Credit Facility.  The JJR Commitment Letter was Defendants' ruse to induce Plaintiffs to accept the terms of the Purchase Agreement and acquire Frankly's stock at its artificially inflated price.

178.    The JJR Letter of July 27, 2015, and its guarantee of a $10 million Credit Facility, was part of the scheme by Chung and Schmeichel (Frankly and JJR) fraudulently to induce Plaintiffs to sign and close the Purchase Agreement, by creating the false impression that this express condition precedent to the Purchase Agreement had been fully satisfied by JJR's Credit Guarantee.  From inception, Plaintiffs' execution of the Purchase Agreement on July 28, 2015, and their consent to the closing of the Purchase Agreement on August 25, 2015, were fraudulently induced by these intentional misrepresentations and omissions by Frankly, Chung, Schmeichel and JJR Capital.

179.    On June 2, 2016, in response to a letter from Gary Gannaway outlining his objection that Frankly and Schmeichel had failed to live up to their obligations with respect to the JJR Credit Facility, Chung (while acknowledging that the $10 million Credit Facility was an express condition precedent to the Purchase Agreement) also stated that JJR's obligation to provide the $10 million Credit Facility was conditioned on the approval of the TSXV, *an approval, Chung said, the TSXV had refused to provide*:

As you know, the TSXV ultimately *did not approve* the provisions of the July 27, 2015 letter. Accordingly, JJR did not have an obligation under the July 27, 2015 letter to provide financing.

180.    Chung and Schmeichel's statements made prior to the closing as to the availability and guarantee of JJR's $10 million Credit Facility were made by both of these Defendants fraudulently and with the intent to induce Plaintiffs to acquiesce to the terms of the deal, statements made by Defendants with full knowledge of their falsity.

181.    This false statement by Chung that the TSXV rejected the JJR Credit Guarantee is compelling evidence of Chung's and Schmeichel's fraudulent intent.

182.    Neither Frankly nor any of the other Defendants ever provided to Plaintiffs any notice that the TSXV had disapproved the terms of the JJR Credit Facility, either before or after the August 25, 2015 Closing, and Plaintiffs agreed to the Closing based on the representations by Schmeichel, JJR, Frankly and Chung that the Credit Facility was in place and approved by the TSXV, as with all other terms of the Purchase Agreement.

183.    Chung never provided to Plaintiffs any communication from the TSXV disapproving the terms of the JJR Credit Facility, and during the Plaintiffs' investigation of this case, the in-house counsel for the TSXV confirmed that the rules of the TSXV would not require TSXV approval over the specific terms of any such credit facility, only the approval of the transaction as a whole, an approval given by Nancy Ho on August 14, 2015, as alleged hereinabove.

184.    Additional proof that Schmeichel and Chung had no intention of providing or accessing, respectively, the $10 million JJR Credit Facility, is provided by the fact that neither Chung nor Frankly ever gave to JJR or Schmeichel the $100,000 "commitment fee" Frankly had agreed to pay to JJR within 5 days of Schmeichel's July 27, 2015 execution of the JJR Credit Guarantee.

185.    Frankly never paid such commitment fee, and Schmeichel never demanded or even asked for the payment of such fee (despite the fact he was a Founder and Director of Frankly), because both Chung and Schmeichel intended that the Credit Facility never would be provided, and the Credit Guarantee was a fraud.

186.    Plaintiffs understood that a condition precedent to the Purchase Agreement and its enforceability was that JJR Capital would provide the promised Credit Facility for

57.

$10 million, and Plaintiffs insisted on such provision as an express, material term and a condition precedent to the Purchase Agreement.

187.    Plaintiffs reasonably relied on Defendants' written statements that such Credit Facility was guaranteed, and would facilitate the promised convergence and development of the two companies' platforms and technologies.  Plaintiffs were fraudulently induced by such false representations to enter into the Purchase Agreement.

188.    In various written and oral statements made to Plaintiff and to the public, Defendants represented that Schmeichel and his company, JJR Capital Holdings, were "world class investors," well established and renowned, legitimate investors capable of providing to Frankly all the necessary and promised capital for the post-acquisition integration and convergence of the assets and technology of Frankly and WorldNow.

189.    Schmeichel and JJR, when Defendants made and/or authorized such statements in the period July through August of 2015, had no financial wherewithal or intention to provide the promised $10 million credit facility to Frankly, or to provide any substantial credit or equity investment in the Company whatsoever.

190.    In fact, Plaintiffs allege on information and belief, that by the Fall of 2015, Schmeichel was unable to provide *any significant capital* for Frankly, either in the form of a $10 million credit facility or investment of equity, but instead, was embroiled in an investigation of alleged securities fraud in connection with another of Schmeichel's public companies, Concordia Health Care, now the subject of several fraud cases still pending.

## FIRST CAUSE OF ACTION

### (Violation of Section 10(b) of the Exchange Act and

### Rule10b-5 Promulgated Thereunder)

### (Against All Defendants except Schwartz)

191.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

192.    During the period from January 5, 2015 through August 25, 2015, the
Company and the Individual Defendants carried out a plan, scheme and course of conduct
which was intended to and did:

      (a)    deceive first the investing public then Plaintiffs, as alleged herein; and

      (b)    cause Plaintiffs to purchase Frankly's securities at artificially inflated
prices. In furtherance of this unlawful scheme, plan and course of
conduct, Defendants, and each of them, took the actions set forth
herein.

193.    The Company and the Individual Defendants:

      (a)    employed devices, schemes, and artifices to defraud;

      (b)    omitted to state material facts necessary to make their statements to
Plaintiffs and the market not misleading; and

      (c)    engaged in acts, practices, and a course of business which operated as
a fraud and deceit upon Plaintiffs as purchasers of almost 10% of the
Company's securities, in an effort to maintain artificially high market
prices for Frankly's securities in violation of Section 10(b) of the
Exchange Act and Rule 10b-5. All Defendants are sued either as
primary participants in the wrongful and illegal conduct charged
herein or as controlling persons as alleged below.

194.    The Company and the Individual Defendants, individually and in concert,
directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or
of the mails, engaged and participated in a continuous course of conduct to conceal adverse
material information about Frankly's true financial status, as specified herein.

195.    Defendants employed devices, schemes and artifices to defraud, while in
possession of material adverse non-public information and engaged in acts, practices, and a
course of conduct as alleged herein in an effort to assure investors of Frankly's value and
performance and continued substantial growth, which included the making of, or the
participation in the making of, untrue statements of material facts and/or omitting to state

59.
COMPLAINT

material facts necessary in order to make the statements made about Frankly and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs as purchasers of the Company's securities. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Frankly's securities was artificially inflated between January 5, 2015 (when the Company's stock started to trade on the TSXV) and August 25, 2015, when Plaintiffs acquired their stock in Frankly.

196.    In ignorance of the fact that the market price of the Company's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, Plaintiffs accepted and closed the Purchase Agreement, acquiring Frankly's securities at artificially high prices, rather than accepting another significantly more valuable offer for the acquisition of WorldNow, and were directly and substantially damaged thereby.

197.    At the time of said omissions and resulting misrepresentations, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth regarding the problems that Frankly was experiencing, which were not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their Frankly securities, and would have accepted another, more valuable offer to acquire WorldNow.

198.    By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) and Rule 10b-5 promulgated thereunder.

199.    As a direct and proximate result of the Company and the Individual Defendants' wrongful conduct, Plaintiffs suffered substantial monetary damages in connection with their respective purchases of the Company's securities.

## A.      DEFENDANTS' MATERIAL OMISSIONS

200.    As alleged in great evidentiary detail hereinabove, Defendants failed to disclose numerous material facts in their statements to the public in general and to Plaintiffs in particular, material facts the omission of which caused the related statements by Defendants, statements made in press releases, interviews, regulatory filings and disclosures, to be materially misleading.

201.    As alleged in specific detail and with evidentiary facts hereinabove, those material omissions by Defendants included, *inter alia*, the following.

202.    Defendants failed and refused to disclose that by March of 2015, they knew there was no way effectively to grow the Frankly user base to compete with any of the much more established and successful companies in the social media space, or meet any of Frankly's benchmarks necessary just to achieve profitability.  Frankly Chat had only 2.1 million registered users, while the much larger and more established messaging apps such as WhatsApp and Line had 500 million and 420 million users, respectively.

203.    The *Harnish* lawsuit and the confidential and onerous terms of its settlement just days before the August 25th closing meant that the only aspect of Frankly's chat technology which gave it the potential rapidly or exponentially to expand its user base to compete with these much larger chat apps, apps with a virtual monopoly over this market, was effectively outlawed.

204.    Muzy's user base was nowhere near 35 million actual users, and was rapidly dwindling as Muzy's photo blogging service failed; Frankly would acquire few if any of those purported 35 million Muzy users before shuttering Muzy.

205.    The Victoria's Secret deal was a bust, was really a sponsorship deal which cost Frankly $500,000, presented no opportunity for monetization or expansion of Frankly's user base, and by its terms expired in April of 2015.

206.    Frankly had neither the contractual right nor the technology to sell Victoria's Secret's advertising inventory. Nor did Frankly have the contractual right or technology to

sell the digital advertising inventory of any of its other purported SDK brand "partners." These relationships were financial one way streets.

207.    Neither Frankly nor JJR Capital/Schmeichel would deliver on the promise to provide $10 million new capital for Frankly, an explicit condition precedent to the Purchase Agreement, essential capital for the promised convergence of Frankly's Chat and SDK with World Now's media platform, capital which Schmeichel and JJR had neither the ability nor the intention to provide.

208.    The "approval" of the TSXV was neither required nor contemplated; Defendants simply imposed this requirement as an "out" when as anticipated JJR would not provide any credit facility or new capital for Frankly after the deal was consummated. Plaintiffs were induced to accept the Frankly deal and its stock acquisition component, rather than a more valuable offer from another bidder, by Defendants' false promise of this $10 million Credit Facility, promises made by JJR, Schmeichel, Frankly and Chung.

209.    Defendants knew by August 25, 2015, that Frankly would not be able to raise the new capital essential for the convergence or development of the two companies' assets, and that Schmeichel/JJR's guarantee of a $10 million credit facility (an express condition precedent to the sellers' obligations under the Purchase Agreement) was fraudulently made and would not be forthcoming.

210.    The letter from Beacon Securities regarding its ability to raise another $25 million for Frankly also was not real, and by August 25, 2015, the Defendants and their investment bankers knew full well they would not be able to raise the essential capital, planning instead to cannibalize World Now's revenue stream to keep Frankly afloat, leaving no chance of the promised asset convergence and synergies.

211.    The $5 million promised investment of existing Frankly capital in this convergence already was ear-marked by Defendants for other expenditures, *i.e.* they intended to spend all the remaining capital on Frankly's and WorldNow's duplicative overhead, rather than on any "convergence" or synergies between the two companies.

212.    JJR was not a "world class investor" with deep pockets to support Frankly and its promised growth.  Undisclosed to Plaintiffs, Schmeichel and JJR were embroiled in a securities fraud investigation involving Concordia Health Care, another Schmeichel and JJR founded company on the TSXV, collapsing under the weight of its own pyramid.

213.    Each of the aforementioned omissions by Defendants' from their public statements and disclosures rendered the related statements by these Defendants materially misleading to the public and to Plaintiffs, and Plaintiffs relied on these materially misleading statements in deciding to accept the Frankly deal and forego other offers.

214.    The omissions of Defendants were material in that they created a substantial likelihood that the Defendants' related statements would be viewed by the reasonable investor, and by Plaintiffs, as having significantly altered the total mix of information made available. The omissions here were important and rendered the Defendants' related statements materially misleading.

215.    Plaintiffs were induced by Defendants' omissions and misleading statements to believe Frankly had the guaranteed $10 million credit facility, and that this $10 million, and an additional $5 million of existing Frankly capital, would be used to finance the convergence and marketing of the companies' combined assets and technologies.

216.    Plaintiffs were induced by Defendants' omissions and misleading statements to believe that Frankly's user base already had grown to more than 50 million users as a result of Frankly's acquisition of Muzy's 35 million users and the users of Frankly's new brand "partners," and that this substantially increased user base would be added to WorldNow's more than 100 million users, and with the converging technologies and platforms that were guaranteed to occur, to create exponential growth in post-acquisition revenue and stock valuation for Frankly and its shareholders.

217.    Plaintiffs were induced by Defendants' omissions and misleading statements to believe that Frankly Chat, its SDK and its data analytics already were being successfully deployed, were fully functional, operational and effective, the pillars of Frankly's plans and projections for rapidly expanding revenue streams and stock valuations.

218.    Instead, almost immediately after close of the Purchase Agreement. as previously planned by Defendants, Defendants completely jettisoned Frankly's Chat and SDK businesses, shut down Muzy, and stopped any development or even discussion of asset or technology convergence or synergies, instead wasting Frankly's rapidly dwindling capital resources (provided by WorldNow's revenue) exclusively on Frankly's duplicative and bloated executive salaries and office overhead.

### B.    PLAINTIFFS' CORROBORATING WITNESSES

219.    In addition to the plethora of documentary evidence already set forth hereinabove, Plaintiffs allege corroborating testimonial evidence supporting each and every allegation of Defendants' material omissions and misrepresentations, attestations from Plaintiffs and from the numerous Confidential Witnesses with whom Plaintiffs or their agents have spoken during their extensive investigations of this case.

*Plaintiff Samantha Gannaway*

220.    Plaintiff Samantha Gannaway corroborates based on her firsthand knowledge many of Plaintiffs' specific allegations regarding:

      (a)    Defendants' material omissions and misrepresentations,

      (b)    Plaintiffs' reliance on such misrepresentations, and

      (c)    the reasons why such omissions and misrepresentations were material in the context of this transaction

      (d)    why Defendants' specific material omissions rendered their other statements on those same subjects misleading.

221.    Samantha Gannaway's firsthand knowledge with respect to such matters is acquired from her direct pre-acquisition communications with Defendants, in particular with Chung and Schwartz, as well as from her post-acquisition conversations with Confidential Witness No. 1, Frankly's Chief Product Officer.

222.   Samantha Gannaway's personal knowledge as to these matters also is acquired from her involvement as a WorldNow owner, executive and Board Member prior to the acquisition by Frankly, and as a Frankly employee after the acquisition.

223.   Ms. Gannaway began her employment with WorldNow in September of 2012 when she was retained as a Client Service Coordinator, dealing with the many media (tv station) clients or licensees of WorldNow.

224.   In September of 2013, Ms. Gannaway became a manager in WorldNow's Social Media and Marketing department, focusing primarily on the social media aspects of WorldNow's business, implementing strategies for its media clients to leverage social media networks and drive digital as well as on-air audiences, and exploiting social data analytics tools to assist WorldNow's media clients to better understand their audiences.

225.   In September of 2014, Ms. Gannaway became the head of WorldNow's Social Media and Marketing department. In this role, Ms. Gannaway managed WorldNow's content and press release distribution deals across all its local media websites, wrote press releases, organized and coordinated conferences, worked closely with the client services and advertising department to better inform clients of monetization opportunities, and worked with clients to assist them in utilizing social media and data analytics to understand their audiences and to leverage these platforms to create greater audience loyalty, while also gaining younger audiences.

226.   Ms. Gannaway also became a Member of the Board of Directors of WorldNow in 2013, and remained on the Board through the acquisition by Frankly in August of 2015.  In that capacity, Ms. Gannaway's responsibilities included working with WorldNow's investment bankers regarding potential acquisitions by WorldNow, and the potential sale of WorldNow.

227.   After Frankly's acquisition of WorldNow, Ms. Gannaway became the Vice President of National Sales for Frankly Media (formerly WorldNow), with responsibilities which included selling direct and programmatic advertising to ad agencies and buyers, as

well as identifying and making content distribution deals across Frankly Media's local media sites, including deals with Business Wire, NASDAQ, CNN, Associated Press, etc.

228.    In this capacity post-acquisition, Ms. Gannaway worked with and had many conversations with Plaintiffs' Confidential Witness No. 1, as well as with Frankly CEO Steve Chung and CFO/COO Lou Schwartz.

229.    Based on her personal knowledge and the statements made to her following Frankly's acquisition of World Now by Confidential Witness No. 1, Ms. Gannaway attests that Defendants prior to the Closing made material misrepresentations and omissions to the public and directly to her with respect to Frankly's SDK technology as well as its business relationships with Victoria's Secret and various other brands.

230.    Specifically, Ms. Gannaway corroborates that Confidential Witness No. 1 told her shortly after the acquisition of WorldNow, that Frankly did not own or possess the technology for the Software Development Kit they were marketing, an SDK capable of "quickly" or "easily," "seamlessly," "instantly," "simply" or otherwise, integrating the Frankly Chat app into another brand's internet platform (including WorldNow).  Frankly had to create each such program from "scratch" to integrate Frankly Chat into another brand's internet platform.  The SDK technology that Frankly was marketing did not exist.

231.    Ms. Gannaway also learned after the closing that the Frankly "partnership" with Victoria's Secret was in actuality a paid promotional opportunity, *i.e.* Frankly paid Victoria's Secret $500,000 for the right to insert for a brief period of time the Frankly chat app into the Victoria's Secret Pink app, a right which, contrary to Frankly's frequent written and oral statements to Plaintiffs and the public, had expired in April of 2015.

232.    Ms. Gannaway also discovered after the acquisition of WorldNow that, contrary to Defendants' statements prior to the acquisition, Frankly had no method of monetizing its business "partnerships" with Victoria's Secrets or any of its other brand "partners," since Frankly did not own the right to sell advertising inventory for any of those brands, or the ability to collect, analyze or sell data pertaining to the consumer user bases for those brands.

233.    Ms. Gannaway discovered after the acquisition that Frankly did not have the technology to collect and analyze data pertaining to its brands' users, the so-called "data analytics" which Frankly and Chung prior to the transaction claimed Frankly would combine with WorldNow's preexisting user base exponentially to increase revenue.

234.    Based upon her personal observations as well as her post-transaction communications with Confidential Witness 1, Ms. Gannaway substantiates that Defendants failed to disclose several other material facts in their oral and written statements to Plaintiffs prior to the acquisition, material omissions which rendered Defendants' related statements extremely misleading.

235.    Ms. Gannaway will attest, for example, that a written presentation from March of 2015 was provided to Plaintiffs in order to sell Plaintiffs on the supposed capabilities of Frankly and the synergies that would be created when those capabilities were combined with the assets and capabilities of WorldNow. Among the many misleading statements and omissions in this Frankly Presentation in March of 2015, are those contained in or omitted from the following quote:

**WE ARE A LEADER IN MOBILE CHAT TECHNOLOGY:**

- **Chat technology** Plug into other existing apps to power white-labeled chat

- **Frankly & Muzy** Messaging and photoblogging apps that use our own chat tech

- **Our chat technology via our customers** integrate to form the world's largest chat network

**VISION: Frankly will be the world's largest chat network on any topic**

236.    Ms. Gannaway also will attest that through this Frankly Presentation, Defendants falsely represented to Plaintiffs, including herself, that Frankly owned, and would integrate with Plaintiffs' assets, the following capabilities, quote:

**(1)   Chat Technology (White-label):** White label chat that plugs into other apps to enable chat inside any mobile app or website

**(2)** **Frankly Chat App:** Ephemeral mobile messaging app 2M+ downloads

**(3)** **MuzyApp**: Leading photo blogging app and site with 35M+ registered users (integrating chat soon)

**Muzy Inc.** Allows Frankly to reach over 35 million users
- Muzy is a **35 million user** photo blogging app

237. As alleged more fully herein, Defendants' statements which pertain to: a) its "white label chat that plugs into other apps," and b) the Muzy App and its 35 million active users who would soon be using the Frankly Chat app, were materially false and misleading due largely to their many omissions of material facts.

238. As Ms. Gannaway will attest, there were many material facts omitted from these statements, including the fact that the SDK technology did not exist and the Muzy app had lost most of its purported 35 million active users by March of 2015 (and was losing the remaining users in droves, apparently from its poor functionality and the superior performance of competing video blogging apps).

239. As Ms. Gannaway will attest, she subsequently learned while still employed by Frankly that Defendants never had any actual plans to integrate the Frankly Chat into the Muzy app to create 35 million new registered users of Frankly Chat, instead planning to close the Muzy site upon acquiring WorldNow.

240. As Ms. Gannaway also will verify from her personal knowledge, the falsely promised 35 million new users of Frankly Chat, had they existed, when integrated with WorldNow's media platform, would have meant an exponential increase in the revenue generated from the combined assets of Frankly and WorldNow, radically increasing the combined user base and creating a new, national user base well beyond the local user base for local media content.  This in turn, had it been genuine, would have dramatically increased the demand for its advertising inventory from advertising agencies and their customers seeking a national advertising audience and unique advertising opportunities.

241. Ms. Gannaway also will testify to the materiality of the specific misrepresentations and omissions by Defendants' Chung and Frankly with respect to

Frankly's purported data analytics capabilities, *i.e.* their claimed technology allowing them to gather, analyze and exploit data on the users of Frankly's, Muzy's, and post-acquisition, Frankly users, including their demographics, personal interests and consumption habits. This was an area of valuable technology in which WorldNow was sorely lacking, and the promised convergence of Frankly's claimed assets with WorldNow's media platform meant immediate synergies and substantial revenue enhancement, in turn dramatically increasing the value of the combined entity's (Frankly) publicly traded stock.

242.   Ms. Gannaway also will attest that Chung made specific statements to her in the days and weeks leading up to the Frankly acquisition of WorldNow that were substantially misleading due to their many material omissions, including but not limited to Chung's statements to her during a dinner meeting in New York on June 15, 2015, in which Chung described the power of the joint technologies of Frankly and WorldNow.  He stressed the synergies the acquisition would create, allowing Frankly to sell more advertising and generate new sources of revenue outside of WorldNow's local media markets, a national sales effort Chung said he wanted Ms. Gannaway to run. These synergies involved the purported use of Frankly's (nonexistent) SDK technology, its (nonexistent) data analytics capabilities, and its ***guaranteed*** influx of new capital (not to be forthcoming) to integrate and perfect these combined technology resources.

243.   In sum, Ms. Gannaway, through her personal observations and direct conversations with Defendants and their employees, including Chung and Confidential Witness No. 1, can and will attest that Defendants failed to disclose material facts, and thus misled Plaintiffs by their statements concerning Frankly's technology, its customers, its user base, its monetization capabilities, its capital resources and its ability and intent to converge the assets,  opportunities and technologies of Frankly and WorldNow to create a vastly more valuable entity.

244.   As a direct result of Defendants' failure to disclose these material adverse facts to Plaintiffs, Plaintiffs were induced to believe that the projections by Defendants and their (some undisclosed) spokespersons (Chung, Moshevich, Beacon and Cormark) as to

69.

1    Frankly's substantially increased revenue and stock valuations, were true and accurate as a
2    matter of fact, and that Frankly's post-acquisition stock price would soon be 10 times its
3    preacquisition price.

4

5                *Plaintiffs' Confidential Witness No. 1 – Frankly's Chief Product Officer*

6         245.    Confidential Witness No. 1 was from August of 2014 to February of 2016 the
7    Vice President of Product and Marketing for TicToc Planet/Frankly, and from February of
8    2016 until February of 2017, Frankly's Chief Product Officer.  As Frankly's Chief Product
9    Officer he worked directly and closely with Frankly CEO Steve Chung, and was integrally
10   involved in the development and marketing of Frankly's technology and products,
11   including its chat products and platform.

12        246.    According to Confidential Witness No. 1, Defendants' multiple and repeated
13   public statements to the effect that Frankly's existing SDK technology allowed any brand
14   to "quickly" or "easily" or "seamlessly" "plug in" Frankly's chat app to that brand's internet
15   platform was a complete falsehood.  Frankly had not developed by June of 2015 (and in
16   fact never developed) any Software Development Kit capable of "quickly" or "seamlessly"
17   or "easily" or "simply" plugging Frankly's chat platform into another brand's app.

18        247.    According to Confidential Witness No. 1, Frankly's SDK product that was
19   developed by his predecessor simply did not work to integrate Frankly Chat into any other
20   brand's app platform, and Steven Chung was well aware of this fact.

21        248.    Confidential Witness No. 1 also stated that when he worked at Frankly,
22   Chung repeatedly "made stuff up" regarding Frankly's technology and pending business
23   deals, then put those false statements in Frankly press releases all for purposes of
24   artificially enhancing or "pumping" Frankly's stock.

25        249.    Confidential Witness No. 1 also confirmed to Plaintiff Gary Gannaway that
26   when Frankly was considering purchasing WorldNow, he told CEO Chung that Frankly
27   could not afford to make that purchase; the Frankly SDK did not work and Frankly's chat

28

technology "stunk," so Frankly needed to spend the $20 million it on hand developing and fixing its own technology, not on buying the assets of WorldNow.

250.   According to Confidential Witness No. 1, Chung responded to this statement by acknowledging that Frankly's technology did not function as advertised, but telling him not to worry about it; they needed to acquire WorldNow and its substantial revenue immediately.

### Plaintiffs' Confidential Witness No. 2 – Frankly's Current Head of Product

251.   Confidential Witness No. 2 also is a computer programmer, software developer and internet technology expert who since October of 2015 has been Frankly's Head of Product, a job which involves leading the team of employees at Frankly responsible for the Company's content management, digital video, responsive web, native mobile and OTT platforms.  In this capacity, Confidential Witness No. 2 works closely with senior management of Frankly, including CEO Steven Chung and CFO/COO Lou Schwartz, to ensure that development plans, resources and strategies are coordinated across all departments in a cohesive and collaborative fashion.  Formerly, Witness No. 2 worked for WorldNow from about 2002 through 2007.

252.   Confidential Witness No. 2 studied Frankly's chat product carefully in the weeks prior to Frankly's acquisition of World Now on August 25, 2015, and he corroborates the statements of Confidential Witnesses Nos. 1 and 3 that Frankly's SDK did not work as advertised, allowing a brand simply and quickly to "plug in" Frankly chat to its own site without the need for any significant expenditures of time or development resources.  To the contrary, Confidential Witness No. 2 confirmed the following with respect to Frankly's SDK:

> (a)   it was not scalable, *i.e.* it could not be used with more than one brand or one site,
>
> (b)   its "back end" could not support more than one website at a time, and

(c)     Frankly's SDK would not work to enable any of the users of
WorldNow's apps to utilize Frankly's Chat network to chat among
themselves.

### Plaintiffs' Confidential Witness No 3 – Frankly's Former CTO

253.     Confidential Witness No. 3 is a software developer and internet technology expert who was hired by Lou Schwartz as Frankly Media's Chief Technology Officer immediately before Frankly's August 25, 2015 acquisition of WorldNow.  Confidential Witness No. 3 attests that at some point in July of 2015, after he had been contacted by Defendant Schwartz with regard to Frankly and its pending acquisition of WorldNow, he asked to examine and analyze Frankly's purported Software Development Kit.  When he accessed what was supposed to be Frankly's SDK, he discovered it was "vaporware."

254.     Confidential Witness No. 3 then asked Frankly's Chief Product Officer (Confidential Witness No. 1) for assistance, thinking that perhaps he had made an error when he downloaded and examined what was supposed to be Frankly's SDK, but Confidential Witness No. 1 offered no explanation or assistance, referring him instead to an underling in the Frankly technology department.  That person never responded to his requests for assistance or explanation, so Witness No. 3, still in July of 2015, informed Defendant Schwartz that Frankly's SDK did not exist.

255.     Neither Confidential Witness No. 1, nor Witness No. 3, nor Schwartz, nor anyone else, ever informed Plaintiffs until more than a year later that Frankly's SDK was vaporware, or that Frankly's SDK, its "core business," was a farce.

### Plaintiffs' Confidential Witness No. 4 – Former CEO of Kit Digital

256.     Plaintiff's Confidential Witness No. 4 was a major shareholder, Board Member and Interim CEO of Kit Digital after its original CEO and CFO were indicted for securities fraud in the Southern District of New York.

257.    Confidential Witness No. 4 attests to the fact  that Defendant Schwartz was involved, while he was Executive Vice President and General Counsel of Kit Digital, in an elaborate and ultimately unsuccessful scheme to coverup Kit's accounting improprieties, including the use of Kit Digital's own cash reserves, paid to off-shore entities as purported "software development fees," then circulated back to Kit Digital as purported "licensing revenues," all to obfuscate prior fraudulent accountings for nonexistent revenues.

### *Plaintiffs' Confidential Witness No. 5 – Frankly's Head of Client Services*

258.    Numerous current and former Frankly employees and customers also confirm that Frankly had no intention of following through on its promises to Plaintiff and the public to converge the technologies of Frankly and WorldNow, and integrate Frankly's chat function into the media based websites of WorldNow and its media customers.  They confirm that Frankly never attempted any of the promised convergence following the acquisition of WorldNow, instead jettisoning its entire chat and SDK business and technology simultaneous with the acquisition of WorldNow.

259.    Confidential Witness No. 5 is Frankly's Head of Client Services, and has been in that position since the acquisition of WorldNow in August of 2015.  Prior to this, she was WorldNow's Senior and then Executive Vice President of Client Services for 17 years. As Head of Client services, Witness No. 5 has been and is responsible for handling WorldNow/Frankly Media's communications with its member stations or station groups, and for familiarizing these clients with any new developments in WorldNow/Frankly's web platform and product services, as well as collecting all input from those clients on the Company's new product and service initiatives.

260.    Witness No. 5 confirms that following Frankly's acquisition of WorldNow, none of the executives of Frankly or its employees ever so much as discussed with her the possibility of integrating Frankly's chat function into the web platform of WorldNow/Frankly or its many clients.

*Plaintiffs' Confidential Witnesses 6-10 – Frankly's Media Clients*

261.    WorldNow/Frankly Media's current and former clients also uniformly confirm that post-acquisition no one from Frankly Media ever discussed with them or even mentioned possible integration of the Frankly chat function into their websites or apps, and no one ever sought to utilize Frankly's SDK to quickly, seamlessly or otherwise plug in or integrate Frankly's Chat into their Frankly Media websites.

262.    Confidential Witness No. 6 is one of these current or former WorldNow/Frankly Media customers who corroborates the testimony of Confidential Witness No. 5 that Frankly Media made no attempt to integrate its chat function into its client station's websites or apps following the acquisition.  He is the President of a media company based in Columbus, Ohio, which owns two television stations and was a long-standing customer of WorldNow's when the acquisition by Frankly was announced.  CW No. 6 decided to cancel his company's license with Frankly Media effective December 31, 2015, when he discovered that Frankly Media neither had the ability nor the intention to integrate Frankly's new chat product into his stations' websites or mobile apps.

263.    Witness No. 6 also attests that he inquired just prior to the acquisition whether Frankly's technology included data analytics capabilities that could be integrated into his stations' websites and apps, and was told they did.  But when Frankly Media never produced for him or integrated any such data analytics technology, or any chat functionality into his stations' websites as promised, he cancelled the license.

264.    Before the license expired, however, Witness No. 6 had a conversation with Schwartz, the soon to be COO of Frankly Media, who asked him whether he could help advise Frankly Media on how to build a consumer database, acknowledging that Frankly had neither a current consumer database nor the expertise to develop one.

265.    Confidential Witnesses Nos. 7-10 all are current or former station manager licensees of the WorldNow/Frankly Media internet platform, all of whom confirmed that following Frankly's acquisition of WorldNow, no one on behalf of Frankly Media ever contacted them or discussed with them the possible integration of Frankly Chat into their

74.

websites or apps, and no one ever offered or provided them with Frankly's purported data analytics capabilities.

### *Plaintiffs' Confidential Witness No. 11 – In House Counsel for TSXV*

266.    Witness No. 11 is the current in-house legal counsel for the Toronto Stock Exchange Venture in Toronto, Canada.  She is Canadian legal counsel responsible for, *inter alia*, drafting and promulgating the filing and registration requirements of the TSXV.

267.    Although Confidential Witness No. 11 expressly stated to Plaintiffs' counsel she was not allowed to comment on or disclose any specific information pertaining to the filings of Frankly, or the communications between the TSXV and Frankly or its legal counsel, she could confirm that the specific terms of a credit facility which were part of an acquisition, such as Frankly's acquisition of WorldNow, would ***not*** be subject to the TSXV's review, approved or disapproval, separate or apart from the TSXV's review and approval of the acquisition as a whole.

268.    Confidential Witness No. 11 confirmed that the document from the TSXV approving the registration or filing of Frankly's Purchase Agreement would be the only approval required or obtained for this transaction or any of its provisions.

### GENERAL SCIENTER ALLEGATIONS

269.    As alleged herein, Defendants acted with scienter in that Defendants knew that the documents and statements issued or disseminated by themselves or in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public and to Plaintiffs; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.

270.    Defendants and each of them, by virtue of their receipt of information reflecting the true facts regarding Frankly, and his or its control over Frankly's materially

misleading misstatements, and/or their associations with the Company which made them privy to confidential information, participated in the fraudulent scheme alleged herein.

271.    Each Defendant acted with the requisite scienter, *i.e.* they knew of the falsity and materiality of their individual misrepresentations and/or they knew that by omitting certain material information Plaintiff and the investing public would be misled by the statements they did make.  Defendants' scienter is established by both direct and circumstantial as alleged herein.

272.    Defendants were motivated to engage in these material omissions and misrepresentations by each of their personal desires to induce Plaintiffs to sell WorldNow and its assets and existing revenue stream to Frankly, so that Chung and Schmeichel could stave off financial ruin and collapse of Frankly (a result of which KPMG in April of 2015 had warned), and Chung and Schmeichel could preserve their stocks and stock options in Frankly, along with their personal reputations and marketability.

273.    Defendants Chung and Schmeichel and each of them were motivated to make such false representations and omissions by their desire to avoid losing their salaries, stock and stock options, as well as by their desire to avoid damage to their own personal reputations.

274.    Neither Chung nor Schmeichel could afford another debacle on his resume, having recently been involved with other companies which were then the subject of growing investigations for securities fraud (Chung with Kit Digital and Schmeichel with Concordia).

275.    Defendants Schwartz and Chung by virtue of their positions and experiences at Kit Digital had extensive exposure to stock manipulation and securities fraud schemes, and neither can claim ignorance or naivete in that respect.

276.    Schwartz and Chung met while working together at Kit Digital, a NASDAQ internet "rollup" company where they were in senior management positions each as executive vice presidents (and Schwartz also as the company's general counsel). Schwartz and Chung both worked at Kit Digital in senior management positions during a period of

time (2011-12) when according to the Securities and Exchange Commission and the Department of Justice, massive securities fraud was taking place.

277.    According to Plaintiff's Confidential Witness No. 4 , a major shareholder, Board Member and Interim CEO of Kit Digital after its original CEO and CFO were indicted by a Grand Jury in the Southern District of New York, Defendant Schwartz was involved as Kit's executive vice president and general counsel in an elaborate and ultimately unsuccessful scheme to coverup Kit's accounting improprieties, including the use of Kit Digital's own cash reserves, paid to off-shore entities as purported "software development fees," then circulated back to Kit Digital as purported "licensing revenues," all to obfuscate prior fraudulent booking of nonexistence licensing revenues.

278.    Many of Frankly's stock manipulation practices which are alleged herein closely mirror the fraudulent practices charged by prosecutors to have taken place during Schwartz and Chung's tenure as Kit Digital executives, including stock manipulation tactics which included:

(a)    the *firing* of company auditors following negative audit opinions,

(b)    key *technology* which actually was *nonfunctional* or *nonexistent*, and

(c)    purported *convergence* of newly acquired technology with existing technology that never was *attempted* or *intended*.

279.    On information and belief, Plaintiffs allege that Defendants Chung and Schwartz were at least tangentially involved in the SEC and DOJ civil and criminal investigations of Kit Digital, investigations which unbeknownst to Plaintiffs were pending at the time of the acquisition of WorldNow.  Schwartz's and Chung's failure to disclose this involvement to Plaintiffs, while openly touting to Plaintiffs and the public their experience and competence as senior executives at Kit Digital, were material omissions rendering their statements regarding their prior executive experience highly misleading.

280.    Whether they were directly or only indirectly involved in the securities fraud and coverup at Kit Digital during their tenure as senior executives, Schwartz and Chung by 2015 had a familiarity with and exposure to the kind of stock manipulation schemes and

77.

devices used at Kit Digital, and neither can claim ignorance or naivete as to Frankly's own fraudulent practices as alleged herein.

281.   As alleged herein above, the public statements by Defendants and each of them were contradicted by the internal (nonpublic) statements and admissions of the Defendants as to the material issues referenced herein.

282.   The false and misleading statements and omissions of Defendants leading up to the sale of Frankly stock to Plaintiffs were followed after the acquisition in only a matter of weeks or months by the public disclosure of directly and materially contradicting information, as alleged hereinbelow, including:

      (a)   write off of Muzy and its purported 35 million users as worthless,

      (b)   the expiration of the Victoria's Secret business relationship,

      (c)   the abandonment of the SDK product line and acknowledgment of Frankly's failure to develop the SDK technology or the data analytics capabilities, and

      (d)   the absence of any ability to monetize Frankly Chat or its brand "partnerships" through the sale of advertising inventory or otherwise.

283.   In June of 2015, as Defendants were fervently trying to induce Plaintiffs to accept the terms of their offer for Frankly's acquisition of WorldNow, CEO Steve Chung sent to Plaintiff Gary Gannaway an extensive presentation or "deck" which had been prepared by Frankly's Chief Product Officer, Harrison Shih, at the request of Chung, for purposes of pitching CNN to become a Frankly Chat "partner" (using Frankly's SDK to integrate Frankly's chat function into CNN's web and mobile platform).

284.   This Frankly "deck" contained various statements, graphs and photos, including the following:

**UP YOUR INSIDE GAME <span style="color:red">WITH FRANKLY</span>**
<span style="color:red">**WE'RE CHAT AS A SERVICE.**</span>
Give your users what they want,

Just add the Frankly Chat SDK
**ACTIVE CONNECT ENGAGE**
Your audience in real-time interactive
conversation about any topic at any time. Own
the world's conversation, not just its
information.  In a global conversation about
important issues Join the Conversation
**BREAKING NEWS
CONVERSATIONS**
**Integrate** chat with your current user
experience Available in **any article or topic
stream** **REAL-TIME MESSAGING
LIVE VIDEO COMMUNITY**
Facilitate chat alongside **live video**
*User Demographics & Insights*
Track time spent online and in-app
**GETTING TO KNOW YOUR USERS**

285.   This Frankly Presentation and its various claims as to Frankly's SDK technology, data analytics, etc., was, according to Plaintiff's Confidential Witness No. 1, "complete BS."  This was false and misleading information simply made up and inserted into this Frankly Deck *at the request and direction of Chung*.  Frankly lacked either the SDK technology or the data analytics capabilities claimed in this Presentation, a document Chung gave to Plaintiffs in June of 2015 to induce Plaintiffs to accept Frankly's offer.

286.   As also alleged hereinabove with greater particularity, Defendants' false and misleading statements and omissions were in disregard of and contrary to the most current factual information known to Defendants when such statements and omissions were made.

287.   As further proof of their scienter, and as alleged in detail hereinbelow, Defendants Chung and Schmeichel were "control" persons of Frankly, privy to all of Frankly's financial and business information, who dictated and controlled the public disclosures, statements, representations of Frankly and its agents and underwriters, as well as controlling what information was omitted by Frankly from each such public disclosures, *i.e.* Frankly's failure to disclose material information.

288.   Each of the Individual Defendants authored and/or authorized the March 15 press release by Frankly, announcing to great fan fair that Muzy had been acquired with its 35 million registered users and its guaranteed revenue, false statements made at or about the same time Defendants first approached Plaintiffs, when each Defendant knew at or about this time that:

(a)   KPMG was telling Frankly management it had significant doubt Frankly could continue as a going concern,

(b)   Frankly was about to fire KPMG,

(c)   the motion to dismiss in the *Harnish* case was denied and Frankly Chat was in legal peril,

(d)   Frankly's burn rate was more than $1 million a month but Frankly still had not developed a functioning SDK or data analytics capabilities, and,

(e)   the Frankly license with Victoria's Secret was coming to an end, and Defendants still had not figured out how to monetize that relationship or its relationship with any other SDK "partner."

**PLAINTIFFS' SPECIFIC ALLEGATIONS OF SCIENTER**

*As to JJR/Schmeichel's $10 million Credit Guarantee*

289.   Defendants Frankly, Chung, Schmeichel and JJR each knew in July and August of 2015 that the $10 million credit guarantee provided by Schmeichel and JJR was not real and would not be forthcoming.

290.   Schmeichel and JJR did not have $10 million to loan to Frankly as promised in July and August of 2015, and Schmeichel and JJR had no ability or intention to make good on such credit guarantee, facts of which Chung, Schmeichel and Frankly were well aware in July/August of 2015.

291.   Defendants' motivation for this material omission and misrepresentation is apparent from Defendants' circumstances in July and August of 2015.  Frankly had just

burned through 25% of its cash on hand since it began trading in January of 2015, and had been sternly warned by KPMG about its future as a going concern, a warning issued in April of 2015 at or about the same time as Defendants opened negotiations with Plaintiffs, and three months prior to entering into the Purchase Agreement.

292.    Defendants' admission in those negotiations with Plaintiffs that Frankly and Schmeichel could not guarantee the additional capital necessary to pay for future development of Frankly/WorldNow and its combined business operations, would have been disastrous for Defendants, *i.e.* Plaintiffs would not have sold WorldNow to Frankly, and Frankly would have been in dire financial circumstances, as Defendants' indirectly acknowledged in Frankly's disclosure on page 4 of its August 7 Material Change Report:

> The commitment letter [from JJR] was entered into less than 21 days before the issuance of this material change report, ***which the Company believes was reasonable and necessary in the circumstances as the commitment letter was negotiated and entered into as part of the competitive bid process for the Worldnow purchase transaction and is a condition of closing the transaction.*** Demonstration of the ability to raise additional funding through the commitment letter for the Credit Facility assisted the Company in negotiating the transaction, to the benefit of the Company and its shareholders."

293.    Proof of Chung's and Schmeichel's deliberate and knowing failure to disclose that the guaranteed $10 million Credit Facility would not be provided by JJR or Schmeichel exists in many different forms.

294.    First, the terms of the credit facility were reviewed and approved by the Board of Directors of Frankly, including the immediate payment of a $100,000 Commitment Fee to Schmeichel/JJR, and nothing in that approval or the Acquisition Report suggested that Schmeichel's/JJR's guarantee of the Credit Facility, or Frankly's commitment to pay to Schmeichel/JJR the $100,000 fee within 5 days of execution of the Purchase Agreement, was in any way nonbinding.

295.    Yet Chung never gave to Schmeichel, and Schmeichel/JJR never demanded, the $100,000 finder's fee that, as a part of the credit guarantee, was to be paid to JJR and

Schmeichel within 5 days of execution of the Purchase Agreement.  Had Chung and Schmeichel believed that Schmeichel's/JJR's guarantee of the $10 million Credit Facility was valid and would be forthcoming, then Chung as a responsible CEO would have directed that this $100,000 finder's fee be paid, and Schmeichel as a responsible businessman and Director of Frankly would have ensured it was paid.  Neither ever happened.

296.    Second, the evidence discovered by Plaintiffs and their counsel in the investigation of this case demonstrates that Chung and Schmeichel falsely and fraudulently asserted that the terms of the JJR credit facility were subject to the approval of the TSXV, and that the TSXV ultimately refused that approval, two falsehoods propagated by Defendants to create an excuse for excuse JJR's/Schmeichel's subsequent failure or refusal to deliver on the credit guarantee.

297.    Plaintiffs' evidence demonstrates that the TSXV does not review, approve or disapprove credit terms in a purchase agreement, as legal counsel for the TSXV confirmed during Plaintiffs' prefiling investigation of this case; the specific terms of a credit facility included in a purchase agreement would not be subject to separate TSXV approval.

298.    In addition, neither Chung nor anyone else ever has seen or provided to Plaintiffs any such letter of disapproval from the TSXV.  Only the letters from Nancy Ho of the TSXV, conditionally and finally approving the Purchase Agreement, ever were produced.

299.    In his letter of June 2, 2016, to Gary Gannaway, Chung explicitly acknowledged that Frankly's obligation to provide the Credit Facility was an express condition precedent to Plaintiffs' obligations in the Purchase Agreement, but he asserted that JJR's obligation was conditioned on the TSXV approving the terms of the Credit Facility, falsely asserting that the TSXV had in fact *refused* that approval.

300.    These overtly false statements, deliberately and knowingly made by Chung both before and after the Purchase Agreement was executed, establish both his and

Schmeichel's intent to defraud Plaintiffs with regard to the $10 million credit guarantee, statements designed to induce Plaintiffs to believe this condition precedent was satisfied.

### *As to KPMG's Negative Auditor's Opinion*

301.    Defendants Frankly, Chung, Schmeichel and JJR each knew by May 1, 2015, that Frankly's auditor had expressed serious doubts as to Frankly's ability to survive as a going concern, and each of them was aware of the potentially fatal consequences of such opinion becoming generally known to the investing public or to Plaintiffs.  Frankly's stock would have plunged and Plaintiffs would have rejected Frankly's purchase offer and accepted another far more valuable offer for the purchase of WorldNow.

302.    Everything about Defendants' now well documented scheme to coverup the negative opinion of Frankly's auditor, through Defendants' statements and conduct, supports the conclusion that Defendants were acting deliberately and with a knowing and reckless intent to defraud, an intent to mislead the investing public in general and Plaintiffs in particular.  No other conclusion may be drawn from these facts.

303.    Immediately after KPMG issued its "serious doubts" opinion, KPMG was fired by Defendants, and Frankly's Annual Information Form for the Year Ended 2014 disclosed only that KPMG "had been terminated as the auditor of the Corporation for commercial reasons."

304.    Defendants in this Annual Information Form make no mention of KPMG's significant doubt as to Frankly's ability to survive, offered no explanation as the bases for KPMG's significant doubt or Managements' basis for disagreement.

305.    Almost a year and a half later, in connection with Frankly's currently pending S-1 Registration, Defendants submitted a substantively different Audited Financial Statement for 2014, an entirely different auditor's opinion from yet another auditor (Baker, Tilly), deleting KPMG'S expression of "significant doubt" that Frankly was a going concern, and replacing it with a "clean" auditor's opinion for YE 2014.

306.    This revised Auditor's Opinion by Baker, Tilly provides no explanation for its substantive revisions to the original KPMG Auditor's Opinion, nor does it contain any acknowledgment that it is indeed a revised opinion for YE 2014, or that the original Statement for 2014 contained a negative auditor's opinion.

307.    Each of these purposefully evasive filings and actions by Frankly, failing to disclose the specific reasons for KPMG's significant doubt, not disclosing those concerns in any filings or corporate documents after the firing of KPMG, and filing in 2016, without explanation, a new, whitewashed financial statement for YE 2014, was certified by CEO Chung and approved by the Board of Frankly.  None of these actions can be explained as anything other than a deliberate attempt to mislead Plaintiffs and the public.

### *As to Defendants' Failure to Disclose the True Identity of Etienne Moshevich*

308.    Defendants Frankly, Chung, Schmeichel and JJR each knew that Moshevich from at least January through April of 2015 was an employee or consultant of Frankly, its "Manager of Investor Relations," being paid by Defendants to promote Frankly and its stock to potential and existing investors.  Each also knew that Moshevich published numerous online "research reports," highly bullish and extremely misleading articles about Frankly, written in collaboration with Chung and Schmeichel, explicitly intending to pump Frankly's stock price, while revealing only that he was a shareholder of Frankly.

309.    Defendants' failure to disclose the true identity of its Manager of Investor Relations, Etienne Moshevich, and the motivation behind his plethora of very positive "Research Reports" about Frankly and its financial prospects, is *per se* proof of Defendants' deliberate intent to mislead the investing public and artificially boost the price of Frankly's stock, the price on which Plaintiffs' acquisition of that stock was based.

310.    No other credible explanation exists for Frankly to masquerade its "Manager of Investor Relations" as a "Research Analyst."  Defendants successfully used a Frankly insider to promote its stock with factually misleading reports, reports which to the

investing public appeared to come from an objective third party source.  Defendants'
motivations for this misleading and deceptive scheme are beyond obvious.

### *As to Muzy's and Frankly's User Base*

311.   Defendants Frankly, Chung, Schmeichel and JJR each knew by March of
2015 that Muzy did not have an actual user base of 35 million or anywhere near that
amount, and Defendants Frankly, Chung, Schmeichel and JJR each knew that Frankly
would not be able to convert through its acquisition of Muzy, 35 million new users to
Frankly's existing user base of 2.1 million.

312.   Muzy did not have 35 million actual or active users when its assets were
acquired by Frankly in September of 2014, having lost most of its users in the preceding
nine months, facts which were well known to Defendants Frankly, Chung, Schmeichel and
JJR during the time period March-August of 2015.

313.   Defendants' scienter with respect to their omissions and related misleading
statements regarding the acquisition of Muzy and its purported 35 million users is further
evidenced by the fact that Steve Chung was a close personal friend of Muzy's founder,
Andrew Chen, and Chung knew that Chen would not be willing to "dump" an internet
business for a mere $100,000 if it really had 35 million registered users, or anywhere near
that number, especially one in which more than $12 million had been invested.

314.   Proof that Chung knew Muzy did not have 35 million users that could be
acquired by Frankly for its existing user base of 2.1 million also is provided by the fact that
Chung had not considered this acquisition of Muzy sufficiently material in September of
2014, when he signed the agreement to acquire Muzy's assets for $100,000, even to issue a
press release or report the acquisition in any of Frankly's contemporaneous public
statements or filings.

315.   Not until 6 months later, on March 12, 2015, as alleged herein above, did
Defendants put out a press release, extensively quoting Chung and announcing the
purchase of the Muzy assets.  The critical element of the purchase, according to this press

release, was the fact that Muzy had 35 million users which Frankly would be able to convert to its own user base (a purported 2.1 million), thereby exponentially increasing its revenue and stock value.  Chung further falsely represented in this press release that the combination of Frankly's Chat technology with Muzy's "massive'' user base would bring new life to Frankly.

316.    Also on March 12, 2015, Beacon Securities issued its "Research Report" regarding Frankly's acquisition of Muzy, a press release explicitly based on information provided to Beacon by the Individual Defendants through the Frankly press release.  This "Research Report" praises Frankly management for having instantly increased the Frankly user base from 2.1 million to 37.1 million registered users worldwide.

317.    Beacon states in its "Report" of March 12 that Muzy will allow Frankly to implement its core Chat SDK app into the entire Muzy user base, providing 35 million new users to Frankly's very limited user base, and putting Frankly well on the way to reaching its user base goal by the end of 2015 (40 million), and that as a result of this prodigious growth in its user base, Frankly would dramatically increase its revenue and stock price.

318.    The fact that Chung and Schmeichel and their respective companies knew full well that Muzy did not have 35 million users, or even a fraction of that amount, and that Frankly would not be able to acquire 35 million new users from Muzy's user base, if any, also is provided by the fact that in August of 2015, Frankly notified the remaining users of Muzy that the photo blogging service would be discontinued at the end of 2015.

319.    Further evidence that Chung and the other Individual Defendants knew, when these statements were made in March of 2015, that Muzy did not have 35 million actual users (or anywhere near that amount) and that Frankly would not be able to add more than a fraction of that number to its own user base also is provided by Frankly's contemporaneous tax accounting for the Muzy acquisition.

320.    In its Year End 2014 Audited Financials at Footnote 3, Frankly's then-auditor, KPMG, explained Frankly's accounting policies with respect to accounting for the

value of any good will in connection with the Company's acquisition of another company or its assets (such as the assets of Muzy):

> **(c)     Business combinations and goodwill:** Business combinations are accounted for using the acquisition method as at the acquisition date. The fair value of the consideration paid is the sum of the fair value of assets given and equity instruments issued less the fair value of liabilities incurred or assumed. Goodwill is measured as the fair value of consideration paid less the fair value of the net assets acquired and liabilities assumed on the acquisition date. *If that excess is negative, a bargain purchase gain is recognized immediately in profit or loss.*

321.    On September 16, 2014, the Company entered into the asset purchase agreement with Muzy in which the Company purchased the assets of Muzy for $100,000. These properties and rights included all of the assets of Muzy, including its registered users, its website, the Muzy app, domain names, source codes, contracts, databases, social media accounts and backend infrastructure.

322.    In the Beacon Report of March 2015 regarding Frankly's acquisition of Muzy, Beacon used information from its client, Frankly (provided by Chung and Schmeichel), to characterize the acquisition as "opportunistic," and explained the incredibly low purchase price of $100,000 for Muzy's assets, especially its 35 million registered users, as a coup resulting from the fact that Muzy's founder, Andrew Chen, was business school roommates with Steve Chung.

323.    Despite these glowing pubic statements from Frankly and its spokespersons (Chung and Beacon) as to the purported 35 million new users Frankly would acquire through its acquisition of Muzy, Defendants in the Frankly Management, Discussion and Analysis report of June 1, 2015, recorded on the Frankly balance sheet this acquisition as the addition of only a $100,000 intangible asset.

324.    Defendants, through Frankly, recorded no "bargain profit" from this acquisition, a substantial bargain purchase gain which by Frankly's own accounting policies would have been required had Frankly increased its user base by approximately 1,700% with this acquisition of Muzy (from 2.1 million to 37 million for a mere $100,000).

325.   In the Year End 12/31/15 Audited Financial Statement for Frankly, Frankly declared the assets of Muzy a total loss, and a write-off was taken for the $100,000 purchase price, further evidence that Defendants knew prior to August 2015, that the Muzy assets were worthless and Defendants' claim to having acquired 35 million new users for Frankly's user base was made with knowledge of its falsity.

326.   Defendants' failure to record any "bargain purchase gain" from the acquisition of Muzy is compelling evidence that Defendants did *not* consider Muzy's assets, and in particular its claim to 35 million new registered users that would be added to Frankly's user base, to be factually accurate, and this claim was objectively false.

327.   No such accounting for a "bargain purchase" profit to Frankly ever was recorded in connection with the Muzy purchase or sale, further substantiation that Defendants did not believe the assets of Muzy were worth more than the miniscule amount ($100,000) that Frankly paid, and Defendants' claim to having acquired 35 million new users for Frankly's user base was made with complete knowledge of its falsity.

### As to The Nonexistence of Frankly's SDK and Data Analytics Technologies

328.   Defendants Frankly, Chung, Schmeichel and JJR each knew between March and August of 2015 that Frankly had not developed and did not own or possess a functioning Software Development Kit that would enable new Frankly "partners" to integrate Frankly's chat into their own platforms (including WorldNow's platform). Frankly's so-called SDK was not scalable, *i.e.* could not applied to more than one site or app, and each of these Defendants was well aware of this by March of 2015.

329.   Notwithstanding Defendants' knowledge that Frankly did not have and never developed the SDK technology it was touting, they continued to make explicit statements to the contrary, including this statement in a Frankly Presentation dated June 18, 2015:

**UP YOUR INSIDE GAME** WITH FRANKLY
WE'RE CHAT AS A SERVICE.
Give your users what they want,
**Just add the Frankly Chat SDK**

330.    Specific and direct proof of Defendants' scienter with respect to Frankly's and Chung's intentional, deliberate and repeated omissions and misrepresentations regarding Frankly's purported SDK technology is provided by Confidential Witness No. 1.  Frankly's former Chief Product Officer who worked closely with Chung from 2013 until early of 2017.  Confidential Witness No. 1 confirmed that Frankly did not have and never developed the technology for a Software Development Kit, one that was scalable and would allow Frankly's chat function to be integrated into any other brand's platform.

331.    Confidential Witness No. 1 also said that he discussed the need to develop the SDK technology with Chung, that Chung understood that Frankly did not have a functioning SDK, and that when Witness No. 1 urged that Chung spend some of Frankly's remaining cash on development of this technology, rather than on the purchase of WorldNow, Chung simply told him not to worry about it. Confidential Witness No. 1 left Frankly in January 2017

332.    Confidential Witness No. 1 also said that at Chung's request he prepare a marketing presentation to CNN in June of 2016, and that, as Chung was well aware, this CNN presentation was full of "total BS."  On one page of that presentation Frankly touted Frankly's Chat product and the potential synergies with CNN's media platform:



333.    Frankly's CNN deck also falsely stated that Frankly had various data analytic capabilities that CNN could benefit from, as represented in the following infographic:

89.

1
2
3
4
5
6
7
8
9
10



11   334.    Chung's admissions he understood this CNN Deck was "full of BS," and

12   Chung's transmittal of this Deck to Gary Gannaway as an inducement for Gannaway to

13   accept the terms of Frankly's offer, demonstrate that Chung's many false and misleading

14   statements and omissions to the public and to Plaintiffs regarding its SDK and its data

15   analytics technology were deliberately and recklessly made, with the intent and for the

16   purpose of artificially inflating the price of Frankly's stock and inducing Plaintiffs to sell

17   WorldNow to Frankly for cash and Frankly stock.

18

19   ***As to the Disappearance of the Promised Convergence and Synergies***

20   335.    Defendants Frankly, Chung, Schmeichel and JJR each knew by April of 2015

21   that Frankly had neither the technology nor the capital necessary to meet its various

22   promises and projections to Plaintiffs and the investing public, *i.e.* to realize enormously

23   enhanced revenue and stock values through the promised convergence of Frankly's

24   purported chat and data analytics technology with Plaintiffs' content management platform

25   and technology.

26   336.    Defendants nonetheless presented Plaintiffs in April of 2015 with a "pitch

27   deck," prepared by Defendants specifically for Plaintiffs, containing numerous false and

28   material statements and omissions regarding the exponential increase in value to be

90.

achieved through the convergence of Frankly's and WorldNow's digital platforms and technologies, statements made through several graphic illustrations (depicted below). Through these illustrations, provided to Plaintiffs, Defendants falsely and intentionally misled Plaintiffs to believe that:

      (a)    Frankly Chat was the future of Frankly's business and profitability,

      (c)    Frankly's SDK is functioning and ready for convergence,

      (d)    Frankly's data analytics capabilities were well established, and

      (e)    The convergence of WorldNow's media content management system and advertising platform with Frankly's existing chat, SDK and data analytics technology guaranteed exponential growth in the revenue and stock value of post-acquisition Frankly.



1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



27
28

92.







93.

1
2
3
4
5
6
7
8
9
10



11
12

337.    These statements made directly to Plaintiffs, reinforced by the many prior

13
statements Defendants made in their public filings, press releases and oral and written

14
statements to the investing public and Plaintiffs, intentionally lead Plaintiffs to believe that

15
if Plaintiffs were to sell WorldNow to Frankly, the synergies between the two companies'

16
technologies, platforms and products would be substantial and the additional ad and data

17
analytics revenue would be prodigious.  These statements were deliberately and recklessly

18
made to induce Plaintiffs to sell WorldNow to Frankly, for cash and Frankly stock (rather

19
than accepting any of Plaintiff's competing bids for WorldNow).  No other scienter is

20
possible.

21
338.    Defendants' motivation and scienter in making these statements to Plaintiffs

22
also are evidenced by the conduct of Defendants immediately following the close of the

23
transaction. In the weeks and months that followed the August 25th closing, Defendants

24
made an immediate, 180 degree pivot away from each of the Frankly products and business

25
plans touted in this Presentation Deck, exclusively to the assets and business of World

26
Now.  By September of 2015, all that was left of Frankly was WorldNow's preexisting

27
business.

28

COMPLAINT

339.   Defendants even changed the name of WorldNow to "Frankly Media" to conceal Frankly's abandonment of its own chat products, technology and business plan. Between January 5, 2015 and August 25, 2015, Defendants successfully employed their own version of "pump and dump" meets "bait switch," and Plaintiffs were the direct victims.

## LOSS CAUSATION

340.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.

341.   Defendants engaged in a scheme to deceive the market and artificially inflate the prices of Plaintiffs' securities, operating as a fraud on Plaintiffs by failing to disclose to the public or to Plaintiffs that the Company's public information and direct written and oral statements to Plaintiffs and the public were omitting material information which omission rendered materially misleading the various statements Defendants made both to the public and directly to Plaintiffs.

342.   When Defendants' material omissions and resulting misrepresentations were disclosed and became apparent to the public, the price of Frankly's stock fell precipitously as the prior artificial inflation came out of the Company's stock price. As a result of their purchases of their securities in Frankly, Plaintiffs suffered substantial economic loss, damages under the federal securities laws, *i.e.* Plaintiffs were induced to sell their membership/ownership interest in WorldNow to Frankly in return for cash along with an approximate 10% interest in Frankly, a stock interest now almost worthless, rather than selling their ownership interest in WorldNow for appreciably more ultimate value offered by another interested bidder.

343.   Because Defendants failed to disclose material facts concerning the Company's business model, technology, user base and legal rights, and therefore its profitability, Plaintiffs were not aware of the true financial state of the Company and its stock value. Defendants presented a misleading picture of Frankly's business and prospects,

95.

and sold a business model to Plaintiffs that Defendants had secretly decided to abandon as unlikely ever to generate a profit. Defendants profited from this misleading picture by selling to Plaintiffs 3,032,000 restricted shares of Frankly at the inflated price of $2.0466/share, for a total cost to Plaintiffs of $6,232,000.

344.   Instead of disclosing to Plaintiffs the true state of the Company's business, Defendants concealed the truth, causing Plaintiffs falsely to believe that Frankly remained committed to the business model it had pursued since its inception.

345.   Defendants' false and misleading statements caused Frankly's common stock to trade at artificially inflated levels throughout the period January-August, 2015. As a direct result of the Company's previously undisclosed problems coming to light, Frankly's common stock price fell precipitously from its value of $2.0466/share at the time of the Purchase Agreement to approximately 10% of that price as of the filing of this Complaint

346.   The decline in the price of Frankly's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Frankly's stock price decline negates any inference that the diminution of the stock price and the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

347.   The economic loss suffered by Plaintiffs was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Frankly's securities and the subsequent decline in the value of Frankly's securities when Defendants' prior omissions and other fraudulent conduct were revealed. A review of the historic stock price of Frankly's Stock relative to Frankly's market manipulation confirms that cause and effect.

348.   Frankly has traded publicly on the TSXV and the regulatory portal for various filings in connection with companies traded on the TSXV is called SEDAR. Tracking the sequence of material filings on SEDAR for Frankly during the eleven month period through November 2015 reveals a consistent pattern of the stock price responding to the statements and filings of Defendants and their spokespersons.

96.
COMPLAINT

### *Indictments of Kit Digital Senior Executives*

349.   With respect to the stock price and stock volume profile of Frankly's publicly traded stock during the June 2015 through December 2015 period, there is an odd stock price movement on September 28, 2015. On this day the stock price dropped nearly 16.5% in one day. This was after a relatively quiet period where the stock traded in a reasonably tight range for the preceding 30 days.

350.   There is no public filing by the Company in and around this day that would explain such a serious drop in price. There is, however, an event that was finally disclosed during this time period, but not by Defendants, that apparently had a major impact on Frankly's stock.  During the first half of September 2015, indictments were handed down against two Kit Digital senior executives, information that appears to have negatively affected the price of Frankly stock because both Defendants Chung and Schwartz previously were executives at Kit Digital during the period of alleged securities fraud.

351.   The integrity and executive management experience and pedigree of Schwartz and Chung were consistently cited by Defendants as a benefit to Frankly and its shareholders, with no mention of the rampant fraud within Kit Digital or the extent of their involvement therein.  Only very recently, in June of 2017, did Defendants' disclose Chung's involvement in Kit Digital during the period of alleged widespread accounting and securities fraud, and Defendants have not disclosed Schwartz's involvement in Kit Digital as executive vice president and general counsel throughout the period of alleged fraud.

### *Frankly Stock Performance Versus the Broad Market*

352.   Frankly's common stock performed dismally on the Toronto Stock Exchange during the post-acquisition period in 2015. *i.e.* after August 25, from a high of $56.10 on June 9, 2015 (adjusted for the February 2017 17:1 reverse stock split) to well under $12.00 by the end of the year.

353.   Frankly's stock performance is compared to the three broad market averages, the S&P 500 Index, the Russell 2000 small cap stock index, and the NASDAQ broad

market index in the chart below. An examination shows the three major indices holding up well throughout 2015 and ending **up** between 10% and 20% by the end of the year. This contrasts to Frankly, which fell precipitously beginning in June and ended up down over 80% on the year. This would debunk any theory that Frankly's stock performance was dragged down by the overall performance of the market.

354.   The events set forth above paint a picture of omission and deceit by Defendants from January 5, 2015 through August 25, 2015, a pattern directly affecting the stock price, supported by the various public research reports put out by Moshevich and Beacon Securities in extolling the virtues of a business plan that never gained traction.

355.   In light of these disclosures of previously undisclosed material, adverse information pertaining to Frankly, its stock lost nearly all of its value by the end of 2015. Frankly stock currently trades between $3.00 and $5.00 a share, or (adjusted for the 17/1 stock split) between 18 and 30 cents a share, compared with the $2.0466 a share which Plaintiffs paid for 3,032,000 shares in August of 2015

## REASONABLE RELIANCE BY PLAINTIFFS

356.   The essence of Defendants' fraud as alleged herein is Defendants' willful failure to disclose pertinent information necessary to make Defendants' related statements not misleading.  Such material omissions included:

> (a)   Defendants' failure to disclose that Schmeichel and JJR had neither the ability nor the intention to provide the promised $10 million credit facility, and Frankly did not intend to invest $5 million of its remaining capital to implement and market the promised convergence,
>
> (b)   Muzy's user base had shrunk considerably and Muzy was failing rapidly; Frankly would acquire few if any of Muzy's remaining users,
>
> (c)   KPMG had issued a negative auditor's opinion and had significant doubt Frankly would survive,
>
> (d)   Frankly's SDK did not work

98.

(e)     Frankly had no data analytics capabilities,

(f)     the Victoria's Secret deal was a bust and had expired in April.

357.    Under these circumstances, Plaintiffs need *not* prove they relied on Defendants' failures *to disclose* pertinent information.  Plaintiffs nonetheless will attest that they did in fact rely on Defendants' statements which were rendered misleading by their material omissions regarding, *inter alia*:

(a)     Frankly's $10 million Credit Facility and access to additional capital,

(b)     Frankly's exponentially expanding user base (from 2m to 37m),

(c)     Frankly's data analytics technology,

(d)     Frankly's thriving SDK business, especially its Victoria's Secret deal,

(e)     Frankly's ability and intention to converge the platforms and digital technologies of the two companies.

358.    But for Defendants' material omissions and misrepresentations as alleged hereinabove, Plaintiffs would not have accepted the terms and conditions of the Purchase Agreement to sell their interest in WorldNow to Frankly, and would not have acquired stock in Frankly in return, instead accepting another, ultimately far more valuable offer.

359.    Gary Gannaway had invested $32 million and 17 years of his life in WorldNow.  He would not have considered selling WorldNow to Frankly for only $19 million and Frankly stock, had Defendants told him the truth about Defendants' plans to jettison all of the existing Frankly products upon acquisition of WorldNow. Rather, he would have sold WorldNow to another competing bidder offering a deal that would have enabled Plaintiffs to earn approximately $15 million more in cash and stock than the Frankly offer.

360.    Both Plaintiffs were misled by Defendants into believing that with the promised convergence and synergies of Frankly's social and mobile platform and technology with WorldNow's platform, its user base and technology, the value of Frankly after the acquisition would grow to ten times its then current value, and Plaintiffs' stock in Frankly, acquired for some $6.2 million, would be worth more than $60 million.

361.    Although Plaintiffs were sophisticated business people in general, they were both unsophisticated in the chat and mobile aspects of Frankly's business and technology, and relied on Defendants and their fiduciary, Louis Schwartz, to advise them in this regard. And as alleged herein, Schwartz breached his fiduciary duties to Plaintiffs and failed to perform adequate due diligence and/or failed to disclose to Plaintiffs the contrary or negative information regarding Frankly he was aware of or should have been aware, as a result of his own financial interest in steering the deal to Chung and Frankly, *i.e.* he was guaranteed a well-paid position with Frankly, but not with any other interested bidder.

362.    Plaintiffs were relentlessly wooed by Defendants, especially by Chung, induced to accept the Frankly offer by Defendants' bombardment of Plaintiffs with intentionally deceptive "third party" research reports, including those of Moshevich, Cormark and Beacon, and by Chung's persistent salesmanship, as exemplified by Chung's concluding sentence in his email to Plaintiffs of May 25, 2015**: *"Gary, are you sure you don't want to take 100 percent stock?"***

363.    Under all of the aforementioned circumstances, Plaintiffs reasonably relied on and were misled by Defendants' fraudulent acts and statements to accept the terms of the deal and acquire almost 10% of Frankly stock, instead of accepting what would have been a far more valuable offer from another bidder, to their substantial detriment and financial harm.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

364.    The market for Frankly's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Frankly's securities traded at artificially inflated prices from March through August of 2015.  Plaintiffs acquired the Company's securities relying on the integrity of the market price of Frankly's securities and market information relating to Frankly, and were damaged thereby.

365.   The artificial inflation of Frankly's stock from March through August of 2015 was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing Plaintiffs to be induced to sell WorldNow to Frankly and to buy Frankly's stock rather than selling WorldNow to another buyer. As described herein, Defendants made or caused not to disclose and therefore to be omitted from their public statements a plethora of material information, rendering the statements and information Defendants did make or disclose materially false and/or misleading statements about Frankly's business, prospects, and operations.

366.   These material misstatements and/or omissions created an unrealistically positive assessment of Frankly and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times before the acquisition of WorldNow, and when disclosed, negatively affected the value of the Company stock. Defendants' omissions and materially false and/or misleading statements to Plaintiffs and to the market induced Plaintiffs to purchase the Company's securities at such artificially inflated prices, rather than taking the offer of a competing bidder, and each of them has been substantially damaged as a result.

367.   At all relevant times, the market for Frankly's securities was an efficient market for the following reasons, among others:

(a)   Frankly's stock met the requirements for listing on the TSXV, and was listed and actively traded on TSXV, a highly efficient and automated market;

(b)   As a regulated issuer, Frankly filed periodic public reports with the Canadian Regulatory Authorities, including the TSXV and the Ontario Securities Commission;

(c)   Frankly regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-

101.

ranging public disclosures, such as communications with the

financial press and other similar reporting services; and/or

(d)     Frankly was followed by securities analysts employed by

brokerage firms who wrote reports about the Company, including

securities analysts Beacon Securities and Cormark Securities,

and these reports were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these

reports was publicly available and entered the public

marketplace.

368.    As a result of the foregoing, the market for Frankly's securities promptly digested current information regarding Frankly from all publicly available sources and reflected such information in Frankly's stock price. Under these circumstances, Plaintiffs as purchasers of Frankly's securities suffered substantial injury through their purchase of Frankly's securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

369.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and material omissions pleaded in this Complaint.

370.    The statements alleged to be rendered false and misleading by Defendants' material omissions all relate to then-existing facts and conditions.

371.    To the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

372.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those

false forwardlooking statements because at the time each of those allegedly forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Frankly who knew that the statement was false when made.

## SECOND CAUSE OF ACTION

### (Violation of Section 20(a) of the Exchange Act)

### (Controlling Person/Entity Liability)

### (Against SKP, Chung and Schmeichel)

373.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

374.    The Individual Defendants, SKP, Chung and Schmeichel, each acted as controlling persons of Frankly within the meaning of Section 20(a) of the Exchange Act.

375.    By virtue of their high-level positions with Frankly (Chung was CEO and Chairman of the Board, Schmeichel was a founder, Board Member and Head of Frankly's Audit Committee, and SKP was a founder and controlled 3 of the 6 board seats, their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with regulatory authorities and disseminated to the investing public, the Individual Defendants had the actual power to influence and control and did influence and control, directly and indirectly, the decision-making of the Company, including the content and dissemination of the statements which Plaintiffs contend are false and misleading, the terms and conditions of Frankly's offer to acquire WorldNow and the Purchase Agreement.

376.    As alleged more fully hereinbelow, each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or

shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

377.    Because of their positions within Frankly and the access to material non-public information which their positions made available to them, the Individual Defendants knew that adverse facts were not disclosed to, and were being concealed from, Plaintiffs and the investing public, and that the Company's public disclosures were rendered materially false and/or misleading due to such material omissions in the information being disclosed. The Individual Defendants are liable for the false statements pleaded herein, as those statements are "group-published" information, the result of the collective actions of the Individual Defendants.

378.    Each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

379.    The terms and representations of Frankly's offer and Purchase Agreement to acquire WorldNow and sell Plaintiffs their Stock in Frankly were major decisions which were determined by the Individual Defendants.

### *SKP is a Controlling Entity*

380.    SKP is and has been since the inception of predecessor-in-interest TicToc, the controlling shareholder of Frankly, and its founding investor.  As of the date of the closing of the agreement to purchase WorldNow, August 25, 2015, SKP was the largest shareholder of Frankly, owning 9,269,917 shares, 28.9% of the common shares.

381.    In February of 2013, SKP recruited Steve Chung to lead TicToc, its North American venture into mobile messaging. Chung was selected in part due to his familiarity with several SKP executives. Since then Chung has been and remains the CEO of TicToc (now Frankly), serving at the discretion of SKP.

382.    In a February 2016 Forbes online interview with Chung, Chung explained how Frankly grew out of his partnership with SKP:

> **Feldman:** Tell me about the company.
> **Chung:** We first started in February 2013. I wanted to strike out on my own, and have my name on the door. And an opportunity came up to partner with South Korea's number one telco, SK Telecom. We wanted to tackle mobile messaging because we believed it would transform the way we interact with content and social on mobile devices. That has been born out in Asia, Europe and elsewhere, and in the U.S. with the adoption of Facebook Messenger, WhatsApp and Snapchat.
> **Feldman:** How did that partnership with SK Telecom come about?
> **Chung:** I knew a few of the executives at SK, and they were looking for a CEO to start this venture with. I was looking at the same opportunity and the stars aligned. SK Planet, its Internet services subsidiary, put in $6 million to start, and $14 million to date. We've had our twists and turns. We're in phase three of our development even though we are only three years old. Phase one was mobile messaging for our own consumer app that competed with Snapchat. Phase two was B2B. It was white-label messaging. Now we're in phase three. We said, let's not just do messaging, but take over the entire app, so it is a platform where customers can publish their content. We got into that with the acquisition of WorldNow, which had customers like Raycom and Meredith Publishing.  Customers can publish their content. We got into that with the acquisition of WorldNow, which had customers like Raycom and Meredith Publishing.

383.    As described in this online article from June of 2013, TicToc/Frankly was founded by SKP as its first effort to build tech companies in the US:

> **South Korea's SK Planet to Invest Up to $1 billion in U.S.**
> *By Jessica E. Lessin*
> Jun 26, 2013 4:41 pm ET
>
> *SK PLANET*
>
> SK Planet's Jinwoo So
> SK Planet, the Internet services arm of wireless giant SK Telecom, is trying to establish a new home in the U.S.
>
> Jinwoo So, chief executive of SK Planet, said in a recent interview that the maker of popular e-commerce and messaging services in South Korea, will spend between $500 million and $1 billion to buy, invest in and build tech companies in the U.S. over the next three to five years. ***The first effort it is backing, a new messaging app called Frankly, is expected to launch this summer***. A U.S. team of around 40, including alumni of Google and Apple, is already brainstorming new mobile video, commerce and education services.

105.

1

2       384.    SKP contributed the initial $6 million to capitalize Frankly, and on March 14,

3    2014, Frankly issued an unsecured convertible promissory note to SKP in exchange for an

4    additional $6,500,000 in cash from SKP.

5       385.    SKP is a major shareholder of Frankly stock. In January 2014, SKP acquired

6    2,536,232 common shares of Frankly stock for $3,500,000. By the beginning of 2015, SKP

7    owned approximately 42.7% of Frankly's aggregate common shares and Class A restricted

8    voting shares. As of both December 31, 2015 and June 30, 2016, SKP owned

9    approximately 28.9% of the aggregate common shares and Class A restricted voting shares.

10      386.    As of February 2016, SKP had invested over $14 million in Frankly and its

11   operations. This funding enabled SKP to exert significant control over CEO Chung, and in

12   turn, the operations and affairs of Frankly and its day-to-day operations, as well as control

13   over its treatment of discrete events.

14      387.    SKP also has controlled the sales of Frankly stock since at least July of 2013

15   when SKP and six individual South Korean investors simultaneously entered into

16   subscription agreements to purchase a total of 2,061,463 shares of Frankly common stock

17   at a price of $1.25 per share. SKP purchased 1,546,000 common shares of Frankly stock

18   while the six individual South Korean investors purportedly purchased the remaining

19   515,463 shares.

20      388.    In July of 2013, Frankly *repurchased* 323,998 common shares from those six

21   South Korean investors for a nominal price of $0.0001 per share.

22      389.    Although the individual South Korean investors who invested in Frankly

23   with SKP purportedly paid more than $644,000 to purchase their 515,463 shares, those

24   same individuals immediately resold the majority of those shares back to Frankly for a

25   *total o*f $32.40, a book loss of $644,296, a bizarre transaction apparently designed by SKP

26   to avoid certain legal or tax consequences for SKP and/or its owners.

27      390.    All of the members of Frankly's original technical team were former

28   employees of SK Telecom, the parent company of SKP.  This use of a technical team

entirely of SKP's choosing was designed to, and did in fact, consolidate SKP's control over the day to day activities of Frankly.

391.    Since its creation by Schmeichel and SKP, Frankly also has entered into a number of service agreements with SKP and its affiliates, demonstrating an alter ego relationship between SKP and Frankly.

392.    TicToc, the predecessor of Frankly, focused on development and marketing of its "TicToc Plus" messaging technology. Frankly and SKP together developed the original Frankly Chat product and technology. This technology was gifted by Frankly to SKP on April 29, 2013, and to this day, SK also maintains physical possession in South Korea over unknown amounts of Frankly's other intellectual property assets.

393.    In 2014, Frankly Co. entered into a services agreement with SKP pursuant to which it provided access to certain members of its mobile development team in connection with SKP's general development of mobile applications and related products. The services agreement generated $161,501 and was terminated in October 2014.

394.    In an agreement terminated in September 2015, SKP provided to Frankly market research, mobile application development, and administrative support for Frankly's back office operations, demonstrating SKP's control over Frankly's day to day operations.

395.    Since Frankly's creation, most of its executives and directors have come from SKP and its affiliates, demonstrating that SKP both directly and indirectly controls on a day-to-day basis the operations of Frankly and its strategic decisions.

396.    Jungsoo Park is and has been the Vice President of Operations of Frankly since March 2013. Park is currently in charge of the day-to-day operations of Frankly, as well as its business planning and communications with its board of directors. Park also leads the strategic planning for Frankly and helps obtain funding for Frankly operations. Park, a South Korean citizen, is and has been strongly affiliated with SKP, and is a founding executive of Frankly.

397.    Between December 2011 and March 2013, Park was a director at Madsmart, Ltd., a subsidiary of SKP that operates a mobile messaging service. As a director, Park

107.

spearheaded the sale of Madsmart to SKP.  Park then helped form TicToc (now Frankly) on behalf of SKP, putting SKP together with Steven Chung and allowing SKP to pursue its North American initiatives, and immediately becoming TicToc's product manager.

398.    Park's role in forming TicToc on behalf of SKP, and his continued role since the inception of TicToc/Frankly in the day to day operations of this SKP subsidiary, is further evidence that SKP through its surrogates controls the affairs and actions of Frankly, and has done so since its creation in 2013.

399.    In March of 2015 when Frankly and Schwartz first broached the concept of Frankly acquiring WorldNow, three of the six members of Frankly's Board of Directors held senior management positions at SKP:  Mike Lunsford, the CEO of SKP; Jung Woo Sung, its CFO; and Jonghyeok Lim, SKP's Head of Corporate Planning and Strategy. Since that time, throughout the many changes to Frankly's Board, the presence of SKP executives in positions of control at Frankly has remained constant.

400.    Michael Lunsford served as a director of Frankly until April 14, 2016. Lunsford is the current CEO of SKP and has served as a director for shopkick, a subsidiary of SKP, since 2014. Lunsford was replaced as a director of Frankly in April 2016, as a part of SKP's annual reorganization of portfolio company directors.

401.    Jung Woo Sung served as a director of Frankly between August 2014 and August 2015, and again between April 2016 and September 2016.  In January of 2015, Sung represented SKP to oversee Frankly's Initial Public Offering on the Toronto Stock Exchange. Sung also was directly involved in the acquisition of WorldNow.

402.    From July 2012 to October 2016, Sung served as the CFO and Head of Corporate Development for SKP. Sung originated and led the execution of SKP's acquisition of shopkick in October 2014. Sung now serves as shopkick's CFO.

403.    As Head of Corporate Development for SKP, Sung was responsible for the deal origination and transaction execution of SKP's strategic acquisitions and investments. His responsibility was to build SKP's presence in the US through investments in and

acquisitions of businesses, products, and related talent in the fields of Mobile Commerce, Customer Loyalty, and Digital Media.

404.   Sung's position as a former Board Member of Frankly is described by Sung in his Linkedin CV as one of his primary duties for SKP. Sung also acknowledges in his Linkedin CV that he is focused on acquiring businesses such as WorldNow for the express purpose of establishing SKP's presence in the US, thus indicating that SKP executives such as Sung act to further the interests of SKP.

405.   Sung's self-described duty **on behalf of SKP** to serve as a board member of Frankly is further proof of SKP's continuing intent and ability to control Frankly, its day to day operations and its strategic decisions.

406.   Jonghyeok Lim served as a director of Frankly from sometime in 2013 to May of 2015, while at the same time serving as the Head of Strategy and Planning for SKP from October 2011 to today. Prior to assuming his current position within SKP, Lim was for 15 years (1996-2011) employed by SK Telecom Co. Ltd in Seoul, South Korea.

407.   Jihnwoo Kim served on Frankly's Board of Directors from May 2015 until April 2016, replacing former director Jonghyeok Lim. Kim was previously employed by SKP, serving as SKP's Head of New Product Development between March and December 2014 and as the CEO of SKP Planet Global between June 2015 and January 2016. From December 2014, Kim also served as the Vice President and Head of Global Strategy and Business Development for SKP, and has been a Member of shopkick's Board of Directors (an SKP subsidiary) since March, 2017.

408.   On April 14, 2016, Frankly announced that former directors Michael Lunsford and Jihnwoo Kim would be replaced by Choong Sik "Samuel" Hyun and Jung Woo Sung. Both Hyun and Sung hold leadership positions within SKP, further demonstrating a continued practice by SKP of controlling Frankly through the installation of SKP executives to its Board.

409.   Choong Sik "Samuel" Hyun joined SK Group in 1998 and has held a number of senior positions within SKP since that time. Hyun currently serves as the Head of SKP

Planet's Global Planning Team, and since 2012, Hyun has served as a director of SKP. As part of his duties as a director, Hyun assists in mergers and acquisitions, business planning, and serves as a board member for numerous entities in the US, Japan, and China, including Frankly. Hyun's presence on Frankly's board is part of SKP's recurring practice of controlling its subsidiaries, including Frankly, through the repeated and continuous installation of SKP executives to the boards of those subsidiaries.

410.    According to a press release issued by Frankly on April 14, 2016, the changes to Frankly's Board of Directors is a part of SKP's annual reorganization of portfolio directors.  That SKP employs an annual reorganization plan regarding the directors of its subsidiaries evidences that SKP exercises a policy of control over its subsidiaries. The placement of SKP executives into board positions of SKP subsidiaries is a process designed to exert control over the actions of these entities, including Frankly.

411.    Finally, according to Frankly's June 18, 2015 Annual Information Form for Year End 2014, some of Frankly's intellectual property assets are located in South Korea, and such assets, on information and belief, are in the possession of one of SKP's South Korean parent corporations.

### Steve Chung is a Controlling Person in Frankly

412.    Steven Chung is and has been the CEO and Chairman of the Board of Frankly from its inception, and is a co-founder (with SKP) of the Company, and major shareholder.  As such, Chung is a controlling person in Frankly, the person with primary responsibility for the day-to-day operations of the Company, its strategic decisions and its public filings and statements. Chung authored, authorized or co-authored or co-authorized each public statement of Frankly or its spokespersons, certified most or all of Frankly's financial statements, and was the person most knowledgeable with respect to the truth or falsity of the information contained in each of Frankly's public statements and filings

### *Ron Schmeichel is a Controlling Person in Frankly*

413.   Defendant Ron Schmeichel was the founder of WBIII, predecessor in interest to Frankly, and a major shareholder and a member of the Board of Directors of Frankly from its inception in 2013 through June of 2016.  He also was the person most responsible for raising capital for the Company, and his entity, JJR Capital, was a "major investor" in the Company and the guarantor of a purported $10 million credit facility for the Company (a condition precedent to the Purchase Agreement).

414.   Schmeichel also was Chairman of the Audit Committee of Frankly at the time of KPMG's negative opinion and thereafter.

415.   According to Chung in a November 2, 2015 telephone conversation with Plaintiff Gary Gannaway, Ron Schmeichel was his "boss" (along with SKP) and he was threatening to fire Chung unless Chung followed Schmeichel's and SKP's specific directives for operating the Company and cutting costs.

416.   Chung's and Schmeichel's controlling person liabilities also arise from the following facts:

    (a)   each of these Defendants, by virtue of his responsibilities and activities as a senior officers and/or directors of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports;

    (b)   each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and

    (c)   each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

417.    Each of these individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Frankly's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

418.    The Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

419.    As alleged hereinabove, Frankly, Chung and Schmeichel each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants SKP, Chung and Schmeichel also are liable under Section 20(a) of the Act.

## **THIRD CAUSE OF ACTION**

### **(Violation of Cal. Corp. Code §§ 25401, 25501 & 25504)**

### **(Against Frankly, Chung, Schmeichel,**

### **JJR Capital, Schwartz, SKP)**

420.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

421.    California Corporations Code §25401 makes it unlawful for any person to offer to sell or sell a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading.

422.   Defendant Frankly sold the securities in question. Defendants Chung, SKP, Schmeichel, JJR Capital and Louis Schwartz each materially aided and/or abetted the sales, were principals or agents to the persons offering to sell or selling the securities, or were persons who directly benefited from the sales of the stock of Frankly, controlled the persons who directly benefited from the sales, or materially aided the statements or admissions alleged hereinabove.

423.   Said Defendants knew, or reasonably should have known, that Plaintiffs would rely upon and be misled by their omissions concerning, *inter alia*, Frankly's nonexistent and/or nonfunctioning SDK technology, legal rights and monetization rights and capabilities, data analytics technology, inflated user base, credit guarantee and specific financial status (not a going concern), as specifically alleged hereinabove.

424.   Plaintiffs, who exercised reasonable care, had no knowledge of said Defendants' misrepresentations and omissions and relied on such representations, and the omissions causing such statements to be misrepresentations, to their detriment in authorizing and/or approving the sale of WorldNow to Frankly and Plaintiffs' acquisition of stock in Frankly.

425.   If Plaintiffs had known that:

(a)   Frankly had not developed and did not have the SDK, chat and data analytics technology Defendants claimed they had,

(b)   Muzy did not have, and Frankly had not acquired, 35 million new users that Frankly could add to its user base (Frankly only had 2.1 million users of its own),

(c)   JJR Capital and Schmeichel did not intend to loan $10 million to Frankly, and

(d)   Frankly was not then, in the opinion of its auditor, a going concern, then Plaintiffs would not have sold WorldNow to Frankly or acquired stock in Frankly.

426.    Plaintiffs did not begin to suspect they had been victims of the misrepresentations and material omissions made by said Defendants until on or after November of 2016, at which time they and their legal counsel began to investigate, and ultimately discovered by about February of 2017, the scope and existence of Defendants' fraud and misconduct.  And in the first quarter of 2017, Plaintiffs eventually obtained copies of documents confirming their suspicions that Defendants had engaged in improper and fraudulent conduct in January through August of 2015.

427.    As a direct result of said Defendants' violations of the California Securities Laws under California Corporations Code §§ 25401, 25501 & 25504, Plaintiffs have been damaged in the sum of at least $15,000,000.

## FOURTH CAUSE OF ACTION

### (Fraud – Misrepresentation, Suppression of Fact)

### (Against Frankly, Chung, Schmeichel, JJR Capital)

428.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

429.    Defendants Frankly, Chung, Schmeichel, JJR Capital and each of them, made material misrepresentations of fact to plaintiffs and/or omitted to state material facts regarding the proposed acquisition of Plaintiffs' interest in WorldNow and the sale to Plaintiffs of stock in Frankly, as set forth above.  Defendants Frankly, Chung, Schmeichel, JJR Capital were at all times relevant hereto active participants in the scheme to defraud.

430.    Said defendants knowingly, intentionally and/or recklessly made such misrepresentations and concealments with the intention to deceive Plaintiffs in order to induce Plaintiffs to sell their interest in WorldNow to Frankly for cash and stock in Frankly. These defendants were, or reasonably should have been aware, of the falsity and misleading nature of their statements.

431.    Plaintiffs reasonably relied on the defendants' misstatements to their detriment.  If plaintiffs had known the true facts, they would not have sold their interest in WorldNow to Frankly, or acquired any stock in Frankly as a result.

432.    As a direct result of said defendants' acts of fraud, Plaintiffs have been damaged in the sum of at least $15,000,000.

433.    The conduct of these defendants and each of them was willful, fraudulent, malicious, and oppressive.  As a result, plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish and deter such defendants.

## FIFTH CAUSE OF ACTION

### (For Constructive Fraud - California Civil Code § 1573)

### (By Plaintiffs GEI and Gary Gannaway

### Against Defendant Schwartz)

434.    Plaintiffs repeat and re-allege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows.

435.    In possessing a fiduciary duty with Plaintiffs, Defendant Schwartz had the means and ability to take undue advantage of and to exercise undue influence over the Plaintiffs. This fiduciary duty was created by law and fact through Defendant Schwartz's relationship of confidence and trust with Plaintiffs and his position as Chief Strategic Officer of Gannaway Web Holdings, and through the execution of the Management Services Agreement with Gannaway Web Holdings in April 2015.

436.    Plaintiffs' reliance on Defendant Schwartz's statements and assurances were reasonable at all relevant times. From the time Defendant Schwartz entered into a Management Services Agreement with Gannaway Web Holdings on April 2015, Defendant Schwartz assumed and accepted the responsibility to investigate and communicate information relating to Plaintiff's investments, asset sales, and other divestitures.

437.    Plaintiffs reasonably trusted the opinion and beliefs of Defendant Schwartz regarding the accuracy of Defendants' ability to comply with their promises and

115.

representations in connection with the sale of Plaintiffs' interests in WorldNow and the sale of Frankly's stock to Plaintiffs. Plaintiffs also reasonably trusted that Defendant Schwartz would fully and adequately advise Plaintiffs as to any material facts or considerations he should discover pertaining to any offers for the purchase of Plaintiffs' interests in WorldNow and as to any stock offered as consideration therefor.

438.    Defendant Schwartz, at all relevant times, continued to perform and accept the duties and responsibilities assigned to him per the Management Services Agreement. Plaintiffs were reasonable in believing that Defendant Schwartz would continue to supply accurate and truthful information and opinions.

439.    Even if Defendant Schwartz had not actually possessed the fraudulent intent to breach his fiduciary duties to Plaintiffs for his own benefit, Defendant Schwartz nonetheless obtained a serious financial and professional advantage through the act of misleading Plaintiffs regarding the actual financial health of Frankly and the veracity of the statements made by Defendants Chung, Frankly, and Schmeichel.

440.    Plaintiffs allege, on information and belief, that Defendant Schwartz misled Plaintiffs in order to obtain the material benefit of securing a corporate officer position with Defendant Frankly upon Frankly's acquisition of WorldNow. Defendant Schwartz would not have secured such a position through an agreement with any other potential buyer of WorldNow. Even if Defendant Schwartz did not intend to fraudulently deceive Plaintiffs, his acts of suppressing information and providing Plaintiffs with misleading statements were motivated by a desire to benefit from the injury caused by Plaintiff's sale of WorldNow to Frankly.

441.    Plaintiffs allege, on information and belief, that Defendant Schwartz misled Plaintiffs regarding the veracity of statements made by Defendants Chung, Frankly, and Schmeichel, and as to the financial state of Frankly, in order to further his personal and professional interests.

442.    Defendant Schwartz accompanied Defendants Chung and Schmeichel to Canada purportedly for the purpose of soliciting funding in excess of the $10 million

116.

already secured by JJR and Schmeichel. At this time, on information and belief, Plaintiffs allege and believe that Defendant Schwartz was aware that the $10 million credit guarantee did not actually exist. Despite this knowledge, Defendant Schwartz suppressed this information regarding the nonexistence of the credit guarantee, and represented to Plaintiffs that the promises made by the Defendants were true.

443.    A financial statement prepared by Frankly's former auditor KPMG expressing doubt as to the financial viability of Frankly was available to Defendant Schwartz at all relevant times. As the Chief Strategic Officer of Gannaway Web Holdings and Plaintiffs' fiduciary, Defendant Schwartz had a duty to investigate and analyze the contents of these reports.  On information and belief, Defendant Schwartz was aware that there were concerns whether Frankly was or would continue to be a "going concern" (*i.e.* whether it would survive long enough to generate profits before its capital was exhausted) and nonetheless represented to Plaintiffs that Frankly was financially stable and the transaction should proceed.

444.    Defendant's misrepresentations were committed, *inter alia*, for the purpose of inducing Plaintiffs to sell their interest in WorldNow and acquire stock in Frankly, to the direct and considerable financial benefit of Defendant Schwartz.

445.    In reliance of such beliefs, Plaintiffs entered into the Purchase Agreement with Frankly.

446.    As a direct and proximate cause of Defendant Schwartz's misconduct alleged hereinabove, Plaintiffs have suffered and will continue to suffer substantial damages in amounts to be determined at trial, including but not limited to the difference between the total consideration Plaintiffs received from Frankly and the total consideration that would have been received from another interested bidder.

447.    As a direct and proximate cause of his misrepresentations to Plaintiffs, Defendant Schwartz obtained a material monetary and professional advantage at the expense of injury to the Plaintiffs.

448.    Defendant's acts and statements in misleading Plaintiffs were committed willfully, maliciously and intentionally, and for purposes of inducing Plaintiffs to sell their interest in WorldNow and acquire stock in Frankly, to the direct and considerable financial benefit of Schwartz.  Accordingly, Defendant's conduct constitutes constructive fraud in violation of California Civil Code §1573.

## SIXTH CAUSE OF ACTION

### (For Breach of Fiduciary Duty)

### (By Plaintiffs GEI, Gary Gannaway

### Against Defendant Louis Schwartz)

449.    Plaintiffs repeat and re-allege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows.

450.    At all times relevant hereto, defendant Louis Schwartz owed an unyielding fiduciary duty of loyalty and due care to protect the interests of GEI and Gary Gannaway, and to act in the best interests of GEI and its majority member, Gary Gannaway.

451.    Plaintiff Gary Gannaway had been friends with Schwartz, the former Chief Digital Officer of the WWE, for many years when in or about February of 2015, Schwartz contacted Gannaway, informing him that Schwartz had left his position as Chief Digital Officer of the World Wrestling Enterprise ("WWE") and was looking for a new position with a company in the digital sector.

452.    Based on his previous experience with Schwartz, Gannaway considered Schwartz a visionary and foremost expert on the digital revolution and the demand for "tv everywhere" (the concept that entertainment content must be available to consumers anywhere, anytime through a multiplicity of digital and mobile platforms and devices, not primarily or exclusively through television screens, subscription services or set top boxes).

453.    Schwartz, in this telephone conversation with Gary Gannaway in January of 2015, and in a two day in person conversation which followed, convinced Gary Gannaway that he would be an invaluable, trusted and loyal advisor and representative to Plaintiffs in

118.

identifying, vetting, and negotiating with, prospective buyers for WorldNow and Plaintiffs' interests therein, especially potential buyers with a strong synergistic presence in the digital world.  In this respect, Gary Gannaway reviewed Schwartz's business CV that Schwartz had forwarded to him. Schwartz's CV describes his expertise and experience as follows:

> Seasoned technology /digital media executive and true pioneer in online and over-the top ("OTT") video delivery, with 20 plus years of experience building and leading global digital technology and media companies with more than 550 people and operating budgets from $20-100 million per year.
>
> Proven expertise in delivering creative and operational excellence to improve market share, gross revenue and EBITDA, focusing on strategy, marketing, product and finance development within developed and emerging markets.
>
> Internationally recognized speaker and expert in new media and IP video conversion, and building collaborative partnerships in culturally diverse environments with exceptional diplomacy and influence.

454.   Schwartz in his conversations with Gannaway stressed his combined knowledge and experience as a digital expert (having been the Chief Digital Officer of the WWE), as well as his professed knowledge and expertise as a lawyer, a financial expert and an investment banker.  Gary Gannaway was impressed by this combination of skills and experience, and asked Schwartz to be his personal advisor and investment banker, offering Schwartz a position as the Chief Strategic Officer of WorldNow, with the responsibilities and expectations as set forth above.

455.   Gannaway liked and trusted Schwartz completely, placing great confidence in Schwartz and expressly relying upon him to provide sound financial and legal advice and analysis with respect to any potential offer for the acquisition of WorldNow, in return for a percentage of any offer he might bring to the table.

456.   Simultaneous with his execution of the Management Services Agreement in April 2015, Defendant Schwartz also entered into a fiduciary relationship with Plaintiffs GEI and Gary Gannaway, as the controlling members of GWH's, and since Schwartz became a corporate officer of Gannaway Web Holdings and a fiduciary to the corporation and its controlling members.

457.   Per the April 2015 Management Services Agreement, Defendant Schwartz's responsibilities as a consultant to WorldNow and its shareholders, including Plaintiffs, involved coordinating and managing WorldNow's strategic sales processes, providing consultation services regarding WorldNow's strategic channel and business sales partnerships, and providing consultation services regarding WorldNow's product strategy. Schwartz's responsibilities also included "coordination and management of the Company's strategic sales process (supporting certain merger and acquisition transactions*, including post transaction business integration*)."

458.   These responsibilities of Defendant Schwartz were significant to the corporation and indicate that he had discretion in managing corporate affairs. Through possession of such discretion, Defendant Schwartz accepted the accompanying responsibility as a fiduciary for WorldNow, but also for its shareholders, Plaintiffs GEI and Gary Gannaway, the CEO and controlling shareholder of WorldNow through his ownership of GEI.

459.   Defendant Schwartz, through his conduct and by his representations and statements to Plaintiffs as alleged herein, purposely and explicitly led Plaintiffs GEI and Gary Gannaway to believe that Schwartz was acting in the best interests of GEI and Gary Gannaway, in seeking out and soliciting potential investment partners or purchasers for Plaintiffs' interests in WorldNow, and in reviewing available information regarding such potential investors or purchasers, and in analyzing and investigating the terms of any offers which would be forthcoming.

460.   Plaintiffs, in reasonably relying on Defendants' representations and statements in this regard, believed that Defendant Schwartz would place the interests of his fiduciaries, GEI and Gary Gannaway, above his own personal interests, and would fully inform Plaintiffs as to any actual or potential conflict of interest he might have.

461.   Plaintiffs also trusted that Schwartz would fully and adequately advice Plaintiffs as to any adverse material facts or considerations he should discover pertaining to

COMPLAINT

any offers for the purchase of Plaintiffs' interests in WorldNow, and as to any stock and other consideration offered therefor.

462.    In reliance on such beliefs, Plaintiffs trusted Schwartz adequately and thoroughly to vet the public statements, promises, assertions and filings of Defendants Chung, Frankly and Schmeichel, to insure the veracity of such assertions and promises.

463.    Plaintiffs also relied upon and trusted Schwartz to insure the accuracy of Defendants' public and private statements regarding the assets of Frankly and the intention and ability of Defendants to comply with their promises and representations in connection with the sale of Plaintiffs' interests in WorldNow and the sale of Frankly's stock to Plaintiffs, and to ably and competently assist with the post-acquisition convergence of the two companies assets, platforms and businesses, as Schwartz expressly agreed to do under the terms of the Management Services Agreement, quoted above.

464.    In breach of his fiduciary duties of honesty, integrity, and full disclosure to Plaintiffs, Defendant Schwartz, Plaintiffs allege on information and belief, intentionally withheld highly material and detrimental information from Plaintiffs in connection with the sale of Frankly stock to Plaintiffs and the concomitant acquisition of WorldNow's stock by Frankly.

465.    In failing adequately or fully to investigate and report to Plaintiffs the true nature of Frankly's financial, legal and business status and condition, Schwartz failed to act in a way that would protect Plaintiffs and serve in their best interests.

466.    Specifically, Plaintiffs allege on information and belief that Schwartz knew, but failed to disclose to Plaintiffs prior to August 25, 2015, that:

        (a)    the $10 million credit guarantee by JJR and Schmeichel was not real, and none of the promised new capital investment in Frankly would be forthcoming,

        (b)    Frankly's SDK did not work; it was not scalable and could not be used to integrate Frankly's Chat function into WorldNow's media platform or any other third party platform,

121.

(c)     Frankly did not have the right or the ability to sell the internet advertising inventory of its brand "partners," including and especially Victoria's Secret.

(d)     Frankly's agreement with Victoria's Secret was a paid promotional opportunity which had expired in April of 2015,

(e)     Frankly did not have and could not acquire 35 million new users through its acquisition of Muzy, or otherwise, and,

(f)     Frankly's auditors, KPMG, had expressed "significant doubt" as to whether Frankly was a "going concern," *i.e.* could generate sufficient revenue before its capital resources were exhausted.

467.    Schwartz also breached his fiduciary duty to facilitate the post-acquisition convergence of WorldNow's and Frankly's assets and platforms, as he expressly promised in the Management Services Agreement, and as implied by the duty off good faith he owed to his fiduciaries.  Schwartz made no effort to facilitate that convergence, and failed to inform Plaintiffs of Defendants' refusal even to seek or attempt such convergence.

468.    As a direct and proximate result of Schwartz's breaches of his fiduciary duties as alleged hereinabove, Plaintiffs have suffered and will continue to suffer substantial damages in amounts to be determined at trial, including but not limited to the difference between the net sales proceeds and consideration Plaintiffs received from Frankly and the net proceeds and consideration Plaintiffs would have received from another bidder for WorldNow.

469.    Defendant's breaches of his fiduciary duties to Plaintiffs were committed willfully, maliciously and intentionally, and for purposes of inducing Plaintiffs to sell their interest in WorldNow and acquire stock in Frankly, for the direct and considerable financial benefit of Defendant Schwartz.  Accordingly, Defendant's conduct constitutes recklessness, oppression, fraud, and malice in the commission of a tort, entitling Plaintiffs GEI and Gary Gannaway also to recover from Schwartz punitive and exemplary damages pursuant to California Civil Code §3294, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     awarding compensatory damages in favor of Plaintiffs and against all Defendants, jointly and severally, for all damages sustained as a direct result of Defendants' wrongdoing, *i.e.* the difference between the value of what Plaintiffs received for the sale of their interest in WorldNow to Frankly, and the value of what Plaintiffs would have received for the sale of their interest in WorldNow to another bidder, in an amount exceeding $15,000,000, and in accordance with proof at trial;

(b)     awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorney fees and expert fees;

(c)     awarding Plaintiffs damages for emotional distress, as provided by law;

(d)     for exemplary or punitive damages in an amount to be determined at trial; and

(e)     such other and further relief as the Court may deem just and proper.


DATED:     July 21, 2017              GORMAN & MILLER


                                     By:      /s/*Kirk M. Hallam*
                                              Kirk M. Hallam
                                              Jun Y. Kwon
                                              Attorneys for Plaintiffs
                                              *Gannaway Entertainment, Inc.,*
                                              *Albert C. Gannaway III and*
                                              *Samantha Gannaway*

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:        July 21, 2017                    GORMAN & MILLER

By:        _____/s/*Kirk M. Hallam*_____
Kirk M. Hallam
Jun Y. Kwon
Attorneys for Plaintiffs
*Gannaway Entertainment, Inc.,*
*Albert C. Gannaway III and*
*Samantha Gannaway*

COMPLAINT